## UNITED STATES COURT OF INTERNATIONAL TRADE

AMSTED RAIL COMPANY, INC. and
ASF-K DE MEXICO S. DE R.L. DE C.V.,

Plaintiffs,

v.

UNITED STATES,

Defendant.

**Court No. 23-00242**

## COMPLAINT

1.      Plaintiffs Amsted Rail Company, Inc. ("ARC") and its affiliated *maquiladora*
ASF-K de Mexico S. de R.L. de C.V. ("ASF-K") (collectively "Plaintiffs" or "Amsted"), by and
through their attorneys, hereby allege and state as follows:

## JURISDICTION

2.      Amsted brings this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and
(a)(2)(B)(i) to contest certain aspects of the final affirmative determination of sales at less than
fair value by the International Trade Administration of the U.S. Department of Commerce
("Commerce") on certain freight rail couplers and parts thereof from Mexico, Case No. A-201-
857 (which, together with concurrent antidumping and countervailing duty investigations on
certain freight rail couplers and parts thereof from the People's Republic of China, constituted
the "2022-23 Investigations").  *See Certain Freight Rail Couplers and Parts Thereof From
Mexico: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative
Determination of Critical Circumstances*, 88 Fed. Reg. 65,153 (Dep't Commerce Sept. 21, 2023)
("*Final Determination*") and accompanying Issues & Decision Memorandum ("I&D Mem.").

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c)
because this action is commenced pursuant to 19 U.S.C. § 1516a.

**PARTIES AND STANDING**

4.      ARC is a U.S. importer of subject freight rail couplers ("FRCs").  ASF K is a *maquiladora* affiliate of ARC that is produces FRCs in Mexico.  Both ARC and ASF-K are interested parties within the meaning of 19 U.S.C. §§ 1677(9)(A) and 1516a(f)(3).  ARC and ASF-K also were parties to the 2022-23 Investigations that led to the determination that is being challenged herein.  Accordingly, ARC and ASF-K both have standing pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c) to commence this action.

5.      Defendant is the United States of America, acting by and through Commerce.

**TIMELINESS OF THE ACTION**

6.      On September 23, Commerce published in the Federal Register the *Final Determination*, 88 Fed. Reg. at 65,153.

7.      As the *Final Determination* involves imports of FRCs from Mexico, a free trade area country within the meaning of 19 U.S.C. § 1516a(f)(9)(A), the time limits for commencing an action before this Court do not begin to run until the 31st day after publication of the *Final Determination* in the Federal Register, 19 U.S.C. § 1516a(a)(5).  Thus, the statutory deadline for filing an appeal of the *Final Determination* is thirty days from October 22, 2023.

8.      Amsted timely filed a Notice of Intent to Commence Judicial Review with the United States Secretary of the USMCA Secretariat on September 28, 2023.  Amsted timely filed a Summons, ECF No. 1, on November 17, within thirty days of October 22, 2023, in accordance with 19 U.S.C. § 1516a(a)(2)(A), 19 U.S.C. § 1516a(a)(5), 28 U.S.C. § 2636(c), and Rules 3(a)(2) and 6(a) of the Rules of this Court.  Amsted timely files this complaint within 30 days of November 17, 2023.

US.359991164.07

## STATEMENT OF FACTS

### The 2021-22 Investigations

9.        On June 17, 2021, ARC engaged the law firm of Wiley Rein LLP ("Wiley") "to provide legal services in connection with advice regarding the elevation and potential prosecution of antidumping of imports of certain couplings and related rail products."

10.        ARC and Wiley formalized this engagement in a letter expressly naming ARC as the client.

11.        A Wiley partner, Daniel B. Pickard ("Attorney"), executed the engagement letter on the firm's behalf. On information and belief, the Attorney is a member of the Bar of this Court, as well as being a member of the Bar of the District of Columbia.

12.        The engagement letter elaborated on the representation's "purpose":

> The purpose of this representation is to evaluate and pursue as
> appropriate a trade remedy investigation, specifically including any
> antidumping and/or countervailing duty proceeding filed on behalf
> of the domestic manufacturing industry, including any petition
> filed with the U.S. Department of Commerce and the U.S.
> International Trade Commission, and any subsequent litigation, as
> well as other litigation and lobbying services related to this
> investigation.

13.        The engagement letter contained an advance waiver of potential future conflicts. By its terms, the advance waiver extends only to Wiley itself—not the Attorney or others. The advance waiver also expressly excludes "matters that are substantially related to our work for you":

> As a large firm with a diverse practice, we represent many other
> companies and individuals. It is possible that during the time that
> we are representing you, some of our present or future clients will
> have disputes or transactions with you, or undertake activities that
> may, directly or indirectly, conflict with your activities and
> interests. For example, we may represent other participants in your
> industry and competing industries—as well as their suppliers,

3

customers, and trade associations. Moreover, we maintain a multidisciplinary practice that includes, but is not limited to, the following practice areas: Appellate, Consumer Product Regulation, Corporate, Election Law & Government Ethics, Employment & Labor, Environment & Safety, Food Drug & Medical Device Law, Franchise, FTC Regulation, Government Contracts, Health Care, Insurance, Intellectual Property, International Trade, Litigation, Privacy & Cybersecurity, Public Policy, Telecom, Media & Technology (TMT), and White Collar Defense & Government Investigations, all of which are described on our firm's website. Notwithstanding our firm's representation of clients across a broad range of practice areas, you agree, except as to matters that are substantially related to our work for you, that we may continue to represent or may undertake in the future to represent existing or new clients in any matter, including litigation, even if the interests of such clients in those other matters are directly adverse to your own. For our part, upon becoming aware of the need, the firm agrees to take reasonable steps to establish and maintain an ethical "screen" designed to provide assurance that firm attorneys who have worked for you or continue to work for you will not, inadvertently or otherwise, share confidential information provided by you with others.

In a trade remedy investigation, we typical [sic] represent several members of the domestic industry that may have interests adverse to other members of any petitioning coalition with respect to future trade or commercial matters. As a result, the domestic producers could be adverse to each other in an antidumping investigation, trade investigation, or other matter. You agree that nothing contained in this representation, including the sharing of information and documents, shall be the basis of a claim of conflict of interest or disqualification against Wiley Rein. Specifically, you agree to waive all current or future conflicts with Wiley Rein with respect to antidumping, countervailing duty, or other trade investigations and will not seek disqualification of Wiley Rein in regard to, or on the basis of, any antidumping, countervailing duty, or other trade remedy investigation.

US.359991164.07

14.     As explained in the accompanying Declaration of Professor Roy D. Simon, Jr., attached hereto as Exhibit A,[1] the supposed advance waiver of conflicts of interest is not a valid waiver because, among other things, it is ambiguous, incomplete, and internally inconsistent.

15.     Through the Attorney, on September 29, 2021, the Coalition of Freight Rail Coupler Producers ("Coalition" or "Petitioner") filed its petition with Commerce and the U.S. International Trade Commission ("Commission"), commencing antidumping duty investigations on FRCs from Mexico and China, and a countervailing duty investigation on FRCs from China (the "2021-22 Investigations").

16.     At the time, the Coalition was composed of two constituent members: ARC and M&T, a domestic producer of FRCs.

17.     The petition principally alleged that certain FRCs imported from China were being subsidized by the Government of China within the meaning of section 701 of the Tariff Act of 1930, *codified as amended at* 19 U.S.C. § 1671 ("Tariff Act"), and were being or were likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act, *codified as amended at* 19 U.S.C. § 1673, and these unfairly traded imports materially injured the domestic industry producing FRCs.

18.     The period of investigation at Commerce for the 2021-22 antidumping duty investigation was January 1, 2021 through June 30, 2021. *Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China*, 87 Fed. Reg. 14,511, 14,511 (Mar. 15, 2021) (preliminary antidumping determination). For the 2021-22 countervailing duty investigation the period of investigation was January 1, 2020, through December 31, 2020.

---

[1] The Declaration attached as Exhibit A is a copy of a declaration that Plaintiffs originally submitted in *Amsted Rail Co., Inc. v. U.S. Dep't of Commerce*, USCIT Case No. 22-00316, which concerns the disqualification issue alleged in this Complaint.

US.359991164.07

*Freight Rail Coupler Systems and Components Thereof from the People's Republic of China*, 87

Fed. Reg. 12,662, 12,662 (Mar. 7, 2022) (preliminary countervailing duty determination).

19.    On October 6, 2021, ARC, again through the Attorney, filed a letter in the 2021-

22 Investigations withdrawing from the petition. The letter explained that ARC would no longer

participate as a petitioning party.

20.    Also on October 6, 2021, the Coalition amended its entry of appearance in the

2021-22 Investigations, removing ARC from the list of Coalition members and adding the

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union, AFL-CIO, CLC ("USW").

21.    On October 14, 2021, ARC's current counsel, the law firm of Faegre Drinker

Biddle & Reath LLP ("Faegre"), entered an appearance in the 2021-22 injury investigations

before the Commission.

22.    Until its withdrawal, ARC supervised and materially contributed to the Attorney's

preparation for the 2021-22 Investigations.

23.    ARC confided in the Attorney its legal strategy for prosecuting FRC-related trade

investigations, competitive decision-making processes, and extensive business proprietary

information relevant to establishing the scope of domestic like product, the domestic industry,

and the conditions of competition.

24.    As one example, the Attorney, after review of certain trade data, contacted ARC

for advice regarding the ultimate final wording of the scope language that the petition for the

2021-22 Investigations should propose to cover. Specifically, in the course of preparing the

petition for this predecessor matter, the Attorney could not reconcile trade data reflecting China-

origin FRC imports, stating that the quantities of imports that he derived from the data seemed to

be too low. The Attorney contacted Jay Allan of ARC to seek his advice concerning the seemingly low values. Mr. Allan explained that the low values were likely due to China-origin FRCs entering Mexico complete or incomplete, and subsequently attached to Mexican-produced rail cars to be imported into the United States without the reporting of the attached FRCs entering into the United States in data collected by U.S. Customs and Border Protection ("CBP"). Mr. Allan further explained in detail how ARC and its maquila, ASF-K, do business with OEM customers that produce rail cars in Mexico. Mr. Allan explained how ARC itself sells to these OEMs with rail car production facilities in Mexico and how ARC's own FRCs produced in Mexico are attached to rail cars in Mexico and then exported from Mexico. In other words, Mr. Allan provided the Attorney with detailed, private information. Mr. Allan of ARC also explained how FRCs attached onto rail cars could cross the border from Mexico into the United States without CBP collecting data on the quantity of rail cars (and consequently FRCs) imported because of special provisions under U.S. law allowing freight cars and certain "Instruments of International Traffic" to be admitted to the United States without being declared in a formal customs entry for consumption. As a result, substantial quantities of FRCs attached to rail cars are imported into the United States that do not appear in U.S. government import statistics.

25.     Realizing the implications of this information relayed by Mr. Allan of ARC, the Attorney's scope language expressly covered within the scope of investigation FRCs and parts thereof that are joined to "non-subject parts" in the country of manufacture of the FRCs or a third country, which would cover Chinese-manufactured FRCs attached to rail cars that are manufactured in Mexico and then cross the border from Mexico into the United States, undetected by the collection of import data.

26.     Although some of these FRCs are likely sourced from China and then sold to rail car producers in Mexico, a much larger quantity of these FRCs are sourced from ASF-K's own production facility in Mexico and sold to the same rail car producers in Mexico. However, because the petition for the 2021-22 Investigations covered only FRCs from China, not FRCs from Mexico, ARC had no reason to worry that this expansion of the scope language would affect ASF-K's FRC production operations.  FRCs produced in Mexico, imported by ARC or attached to rail cars imported by OEM customers, would not be adversely impacted as the scope language did not purport to cover such FRCs produced in Mexico.

27.     Plaintiffs are prepared, if required to do so, to offer additional examples of client confidences that may be used against them in a trade investigation. Mr. Allan of ARC disclosed all of this confidential information, including via telephone calls, in the reasonable expectation and belief that the Attorney would preserve it within the confines of the attorney-client relationship.

28.     The Attorney's emails to ARC described themselves as "Attorney Client Communication – Privileged & Confidential," or variants of that description.

29.     The very information Mr. Allan provided to the Attorney was subsequently used against ARC in the 2022-23 Investigations. The scope of the 2022-23 antidumping duty investigation on FRCs from Mexico (the "Mexico Investigation") included both FRCs imported directly from Mexico into the United States and FRCs attached to rail cars in Mexico that are then exported to the United States. This directly impacts ARC and ASF-K because a substantial amount of the FRCs produced in Mexico are covered by the scope of the 2022-23 Investigations.

30.     In the 2022-23 Investigations, Amsted took a position that was directly opposed to the scope of the investigation for its FRCs that are attached to rail cars in Mexico. ASF-K is

8

the producer of FRCs, but ARC is always the seller of such FRCs, whether ARC imports directly

from ASF-K in Mexico, or ARC sells to customers in Mexico, which customers, in turn, attached

the FRCs to rail cars in Mexico that are then exported to the United States and/or Canada.

Therefore, ARC is impacted by antidumping duty cash deposits currently being collected on the

FRCs that it imports from Mexico.  Specifically, ARC is directly impacted when importing

FRCs, and indirectly impacted when railcars are imported into the United States with FRCs

attached thereto.

      31.    Moreover, the information that Mr. Allan supplied to the Attorney provided the

Attorney with an advantage in the Mexico Investigation before Commerce. Through discussions

with Mr. Allan, the Attorney was aware of ARC's sales structure. The information that Mr. Allan

of ARC provided to the Attorney was used by the Attorney in the Mexico Investigation directly

against ARC. Mr. Allan provided the Attorney with extremely confidential information

concerning its operations in Mexico and how it does business with OEMs in Mexico, which of

course was the focus of the Mexico Investigation before Commerce.  The Attorney formulated

arguments against Amsted (including ARC) throughout the Mexico Investigation based on the

information that Mr. Allan provided to the Attorney in connection with the 2021-22

Investigations.

      32.    Even after Faegre entered its appearance for ARC in the 2021-22 Investigations,

the Attorney attempted to coach ARC into taking positions he would later use against ARC in the

Mexico Investigation. For instance, in March 2022, the Attorney told ARC it would be "very

helpful" if ARC took the position, "to the extent that it is factually correct," that "a significant

part of the decision to move production to Mexico was due to competition with low priced

imports from China."

US.359991164.07

33.     For Wiley's legal services, ARC paid substantial attorneys' fees and costs. On information and belief, it shared these expenses equally with M&T.

34.     Between June 2021 and September 2021, ARC and the Attorney worked together extensively (via correspondence and telephone calls) to prepare the petition for the 2021-22 Investigations. ARC and the Attorney discussed sensitive marketplace conditions and proprietary analysis of Plaintiffs' and competitors' products. Additionally, strategies for the development of the ultimate product scope definition were discussed. ARC provided key input into the petition filed in the 2021-22 Investigations. After the petition was filed, the Attorney had access to and likely reviewed numerous documents submitted under the 2021-22 Investigations that contained confidential information regarding Amsted's competition, distribution practices, pricing practices, operations, and sales figures, among other confidential information. As a result of all this, the Attorney became aware of specific categories of information relevant to ARC's position in the 2021-22 Investigations and Amsted's position in the Mexico Investigation.

35.     On March 8, 2022, the Attorney entered his appearance on the Coalition's behalf to reflect that he had changed law firms.

36.     A certified public accountant ("Accountant"), accompanied the Attorney in his move from Wiley to the Firm. As reflected on the petition's cover page, the Accountant was one of the Coalition's representatives in the 2021-22 Investigations.

37.     The Commission scheduled the final phase of the 2021-22 Investigations following notification of preliminary determinations by Commerce that imports of FRCs from China were subsidized within the meaning of section 703(b) of the Tariff Act, 19 U.S.C. § 1671b(b), and sold at less than fair value within the meaning of 733(b) of the Tariff Act, 19

US.359991164.07

U.S.C. § 1673b(b). Notice was given of the scheduling of the final phase and of a public hearing to be held.

38.     The Commission conducted its hearing on May 12, 2022. Representatives for the Coalition appeared at the hearing accompanied by counsel and submitted pre-hearing and post-hearing briefs, and final comments. Three respondent entities—Strato, Inc., Wabtec Corp., and TTX Company—participated in the final phase.

39.     The Commission announced its unanimous negative vote on June 14, 2022, thus terminating the 2021-22 Investigations and denying the Coalition its requested relief.

40.     In early July 2022, the Commission issued its determinations and released its final report.

41.     Based on the record in the 2021-22 Investigations' final phase, the Commission determined that an industry in the United States was not materially injured or threatened with material injury by reason of FRC imports found by Commerce to be sold in the United States at less than fair value and to be subsidized by the Government of China.

42.     One reason for the negative injury determination was that Chinese FRCs could not be considered a cause of the alleged injury because of significant non-subject FRC imports from Mexico.

### The Mexico Investigation

43.     Just days after certifying destruction of the confidential record from the 2021-22 Investigations, on September 28, 2022, the Coalition filed a second petition commencing the 2022-23 Investigations. The 2022-23 Investigations were a reprise of the 2021-22 Investigations. Both sets of investigations were and are quasi-adjudicative antidumping and countervailing duty investigations before the Commission and Commerce pursuant to the same body of statutory and

US.359991164.07

regulatory provisions. The petitioning party in each investigation was the Coalition, of which ARC is a former member. The FRCs covered by the investigations include E, F, and E/F couplers and E and F knuckles. ARC's confidential information concerning its FRCs was used in the 2021-22 Investigations; much of that same business proprietary information ("BPI") was the focus of the 2022-23 Investigations. The petitions in both alleged that FRCs are being or are likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act. In the 2021-22 Investigations, the period of investigation ("POI") in Commerce's antidumping investigation of FRCs from China was January 1, 2020, through June 30, 2020, and the POI in the China countervailing duty investigation was January 1, 2020 through December 31, 2020. In the 2022-23 Investigations, the POI in the Mexico antidumping investigation was July 1, 2021, through June 30, 2020.

44.     In both the 2021-22 and 2022-23 Investigations, the Coalition's two members were M&T and USW.

45.     M&T is ARC's industry competitor.

46.     The USW represented unionized workers at ARC.

47.     The Coalition contended that the USW became a member "because of the impact of subject imports on USW workers," including purported job losses "in the domestic FRC industry."

48.     In the 2022-23 Investigations, the Coalition hoped to "fix" the negative injury determination in the 2021-22 Investigations by adding imports from Mexico to the 2022-23 Investigations' scope.

49.     To do this, the Coalition painted a target on ARC. As asserted in the Coalition's petition, ARC "was formerly a major producer of FRCs in the United States, relocated

US.359991164.07

substantially all of its FRC production to Mexico and is now an importer of in-scope FRCs that are produced at its Mexican location." The Coalition further asserted that "[t]he AAR certified manufacturing plant in Mexico that manufactures FRC products is ASF-K de Mexico, S. de R. L. de C.V. Sahagun, which is owned by ASF-Keystone, a division of Amsted Industries' Amsted Rail Group." This is the same scenario that existed during the 2021-22 Investigations, yet the Coalition, represented by the Attorney, did not include Mexican imports there.

50.     In the telling of the petition for the 2022-23 Investigations, the "shift to production in Mexico by [ARC] has resulted in a significant market share decrease for domestic producers that chose not to abandon their U.S. employees and to continue their FRC production in the United States."

51.     ARC "relocated its production to Mexico," the Coalition posits in its petition, "to offer prices in the U.S. market for its imported FRCs from Mexico that are competitive with Chinese FRCs." The Coalition fails to mention, however, that ARC's initial relocation of its FRC production in Mexico in 2006 predated the petition for the 2022-23 Investigations.

52.     The petition for the 2022-23 Investigations also included the same expansive scope provision added in the 2021-22 Investigations (described in ¶ 29 above), specifically including within the scope of investigation FRCs and parts thereof that are joined to "non-subject parts" in the country of manufacture of the FRCs or a third country.

53.     This expansive scope language in the petition for the 2022-23 Investigations, however, applied not only to FRCs produced in China, but also to FRCs produced in *Mexico*, meaning that the expansive scope language covered within its sweep a substantial quantity of ARC's FRCs produced in Mexico, imported into the United States for sale, and also imported as attached to rail cars that subsequently cross the border into the United States.

54.     Immediately upon learning of the Attorney's participation in the 2022-23 Investigations as the Coalition's lead counsel, ARC moved to protect itself from the Attorney's betrayal. It directed Faegre to send a letter to the Attorney detailing his ethical violation and requesting the Firm's withdrawal from further representation of the Coalition in the 2022-23 Investigations. Faegre sent a letter to that effect on October 6, 2022.

55.     The Firm's general counsel responded by letter on October 11, 2022. Ignoring that ARC is the importer of record and would be harmed by the trade relief requested in the 2022-23 Investigations, the Firm asserted that ARC actually "stands to benefit" if the 2022-23 Investigations succeed. The Firm further asserted that Wiley negotiated a "robust advance waiver" in the June 2021 engagement letter. The advance waiver applies only to Wiley itself and, further, excludes "matters that are substantially related to our work for you."

56.     On October 12, 2022, ARC filed a letter with Commerce asking it to, among other things: (i) disqualify the Firm from further participation as counsel for the Coalition in the 2022-23 Investigations; and (ii) terminate the 2022-23 Investigations under Commerce's sanctions authority and/or dismiss the underlying antidumping and countervailing duty petitions as Commerce cannot reasonably determine the accuracy and adequacy of the evidence provided in the petition.

57.     One basis for these requests was the Attorney's violation of Rule 1.9(a) of the American Bar Association's ("ABA") Model Rules of Professional Conduct and its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct. Rule 1.9(a) provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially

US.359991164.07

adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

58.     Commerce has the power to disqualify lawyers from practicing in specific trade investigations provided that "good cause" is shown. Commerce's rules state in relevant part: "Any attorney or representative practicing before Commerce, or desiring so to practice, may for good cause shown be suspended or barred from practicing before Commerce, or have imposed on him such lesser sanctions (e.g., public or private reprimand) as the Secretary deems appropriate, but only after he has been accorded an opportunity to present his views in the matter." 19 CFR § 351.313(a).

59.     The term "good cause" is not defined in this rule or in the rule's enabling legislation. However, Commerce has applied the ABA Model Rules, including Rule 1.9(a), to evaluate whether a lawyer or law firm should be disqualified from practicing in antidumping and countervailing duty investigations. *See, e.g.*, Memo. from Enforcement & Compliance, Office, U.S. Department of Commerce, *Silicon Metal from the Republic of Kazakhstan: Representation of Tau-Ken Temir LLP by Squire Patton Boggs*, C-834-811 (Oct. 6, 2020).

**Commerce's Response To The Misconduct Allegations**

60.     On October 18, 2022, Commerce informed Plaintiffs, via a letter from Ms. Begnal, that Commerce would not make a determination as to whether the Firm should be disqualified from further participation in the 2022-23 Investigations.

61.     Specifically, ignoring its own prior administrative precedent, Commerce stated that its decision was premised on its position that 19 C.F.R. § 351.313 is not "intended to cover ethical conflicts uniquely within the province of local Bar authorities."

US.359991164.07

**Prior Proceedings Before the U.S. Court of International Trade
Concerning Misconduct Allegations**

62.     On October 31, 2022, Plaintiffs filed suit in this Court for injunctive and declaratory relief, pursuant to 28 U.S.C. § 1581(i), asking the Court to take the following actions: (1) declare that Commerce's refusal to disqualify the Attorney, the Accountant, and the Law Firm from representing the Coalition in the 2022-23 Investigations as arbitrary, capricious, an abuse of discretion, and contrary to law; (2) direct Commerce to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in the 2022-23 Investigations; (3) preliminarily and permanently enjoin Commerce, its agencies, officers, employees, and agents, and others who were in active concert or participation with them, from allowing the Attorney, the Accountant, and the Firm any access to the 2022-23 Investigations at the Coalition's behest; (4) declare Commerce's failure to timely rescind the Firm's authorization to access Plaintiffs' BPI in the 2022-23 Investigations as arbitrary, capricious, an abuse of discretion, and a denial of due process; (5) preliminarily and permanently enjoin Commerce, its agencies, officers, employees, and agents, and others who are in active concert or participation with them, from disclosing, or requiring Plaintiffs to disclose, to the Attorney, the Accountant, and the Firm in the 2022-23 Investigations BPI submitted by the Plaintiffs; (6) directing Commerce to dismiss, without prejudice to refiling, the petition filed in the 2022-23 Investigations; and (7) provide Plaintiffs such further and additional relief as may be just.  *See* Verified Complaint or, in the Alternative, Petition for Writ of Mandamus, *Amsted Rail Company, Inc. v. U.S. Department of Commerce*, Ct. No. 22-cv-00316 (Oct. 31, 2023) (the "*Prior DOC Appeal*"), CM/ECF Docket Entry No. 5.

63.     Prior to filing suit in the *Prior DOC Appeal*, on October 14, 2022, the Plaintiffs filed suit against the Commission on similar grounds, also pursuant to 28 U.S.C. § 1581(i).

16

*Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Ct. No. 22-cv-00307 (Oct. 14, 2023) (the "*ITC CIT Appeal*"), CM/ECF Docket Entry No. 14.

64.     On November 16, 2022, the Court in the *ITC CIT Appeal* dismissed Plaintiffs' complaint without prejudice to refiling under 28 U.S.C. 1581(c).  *ITC CIT Appeal*, Slip Op. 22-124, CM/ECF Docket Entry No. 88.  The CIT did not address the merits of Plaintiffs' claims, but instead held that the remedy available to Plaintiffs under 28 U.S.C. § 1581(c) is not manifestly inadequate, and therefore jurisdiction under 28 U.S.C. § 1581(i) was not available.  *ITC CIT Appeal*, Slip Op. 22-124, at 32-33.

65.     On December 20, 2022, Plaintiffs appealed to the U.S. Court of Appeal for the Federal Circuit ("CAFC") the CIT's opinion and final judgment in the *ITC CIT Appeal*.  *Notice of Appeal of Final Judgment* (Dec. 22, 203), *ITC CIT Appeal*, CM/ECF Docket Entry No. 101.

66.     On January 10, 2023, the CAFC docketed the appeal, styled as *Amsted Rail Company, Inc. v ITC*, No. 2023-1355 (the "*ITC CAFC Appeal*").  *See Notice of Docketing*, Case No. 23-1355 (Jan. 10, 2023), *ITC CAFC Appeal*, Doc. 1-1.

67.     On January 13, 2023, Plaintiffs and the other appellants in the *ITC CAFC Appeal* filed a motion asking the CAFC to set an expedited briefing schedule.  *See Appellants' Emergency Motion to Expedite* (Jan. 13,2023), *ITC CAFC Appeal*, Doc. 26-1.

68.     On the same date (January 13, 2023), Plaintiffs and the other appellants filed their opening brief in the *ITC CAFC Appeal*.  *See Plaintiffs-Appellants' Opening Brief* (Jan. 13, 2023), *ITC CAFC Appeal*, Doc. 27.

69.     On January 23, 2023, the CAFC denied Appellants' motion, but stated that the parties should not anticipate extensions of time, and the case would be placed on the next

available oral argument calendar after briefing is complete.  *Order* (Jan. 23, 2023), *ITC CAFC Appeal*, Doc. 42.

70.     On February 24, 2023, the CIT in the *Prior DOC Appeal* entered an order staying the action pending final resolution of all appellate review proceedings in the *ITC CAFC Appeal*. *See Order* (Feb. 24, 2023) *Prior DOC Appeal*, CM/ECF Docket Entry No. 59.

71.     The parties in the *ITC CAFC Appeal* completed briefing on February 27, 2023. *See Plaintiffs-Appellants' Reply Brief* (Feb. 27, 2023), *ITC CAFC Appeal*, Doc. 48.

72.     On June 30, 2023, the CAFC having not yet calendared oral argument and the Commission's final injury investigation nearing completion, the Plaintiffs decided that the passage of time had essentially mooted their request for the Commission to disqualify the Attorney, the Accountant, and the Firm from the pending final injury investigation. Accordingly, after securing the consent of the other parties, Plaintiffs filed a Joint Stipulation of Voluntary Dismissal of the *ITC CAFC Appeal* on June 30, 2023. *Joint Stipulation of Voluntary Dismissal* (June 30, 2023), *ITC CAFC Appeal*, Doc. 89.

73.     The CAFC dismissed the *ITC CAFC Appeal* on July 5, 2023.  *Order* (July 5, 2023), *ITC CAFC Appeal*, Doc. 90.

74.     On July 18, 2023, Plaintiffs filed a notice of dismissal of the *Prior DOC Appeal* pursuant to USITC Rule 41.(a)(1)(A)(i).  *Notice of Dismissal* (July 18, 2023), *Prior DOC Appeal*, CM/ECF Docket No. 60.

75.     On July 19, 2023, the CIT entered dismissal of the *Prior DOC Appeal*.  *Order* (July 19, 2023) *Prior DOC Appeal*, CM/ECF Docket No. 61.

US.359991164.07

**Procedural History Relating to Commerce's Conduct of Investigation**

76.     On October 18, 2022, based on the allegations in the petition, Commerce initiated the Mexico Investigation.  *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico: Initiation of Less-Than-Fair-Value Investigations*, 87 Fed. Reg. 64,444-64,450 (Dep't of Commerce Oct. 25, 2022) ("Initiation Notice").

77.     In the Initiation Notice, Commerce adopted scope language designed to include coupler parts "that have been further processed or further assembled, *including those coupler parts attached to a railcar in third countries*."  *Id.* (emphasis added); *see also id.* ("Subject freight railcar couplers and parts are included within the scope … whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar.").

78.     On November 17, 2022, interested parties, including Amsted, filed comments on the proposed scope of the antidumping investigation.  Amsted urged Commerce to revise the scope to remove the language purporting to cover FRCs attached to railcars.

79.     On November 30, 2022, Amsted filed its response to Section A of Commerce's questionnaire.

80.     On December 21, 2022, Petitioner filed a letter (the "MNC Allegation") alleging that Commerce should determine normal value for Amsted using the special rule for multinational corporations ("MNCs"), pursuant to 19 U.S.C. § 1677b(d) (the "MNC Special Rule").  Amsted responded to Petitioner's letter on January 5, 2023, arguing that Petitioner's MNC Allegation was insufficient for Commerce to initiate an MNC investigation for several reasons.

US.359991164.07

81.     On December 21, 2022, Commerce issued a questionnaire to the Petitioner regarding the scope of investigation.  In the questionnaire, Commerce asked Petitioner to explain how antidumping duties could be levied on an Instrument of International Traffic ("IIT") under existing U.S. trade and customs laws and given that the Tariff Act references the imposition of antidumping duties on subject merchandise entered "for consumption."  The Petitioner responded on December 29, 2022.

82.     On January 11, 2023, Amsted filed its response to Sections B, C, and D of Commerce's questionnaire.

83.     On January 12, 2023, Amsted submitted additional factual information for the record regarding Petitioner's supplemental scope questionnaire response.  Petitioner filed a rebuttal on January 19, 2023.

84.     On February 13 and 15, 2023, Petitioners and Amsted filed additional comments regarding Petitioner's MNC Allegation.

85.     On March 2, 2023, Commerce submitted for the record a memorandum summarizing video calls that it had with CBP explaining its administration of the IIT provisions of U.S. law, and stating that "administrability of an AD/CVD order on freight rail couplers that are attached to or integrated with a freight rail car that is not entered into the United States would be very difficult and burdensome from a legal and operational point of view."  CBP added that it "lacked the legal authority to subject freight rail couplers to AD/CVD if the couplers are attached to freight rail cars which are exempt from entry" under CBP's regulations.

86.     On March 7, 2023, interested parties commented on Commerce's March 2, 2023 memorandum concerning its discussions with CBP.  On March 16, 2023, Amsted responded to Petitioner's comments regarding this issue.

US.359991164.07

87.     On March 10, 2023, Commerce issued a questionnaire to Amsted, asking Amsted to provide full comparison market sales and cost information concerning Amsted's largest third-country market.

88.     On March 28, 2023, Commerce issued a Preliminary Scope Decision Memorandum.  *See* Memorandum to James Maeder from Erin Begnal, re: Freight Rail Couplers from Mexico and the People's Republic of China: Preliminary Scope Decision Memorandum (Mar. 28, 2023).  In the Preliminary Scope Decision Memorandum, Commerce declined to revise the scope to remove the language purporting to cover FRCs attached to railcars.

89.     On April 3, 2023, Commerce issued a letter to Petitioner inviting it to provide additional information in support of its MNC Allegation.  Petitioner responded to Commerce's request on April 11, 2023, and Amsted responded to Petitioner's April 11, 2023 submission on April 17, 2023.

90.     On April 4, 2023, Amsted filed comments on certain issues prior to Commerce's preliminary determination, including the viability of Amsted's home market.

91.     On April 10, 2023, interested parties filed case briefs regarding scope issues.  On April 17, 2023, interested parties filed rebuttal briefs regarding scope issues.

92.     On April 27, 2023, Commerce issued a questionnaire to Amsted, stating that the Petitioners' MNC Allegation, combined with additional information that the Petitioners provided in response to additional questions by Commerce, provides a reasonable basis to initiate an MNC Investigation.  Commerce requested that Amsted provide complete Brazilian market sales and cost data for sales of freight rail couplers produced in Mexico by Amsted's affiliate in Brazil, Amsted Maxion Fundição e Equipamentos Ferroviários S.A. ("Amsted Maxion"). Amsted

US.359991164.07

responded to Section A of Commerce's MNC questionnaire on May 16, 2023, Section D on May 23, 2023, and Section B on May 25, 2023.

93.    On May 3, 2023, Commerce published its preliminary determination in the antidumping investigation of FRCs from Mexico. *Certain Freight Rail Couplers and Parts Thereof From Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 88 Fed. Reg. 27,864 (Dep't Commerce May 3, 2023).

94.    In an April 26, 2023 Decision Memorandum accompanying its preliminary determination ("Preliminary Decision Memo"), Commerce stated that it believed that the information contained in Petitioner's MNC Allegation provided a reasonable basis to initiate an MNC Investigation.

95.    On May 5, 2023, Commerce issued a supplemental questionnaire to Amsted regarding its third country sales (*i.e.*, Amsted's sales to Canada). Amsted responded to Commerce's questionnaire on May 12, 2023.

96.    On May 15, 2023, Commerce issued a Final Scope Decision Memorandum.

97.    On May 25, 2023, Commerce issued a supplemental scope questionnaire regarding Amsted Maxion. Amsted responded to this questionnaire on June 6, 2023.

98.    On May 30, 2023, Commerce issued a Supplemental Section D Questionnaire to Amsted regarding Amsted Maxion. On June 9, 2023, Amsted responded to this questionnaire.

99.    On June 12, 2023, Commerce issued a Supplemental Section D Questionnaire regarding Amsted Maxion. Amsted responded to this questionnaire on June 22, 2023.

US.359991164.07

100.    On June 12 through 16, 2023, Commerce conducted a verification of Amsted's sales information.  On July 10, 2023, Commerce issued its sales verification report.

101.    On July 18, 2023, Commerce issued a Post-Preliminary Analysis Memorandum regarding application of the MNC Special Rule.  Commerce also issued a separate calculation memorandum, in which it concluded that the weighted average normal value for Amsted Maxion's home market sales Brazil is lower than the weighted average normal value for Amsted's third country sales in Canada.  Commerce concluded that as a result of its analysis, the conditions for applying the MNC Special Rule were not met.

102.    On July 17 through 21, 2023, Commerce conducted a verification of Amsted's cost of production information.  On August 7, 2023, Commerce issued its cost verification report.

103.    On August 15, 2023, Amsted and Petitioner filed case briefs.

104.    On August 22, 2023, Amsted and Petitioner filed rebuttal briefs.

105.    On September 18, 2023, Commerce issued its Final Determination, along with a Final Issues and Decision Memorandum.

106.    Commerce published its final determination in the September 21, 2023 Federal Register.  *See* 88 Fed. Reg. 65,153 (Dep't Commerce Sept. 21, 2023) (final determ.).

## STATEMENT OF CLAIMS

### COUNT I

107.    The preceding paragraphs are incorporated herein by reference.

US.359991164.07

108.     The APA authorizes the Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

109.     The Attorney betrayed ARC. He did so for the cynical, self-interested purpose of trying to "undo" the Commission's negative injury determination in the Predecessor Investigations by including Mexico in the Investigation. As explained in the accompanying Declaration of Professor Roy D. Simon, Jr., attached hereto as Exhibit A, the Attorney had a disqualifying conflict of interest.

110.     Amsted requested that Commerce disqualify the Attorney, the Accountant, and the Firm from further participation as counsel in the Investigation due to ethical violations, but Commerce denied that request on the basis that it has no authority to adjudicate ethical violations.

111.     In its Case Brief, Amsted argued that Commerce should disqualify the Attorney, the Accountant, and the Firm from the Mexico Investigation and should dismiss the Petition, because of an irreconcilable conflict of interest.

112.     Commerce's decision refusing to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in the Investigation, and refusing the dismiss the Petition is arbitrary, capricious, an abuse of discretion, and contrary to law, including because Commerce failed to reasonably explain its decision.

113.     "State ethics rules provide an important backdrop for the federal agency rules regulating lawyers who appear and practice before the agencies." George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963, 1972 (2016). Indeed, "lawyers who practice before federal agencies must comply with state ethics rules, typically based on the ABA Model

Rules and applicable to all lawyers, as well as with the specific rules applicable to lawyers engaged in agency practice." *Id.*

114.    In accordance with its authority under 19 C.F.R. § 351.313, Commerce has previously in at least one other investigation applied the ABA Model Rules, including Rule 1.9, to evaluate whether a lawyer or law firm should be disqualified from practicing.

115.    The Attorney's and the Accountant's representation of the Coalition in the Investigation was contrary to Rule 1.9(a) of the ABA Model Rules and its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct. In addition, even "before the Rules of Professional Conduct were adopted, the common law recognized that a lawyer could not undertake representation adverse to a former client in a matter substantially related to that in which the lawyer previously had served the client." *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015) (internal quotation marks omitted).

116.    The Firm's representation of the Coalition in the Mexico Investigation was contrary to Rule 1.10(a) of the ABA Model Rules and its analogue, Rule 1.10(b)(1) of the District of Columbia Rules of Professional Conduct: "[W]hen a lawyer becomes associated with a firm, the firm may not knowingly represent a person in a matter which is the same as, or substantially related to, a matter with respect to which the lawyer had previously represented a client whose interests are materially adverse to that person and about whom the lawyer has in fact acquired information protected by Rule 1.6 that is material to the matter."

117.    During the Mexico Investigation, Commerce asserted that it will not "address the ethical questions raised by Amsted's filings at this time."

118.    Commerce's decision not to act in the face of these serious allegations was the antithesis of reasoned decision-making.

25

119.     A claim of a trade agency's "arbitrary and capricious refusal to disqualify" a conflicted attorney during a trade investigation may be "easily" framed as a challenge that the agency's final determinations were "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Amsted Rail Co. v. United States Int'l Trade Comm'n*, 600 F. Supp. 3d 1308, 1322 (Ct. Int'l Trade 2022) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "Plaintiffs may []format their challenges to agency determinations not to investigate allegations of … ethical misconduct as part of a § 1581(c) challenge to a reviewable final determination by the [trade agency]." *Amsted Rail Co. v. United States Int'l Trade Comm'n*, 607 F. Supp. 3d 1283, 1294 (Ct. Int'l Trade 2022). After all, "Plaintiffs are entitled to their day in court. Claims of misconduct should be addressed in the appropriate fora, and the [trade agency's] determinations should be subject to appropriate judicial review." *Id.*

120.     Accordingly, the Court should set aside Commerce's refusal to disqualify the Attorney, the Accountant, and the Firm in the Mexico Investigation, direct Commerce to terminate the antidumping duty order that it intends to impose on FRCs from Mexico; and if the Coalition files a new antidumping duty or countervailing duty petition on FRCs from Mexico, order Commerce to disqualify the Attorney, the Accountant, and the Firm in any such investigation(s) that might result.

**COUNT II**

121.     The preceding paragraphs are incorporated herein by reference.

122.     In order to calculate a dumping margin, Commerce normally compares the price of the respondent's U.S. market sales to a "normal value" based on the price of its sales in its home market.

26

123.    Commerce will use the respondent's home market sales as the basis for normal value only if it determines that the volume of home market is sufficient, *i.e.*, "viable."

124.    To determine whether the home market is viable, Commerce determines whether the aggregate volume of home market sales is equal to or greater than five percent of the aggregate volume of U.S. sales.

125.    ASF-K is a maquiladora that manufactures FRCs in Mexico.

126.    ASF-K never takes title to or sells FRCs in either the United States or the comparison market.  Instead, ASF-K operates in a manner akin to a toll producer for ARC, and ARC makes the sale.

127.    Most of the sales that ARC made in the home market during the period of investigation ("POI") were sales to unaffiliated original equipment manufacturer ("OEM") companies that consume FRCs as one of many inputs in the manufacture of rail cars in Mexico.

128.    ARC's home market OEM customers pick up the sale *Free Carrier* ("FCA"). Under the shipping terms for the FCA Incoterms, ASF-K is responsible for export clearance and delivery of goods to the carrier at the named place of delivery.

129.    ARC makes these sales using the "IMMEX program," which is a tax-benefit program that incentivizes non-Mexican companies to manufacture goods in Mexico by allowing non-payment of import duties and value added taxes ("VAT") if the factory (the "maquiladora" or "maquila") owned by the foreign company produces goods that are exported or sold to another maquiladora utilizing a virtual export transaction.  The program requires that the maquiladora use inputs and assets owned by the foreign owner.

130.    The companies that purchase FRCs from ARC and consume them to manufacture rail cars in Mexico are unaffiliated maquiladoras themselves.

27

131.    When supplying products to other participants in the IMMEX program that further manufacture in Mexico, in order to avoid a physical export out of Mexico and re-import the products (which could trigger liability for Mexican VAT taxes and Mexican duties), the transfer may be made through the use of "virtual *pedimentos*," which is a special procedure under which the maquiladora that transfers the products issues a virtual export *pedimento* telling Mexican Customs that it has virtually "exported" the input to a second maquila, even though the product does not physically export out of Mexico.  The second maquila then issues a virtual import *pedimento* telling Mexican Customs that it has since virtually "imported" the product despite never physically crossing the border or being physically presented to Mexican Customs.

132.    In its Preliminary Decision Memo, Commerce stated that because ARC's sales to the downstream maquiladora rail car manufacturers in Mexico are part of the IMMEX program, it determined that these sales should not be treated as home market sales.

133.    In explaining in its Preliminary Decision Memo that these sales should not be treated as home market sales, Commerce held that the FRCs continue to be a "distinct article of commerce, even after they are attached to a freight railcar by OEMs that purchase them, and thus, they are not consumed in the production of non-subject merchandise in Mexico."

134.    ARC further asserted that once the FRC has been attached to the rail car during the rail car production process in Mexico, when the rail car physically exports out of Mexico and enters the United States or Canada on its maiden journey, the FRC is no longer a separate article of commerce when entering the country of import; the FRC has performed its primary function to connect rail cars, forming a train that travels to a predetermined destination and as such is a used FRC.

135.    In its Preliminary Decision Memo, Commerce further asserted as follows:

US.359991164.07

We also preliminarily determine that, because these sales are part of the IMMEX program, the evidence on the record supports finding that these freight rail couplers are not sold for consumption in Mexico. We acknowledge that the IMMEX program allows the subject merchandise to be sold into the Mexican market upon payment of applicable taxes and duties and does not necessarily require export. However, we do not find that determinative because our decision is based on Amsted's knowledge at the time of sale and, specifically, whether Amsted knew, or should have known, that its freight rail couplers sold into the IMMEX program would be consumed in Mexico. Commerce's general practice in conducting the "knowledge test" is to consider documentary or physical evidence that the producer knew or should have known at the time of sale, because this type of evidence is more probative, reliable, and verifiable than unsubstantiated statements or declarations. Here, the record is clear that sales in the IMMEX program are taking place under a distinct tax regime established specifically for the ultimate export of finished goods and separate steps must be taken afterwards by the buyer for payment of value-added tax and import duties on any sales removed from the IMMEX program and consumed within Mexico. Given the nature and purpose of the IMMEX program, we find that Amsted knew, or should have known, that its freight rail couplers sold into the IMMEX program ultimately were meant for export, rather than domestic consumption.

136. As a result, Commerce determined that Amsted's Mexico home market was not viable, and so Commerce instead used Amsted's sales to a third country market—Canada—as the basis for normal value.

137. In its Case Brief, Amsted continued to argue that Commerce should have treated ARC's sales to OEMs in Mexico as home market sales, should have determined that Amsted's Mexico home market was viable, and used Amsted's Mexico home market sales as the basis for normal value.

138. In its Final Determination, Commerce continued to hold that Amsted's home market was not viable.

29

139.    In the Issues and Decision Memorandum accompanying its Final Determination, Commerce first stated that it has a "consistent practice of not revisiting comparison market viability determinations at the final determination stage."

140.    Commerce also reasserted its rationale in the Preliminary Determination that "attachment to a freight railcar does not turn a freight rail coupler into non-subject merchandise."

141.    In so asserting, Commerce pointed to its Final Scope Determination, stating that the Final Scope Determination "settled" the issue by concluding that when FRCs are attached to railcars in Mexico and then the railcar is transported across the border into the United States, the FRCs are still subject merchandise.

142.    Commerce's determination to use, as the basis for normal value, Amsted's sales of FRCs to Canada as the basis of normal value rather than ARC's sales of FRCs to the freight rail manufacturers in Mexico, is unsupported by substantial evidence and/or is otherwise not in accordance with law.

143.    As a subsidiary conclusion leading to its ultimate market viability determination, Commerce's scope determination that FRCs attached to railcars in Mexico and then transported across the border into the United States as part of the railcar, are still subject merchandise, is unsupported by substantial evidence and/or is otherwise not in accordance with law.

## COUNT III

144.    The preceding paragraphs are incorporated herein by reference.

145.    In a Home Market Viability Analysis Memorandum issued concurrently with its preliminary determination, Commerce also held that while it considered ARC's sales to OEMs in Mexico not to be home market sales, at the same time Commerce held that these sales should not be considered U.S. sales either.

US.359991164.07

146.     Commerce's normal practice is that it classifies a respondent's sales as U.S. sales if the respondent knew or had reason to know at the time of sale that those sales were destined for the United States.  Sales for FRCs when entering the United States are accomplished via two distinct streams of commerce: a new, never-used FRC imported and then sold, or attached to a railcar, entering the United States as used, not new.

147.     In the Home Market Viability Analysis Memorandum, Commerce reasoned that Amsted did not know that any particular FRCs are destined for the United States, as opposed to other export markets.

148.     In its Case Brief, Amsted argued that if Commerce did not treat the sales to the OEMs in Mexico as home market sales, then Commerce should treat them as U.S. sales.

149.     Having already determined that Amsted's sales to OEM customers in Mexico were not home market sales, Commerce's subsequent determination that these sales also were not U.S. sales is unsupported by substantial evidence and is otherwise not in accordance with law.  In short, Commerce cannot simply say that these sales are neither home market sales nor U.S. sales, but instead are some kind of unclassifiable export sales.

## COUNT IV

150.     The MNC Special Rule (19 U.S.C. § 1677b(d)) provides as follows:

**(d)** SPECIAL RULE FOR CERTAIN MULTINATIONAL CORPORATIONS

Whenever, in the course of an investigation under this subtitle, the administering authority determines that—

(1) subject merchandise exported to the United States is being produced in facilities which are owned or controlled, directly or indirectly, by a person, firm, or corporation which also owns or controls, directly or indirectly, other facilities for the production of the foreign like product which are located in another country or countries,

31

(2) subsection (a)(1)(C) applies, and

(3) the normal value of the foreign like product produced in one or more of the facilities outside the exporting country is higher than the normal value of the foreign like product produced in the facilities located in the exporting country, it shall determine the normal value of the subject merchandise by reference to the normal value at which the foreign like product is sold in substantial quantities from one or more facilities outside the exporting country.

The administering authority, in making any determination under this paragraph, shall make adjustments for the difference between the cost of production (including taxes, labor, materials, and overhead) of the foreign like product produced in facilities outside the exporting country and costs of production of the foreign like product produced in facilities in the exporting country, if such differences are demonstrated to its satisfaction.  For purposes of this subsection, in determining the normal value of the foreign like product produced in a country outside of the exporting country, the administering authority shall determine its price at the time of exportation from the exporting country and shall make any adjustments required by subsection (a) for the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States by reference to such costs in the exporting country.

151.    Subsection (a)(1)(C) (19 U.S.C. § 1677b(a)(1)(C)), in turn, provides as follows:

(C) Third country sales

This paragraph applies when—

(i) the foreign like product is not sold (or offered for sale) for consumption in the exporting country as described in subparagraph (B)(i),

(ii) the administering authority determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States, or

(iii) the particular market situation in the exporting country does not permit a proper comparison with the export price or

US.359991164.07

constructed export price.

> For purposes of clause (ii), the aggregate quantity (or value) of the foreign like product sold in the exporting country shall normally be considered to be insufficient if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) if sales of the subject merchandise to the United States.

152.   The legislative history of the MNC Special Rule is to determine normal value by comparing *prices* of merchandise that the subject producer sold in third country markets to *prices* of merchandise that an affiliate of the subject producer sold in that affiliate's own home market.

153.   Commerce has stated that when a petitioner makes a MNC allegation, Commerce does not automatically initiate an MNC investigation.  Instead, Commerce's practice is to require petitioners "to present an adequate and timely allegation regarding the applicability of the MNC provision."  *Certain Small Business Telephone Systems and Subassemblies Thereof from Taiwan*, 54 Fed. Reg. 31,987, 31,988 (Dep't Commerce 1989) (prelim. determ.).

154.   Commerce has stated that an "adequate allegation" is one that gives Commerce a basis for believing that all of the following criteria are met:

> (1) Merchandise exported to the United States is being produced in facilities which are owned and controlled, directly or indirectly, by a person, firm or corporation which also owns or controls, directly or indirectly, other facilities for the production of such or similar merchandise which are located in another country or countries.

> (2) The sales of such or similar merchandise by the company concerned in the home market of the exporting country are nonexistent or inadequate as a basis for comparison with the sales of the merchandise to the United States.

> (3) The foreign market value (FMV) of such or similar merchandise produced in one or more of the facilities outside the country of exportation is higher than the foreign market value of such or similar merchandise produced in the facilities located in the country of exportation.

US.359991164.07

(4) Because {Commerce} bases its fair value comparisons on comparable merchandise, any observed differences in FMV are not solely attributable to physical differences in merchandise.

(5) Any observed differences in value between the FMV of products produced outside the country of exportation and the FMV of products produced in the country of exportation are not solely attributable to differences in costs of production, pursuant to the final paragraph of the MNC provision.

*Id*.

155.    In this investigation, Amsted demonstrated that its Mexico home market is viable, as discussed in Count II above therefore the MNC Special Rule does not apply.  Accordingly, Commerce should have rejected the Petitioners' MNC Allegation and not conducted an MNC Investigation.

156.    Petitioners' MNC Allegation contained absolutely no evidence regarding prices of FRCs produced by Amsted Maxion in Brazil.

157.    Instead, Petitioners calculated a "normal value" for Brazil by calculating a constructed value based on the cost and consumption information that Petitioners presented in the petition, none of which concerned Amsted Maxion's actual costs or Brazilian market sales prices.

158.    Petitioners then compared this Brazilian constructed value to the average unit values or net prices of Amsted's third-country sales into Canada.

159.    Petitioner never even *attempted* to obtain prices of FRCs sold in the Brazilian market, by Amsted Maxion or any other producer.

160.    In past investigations, Commerce has declined to initiate an MNC Investigation in similar situations, when the petitioner failed to provide any data on actual sales or offers to sell by the MNC's foreign affiliate.

US.359991164.07

161.    As a result, Petitioners did not provide a basis for determining that the normal value of FRCs produced by Amsted Maxion in Brazil were higher than the normal value of FRCs produced by ASF-K in Mexico and sold by Amsted in the Canadian market.

162.    Petitioners did not demonstrate that any observed differences in normal value are not solely attributable to physical differences in merchandise.

163.    As a result of all of the issues discussed above, Petitioners failed to provide an adequate basis for Commerce to initiate an MNC Investigation.

164.    Commerce's decision to initiate an MNC Investigation, notwithstanding Petitioners' lack of an adequate basis, is unsupported by substantial evidence and is otherwise not in accordance with law.

165.    Notwithstanding the fact that after completing its MNC Investigation, Commerce ultimately determined that the MNC Special Rule did not apply, this Count should not be dismissed on mootness grounds, because this claim is "capable of repetition, yet evading review." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998); *Torrington Co. v. United States*, 44 F.3d 1572, 1577 (Fed. Cir. 1995); *Jem D Int'l (Michigan) Inc. USA v. United States*, 44 CIT ___, ___, 470 F. Supp. 3d 1374, 1380 (2020).

166.    The claim in this Count is the type of claim that the courts have recognized as "inherently transitory" and therefore are capable of evading review. *Jem D Int'l*, 44 CIT at ___, 470 F. Supp. 3d at 1380 (collecting cases).

167.    Here, the claim is "inherently transitory" because any time that Commerce initiates a MNC Investigation but after completing the MNC Investigation, determines that the MNC Special Rule does not apply, Commerce could repeat its error of initiating the MNC

US.359991164.07

Investigation despite the underlying MNC allegation by the petitioner being inadequate, and then claim that any challenge to the adequacy of the MNC allegation is moot.

168.    More specifically, if this Court does not review whether the basis for Commerce to initiate an MNC Investigation was inadequate, it would give license for petitioners in future investigations to allege that the MNC Special Rule applies if the petitioner can concoct a "constructed value" (which petitioners frequently provide anyway as part of its petition) and avoid having to obtain any information on actual prices of the affiliate third-country producer for merchandise the affiliated producer sold in its own home market.  Future petitioners also would have a license, in their MNC allegation, to avoid the issue of whether the merchandise produced by the third-country affiliates is not comparable to the merchandise sold in the U.S. market and thus any comparisons would be due to the physical differences in the merchandise, rather than two price differences.

169.    Moreover, if this Court does not review whether the basis for Commerce to initiate an MNC Investigation was inadequate, it would give license for the Coalition to make legally and factually inadequate MNC allegations against Amsted in every administrative review of this antidumping duty order, and for Commerce to initiate MNC investigations on that basis, without any scrutiny by this Court of the adequacy of the allegation.

## DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in its favor and against the Defendant:

(1) hold Commerce's *Final Determination* unsupported by substantial evidence and otherwise not in accordance with law;

US.359991164.07

(2) remand the *Final Determination* to Commerce for a redetermination consistent with the judgment and finding of this Court; and

(3)  provide such additional relief as the Court may deem just and proper in the circumstances.

Respectfully submitted,

/s/ Richard P. Ferrin
Douglas J. Heffner
Richard P. Ferrin
Carrie Bethea Connolly
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005
Telephone: (202) 230-5803

*Counsel to Amsted*

November 17, 2023

US.359991164.07