**PUBLIC VERSION**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| AMSTED RAIL COMPANY, INC. AND ASF-K DE MEXICO S. DE R.L. DE C.V., <br><br>     Plaintiffs, <br><br>  v. <br><br> UNITED STATES, <br><br>     Defendant, <br><br><br>   and <br><br> COALITION OF FREIGHT COUPLER PRODUCERS, <br>     Defendant-Intervenor. | Court No. 23-242 <br><br> **PUBLIC VERSION** |

MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS
IN SUPPORT OF RULE 56.2 MOTION
FOR JUDGMENT ON THE AGENCY RECORD

Douglas J. Heffner
Brian Perryman
Richard P. Ferrin
Carolyn Bethea Connolly
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel for Plaintiffs*

Dated: July 15, 2024

PUBLIC VERSION

# TABLE OF CONTENTS

**STATEMENT PURSUANT TO RULE 56.2**......................................................................... **1**

**I.     ADMINISTRATIVE DETERMINATION UNDER REVIEW**................................. **1**

**II.    ISSUES PRESENTED**............................................................................................... **1**

**III.   STATEMENT OF FACTS**........................................................................................ **1**

A.   Facts Concerning Ethics Issue. ...................................................................................... 1

   1.   The 2021-22 Investigations.................................................................................. 2

   2.   The 2022-23 Investigations.................................................................................. 3

   3.   Proceedings at Commerce..................................................................................... 3

B.   Procedural History Relating to Commerce's Conduct of Investigation........................... 6

**ARGUMENT** .............................................................................................................................. **8**

**I.     COMMERCE'S FAILURE TO DISQUALIFY [          ], THE ATTORNEY, AND THE ACCOUNTANT RENDERS COMMERCE'S DETERMINATION TO BE OTHERWISE NOT IN ACCORDANCE WITH LAW** ......................................... **8**

A.   [          ], the Attorney, and the Accountant Represented the Coalition in a Substantially Related Matter Against Amsted, a Former Client, Which Never Consented to the Representation......... 8

B.   The Attorney's Representation of M&T and the USW in a Substantially Related Matter Adversely Against the Attorney's Former Client Amsted Violated the American Bar Association's Model Rules of Professional Conduct and the District of Columbia Rules of Professional Conduct. ......................... 10

C.   Commerce's Refusal to Act Was Unlawful. ................................................................. 10

   1.   The Attorney and the Accountant Had a Direct and Nonconsensual Conflict of Interest. ......... 11

   2.   Amsted Was Harmed by Misuse of Its Confidential Information. ............................... 16

   3.   The Conflict of Interest Must Be Imputed to [          ] Generally.................................. 17

   4.   The Conflict Warranted Disqualification............................................................... 17

   5.   Because The Conflict Of Interest Tainted The Proceedings, The Court Must Redress Commerce's Refusal to Disqualify. ....................................................................... 18

   6.   Commerce's Claimed Lack of Expertise in Conflict-of-Interest Rules Does Not Justify Ignoring Ethical Violations............................................................................................. 21

   7.   The Court Should Reject Commerce's Reliance on the Preamble to 19 C.F.R. § 351.313. ....... 23

   8.   Commerce's Passing the Buck to Local Bar Authorities Leaves Amsted With No Adequate Remedy. ................................................................................................................ 25

D.   Because of the Ethical Violations Committed by [          ], the Attorney, and the Accountant, the Court Should Remand to Commerce With Instructions to Terminate the Investigation. ................ 27

**II.    COMMERCE'S DETERMINATION THAT AMSTED'S HOME MARKET WAS NOT VIABLE IS NOT IN ACCORDANCE WITH LAW AND IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE.** ............................................................................... **28**

A.   Standard of Review......................................................................................................... 28

B.   Background Concerning Commerce's Determination of Normal Value. ....................... 30

C.    Commerce's Determination that Consumption in the Home Market Requires Subject Merchandise be Transformed into Non-Subject Merchandise is Not in Accordance with the Law. ...........................32

    1.    Determination of the Sales to be Used to Ascertain Normal Value Requires Interpretation of the Term "Consumption". ......................................................................................................................32

    2.    The Plain and Ordinary Meaning of the Term "Consumption" Is the "Use of Something". .......33

    3.    Amsted's FRCs Are "Consumed" When Used by Railcar Manufacturers in Mexico to Manufacture a Freight Railcar. ............................................................................................................33

    4.    Commerce's Determination To the Contrary Conflicts With the Plain Language of the Statute. 35

D.    The Court Must Reject Commerce's Position that the Issue of Home Market Viability Cannot be Reassessed During the Course of a Proceeding. ......................................................................................42

**III.    IF AMSTED's SALES OF FRCs TO OEMs IN MEXICO ARE NOT HOME MARKET SALES, THEN COMMERCE's DECISION NOT TO TREAT THEM AS U.S. SALES IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND/OR NOT IN ACCORDANCE WITH LAW.............................................................................................. 43**

**IV.    CONCLUSION AND PRAYER FOR RELIEF............................................................. 44**

PUBLIC VERSION

## TABLE OF AUTHORITIES

**Cases**

*Agro Dutch Industries Ltd. v. United States*, 508 F.3d 1024 (Fed. Cir. 2007) ........................... 29

*Amsted Rail Co. v. United States Int'l Trade Comm.*, 46 CIT ___, 600 F. Supp. 3d
    1308 (2022) ............................................................................................................... *passim*

*Amsted Rail Co. v. United States Int'l Trade Comm.*, 46 CIT ___, 607 F. Supp. 3d
    1283 (2022) ...................................................................................................................... 5

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, In.*, 467 U.S. 837 (1984) ............ 28

*Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.)*, 837 F.3d 1280
    (Fed. Cir. 2016) ......................................................................................................... *passim*

*EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459 (Fed. Cir. 1984) ............................................... 18

*FTC v. Exxon Corp.*, 636 F.2d 1336 (D.C. Cir. 1980) ................................................................ 16

*Goldsmith v. United States Bd. of Tax Appeals*, 270 U.S. 117 (1926) ....................................... 20

*Herman v. Acheson*, 108 F. Supp. 723 (D.D.C. 1952) ................................................................ 20

*In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373 (Fed. Cir. 2010) ............................... 16

*INA Walzlager Schaeffler KG v. United States*, 21 CIT 110, 957 F. Supp. 251 (1997) ...... *passim*

*Kearns v. Fred Lavery Porsche Audi Co.*, 745 F.2d 700 (Fed. Cir. 1984) ................................. 18

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ..................................................................................24-25

*Loper Bright Enters. V. Raimondo*, slip op. at 35 (U.S. June 28, 2024) .............................. *passim*

*Makita Corp. v. United States*, 17 CIT 240, 819 F. Supp. 1099 (1993) ............................. *passim*

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) .................. 30

*Miller & Co. v. United States*, 824 F.2d 961 (Fed. Cir. 1987) ................................................... 19

*Peabody Coal C. v. Dir., Off. Of Workers Comp. Prog's*, 746 F.3d 1119 (9th Cir. 2013) ......... 24

*Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992 (10th Cir. 2019) .............. 24

DMS_US.364917672.11

*Pesquera Mares Australes Ltda. v. United States*, 266 F. 3d 1372 (Fed. Cir. 2001)...........*passim*

*Polyhdoroff v. ICC*, 773 F.2d 372 (D.C. Cir. 1985) ..................................................... 20

*Shanxi Hairui Trade Co., Ltd. v. United States*, 39 F.4th 1358 (Fed. Cir. 2022) ...................... 28

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...........................................*passim*

*Stupp Corp. v. United States*, 43 CIT ___, 359 F. Supp. 3d 1293 (2019) ................................. 38

*Touchcom, Inc. v. Bereskin & Parr*, 299 F. App'x 953 (Fed. Cir. 2008) ............................ 11, 15

*Trone v. Smith*, 621 F.2d 994 (9th Cir. 1980) ........................................................... 18

*Tung Mung Development Co., Ltd. v. United States*, 25 CIT 752 (2001)...........................*passim*

*W.L. Gore & Assocs. v. Int'l Med. Prosthetics Research Assocs.*, 745 F.2d 1463
    (Fed. Cir. 1984)........................................................................... 18

*Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999) ................. 24, 25

*Z.A. Sea Foods Priv. Ltd. v. United States*, 47 CIT ___, 606 F. Supp. 3d 1335 (2023) ......*passim*

*Zenith Elecs. Corp. v. United States*, 14 CIT 831, 755 F. Supp. 397 (1990)............................ 22

**<u>Statutes</u>**

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................... 18, 19

19 U.S.C. § 1677a ................................................................................. 43

19 U.S.C. § 1677b................................................................................*passim*

19 U.S.C. § 1677b(a)(1)(B) ......................................................................*passim*

19 U.S.C. § 1677b(a)(1)(C)(i) ...................................................................... 33

19 U.S.C. § 1677b(e)(2)(B) ......................................................................... 30

28 U.S.C. § 1581(c) ............................................................................. 5, 19

28 U.S.C. § 1581(i) ............................................................................. 4, 5

**<u>Regulations</u>**

1 C.F.R. § 8.1(a)................................................................................... 24

DMS_US.364917672.11

12 C.F.R. § 19.8 (2024) ..................................................................................22-23

17 C.F.R. § 205.1-.7 (2024) ................................................................................ 22

19 C.F.R. § 351.313 ..................................................................................*passim*

## Administrative Determinations

*Agreement Suspending the Antidumping Duty Investigation on Sugar from Mexico*, 87 Fed. Reg. 932 (Dep't Commerce Jan 7, 2022) (prelim. results) .................................................... 36

*Certain Preserved Mushrooms from the Netherlands*, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 23, 2023) (final determ.) ........................................................................... 42

*Silicon Metal from the Republic of Kazakhstan: Representation of Tau-Ken Temir LLP by Squire Patton Boggs*, DOC Inv. No. C-834-811 (Oct. 6, 2020) ............................................... 21

*Tin Mill Products from Canada*, 89 Fed. Reg. 1542 (Dep't Commerce Jan. 10, 2024) (final determ.) ..................................................................................*passim*

## Other Court Proceedings

Brief of Defendant-Appellee United States at 31, *Paul Muller Industrie GMBH & Co. v. United States*, 283 F. App'x 789, No. 2007-1547, 2008 WL 700912 (Fed. Cir. filed Feb. 27, 2008) .......................................................................................... 13

Joint Stipulation of Voluntary Dismissal (June 30, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Fed. Cir. Ct. No. 23-1355, CM/ECF Docket Entry No. 89 .................................................................................................................. 6

Notice of Appeal (Dec. 22, 2022), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Ct. No. 22-cv-00307 CM/ECF Docket Entry No. 101 .............................. 5

Notice of Dismissal (July 18, 2023), *Amsted Rail Company, Inc. v. U.S. Department of Commerce*, Ct. No. 22-cv-00316, CM/ECF Docket No. 60 ........................................... 6

Order (Feb. 24, 2023), *Amsted Rail Company, Inc. v. U.S. Department of Commerce*, Ct. No. 22-cv-00316, CM/ECF Docket Entry No. 59 ..................................................... 5

Order (July 19, 2023) *Amsted Rail Company, Inc. v. U.S. Department of Commerce*, Ct. No. 22-cv-00316, CM/ECF Docket No. 61 ............................................................. 6

Plaintiffs-Appellants' Reply Brief (Feb. 27, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Ct. No. 23-1355 (Feb. 27, 2023), CM/ECF Docket Entry No. 48 .......................................................................................................... 5

Reply Brief of Defendant-Appellant United States at 40, *Heveafil Sdn. Bhd. V. United States*, 58 F. App'x 843, No. 2002-1085, 2002 WL 32620069 (Fed. Cir. filed July 16, 2002) .............................................................................................. 13

Verified Complaint (Oct. 14, 2022), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Ct. No. 22-cv-00307 CM/ECF Docket Entry No. 14 .............................. 4-5

Verified Complaint or, in the Alternative, Petition for Writ of Mandamus (Oct. 31, 2023), *Amsted Rail Company, Inc. v. U.S. Department of Commerce*, Ct. No. 22-cv-00316 CM/ECF Docket Entry No. 5 .......................................................................................... 4

## Other Authorities

ABA Comm. on Ethics & Pro. Responsibility, Formal Op. 497 (2021) ............................ 12, 13

George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963 (2016) ...... 20, 22

D.C. R. Pro. Conduct 1.9(a) ....................................................................................... *passim*

D.C. R. Pro. Conduct 1.10 ............................................................................................. 17

Model Rules of Pro. Conduct r. 1.9(a) (1983) .................................................................. *passim*

Model Rules of Pro. Conduct r. 1.10 (1983) .......................................................................... 17

*Regulation Strengthening Accountability of Attorneys and Non-Attorney Representatives Appearing Before the Department*, 78 Fed. Reg. 22,773 (Dep't of Commerce Apr. 17, 2013) ...................................................................................................................... 23

Keith Swisher, *The Practice and Theory of Lawyer Disqualification*, 27 Geo. J. Legal Ethics 71 (2014) ................................................................................................................... 25-26

DMS_US.364917672.11

**STATEMENT PURSUANT TO RULE 56.2**

**I.      ADMINISTRATIVE DETERMINATION UNDER REVIEW.**

Amsted brings this action to contest the final affirmative determination of sales at less than fair value by the International Trade Administration of the U.S. Department of Commerce ("Commerce") on certain freight rail couplers ("FRCs") and parts thereof from Mexico. *Certain Freight Rail Couplers and Parts Thereof From Mexico*, 88 Fed. Reg. 65,153 (Dep't Commerce Sept. 21, 2023) (final determ.) "Final Determination" and accompanying Issues & Decision Memo ("IDM").

**II.     ISSUES PRESENTED.**

1.      Did Commerce's failure to disqualify a law firm, attorney, and accountant representing the petitioners in this case, due to a disabling conflict of interest, render the Final Determination not in accordance with law?

2.      Was Commerce's refusal to treat Amsted's sales of FRCs to original equipment manufacturers ("OEMs") in Mexico, as home market sales providing a basis for calculating normal value, not in accordance with law?

3.      If Commerce were correct in refusing to treat Amsted's sales of FRCs to OEMs in Mexico as not home market sales, was Commerce's refusal also to treat these sales as U.S. sales unsupported by substantial evidence and/or not in accordance with law?

**III.    STATEMENT OF FACTS.**

    **A.      Facts Concerning Ethics Issue.**

The facts underlying Count I of the Complaint in this action, concerning violation of conflict-of-interest ethical rules by [                              ] ("Attorney"), the law firm [
                    ] ("[              ]") and [                    ] ("Accountant"), are recounted in detail in paragraphs 9-75 of the Complaint, and in related litigation previously before this Court.

*See Amsted Rail Co. v. United States Int'l Trade Comm.*, 46 CIT ___, 600 F. Supp. 3d 1308, 1314-18 (2022) ("*Amsted Rail I*"). Below we briefly recount some of the key facts.

### 1. The 2021-22 Investigations.

On June 17, 2021, Amsted engaged the law firm of [                              ] "to provide legal services in connection with advice regarding the elevation and potential prosecution of an antidumping petition concerning imports of certain couplings and related rail products." Letter from Faegre Drinker to Sec'y of Commerce re: Request to Disqualify and Exclude Petitioners' Counsel from the Administrative Protective Order and Dismiss the Petition (Oct. 12, 2022) ("Request to Disqualify"), at 3-4, P.R. 73.

Through the Attorney, on September 29, 2021, the Coalition of Freight Rail Coupler Producers ("Coalition" or "Petitioner") filed its petition with Commerce and the U.S. International Trade Commission ("Commission"), commencing antidumping duty investigations on Freight Rail Couplers ("FRCs") from China, and a countervailing duty investigation on FRCs from China (the "2021-22 Investigations"). *Amsted Rail Co.*, 600 F. Supp. 3d at 1314. At the time, the Coalition was composed of two constituent members: Amsted and M&T, a domestic producer of FRCs. *Id.*

On October 6, 2021, Amsted, again through the Attorney, filed a letter in the 2021-22 Investigations withdrawing from the petition. *Id*. at 1315. Until its withdrawal, Amsted supervised and materially contributed to the Attorney's preparation for the 2021-22 Investigations. Request to Disqualify, at 5. On October 14, 2021, Amsted's current counsel, the law firm of Faegre Drinker Biddle & Reath LLP ("Faegre"), entered an appearance in the 2021-22 injury investigations before the Commission. *Id.*

On March 8, 2022, the Attorney entered his appearance on the Coalition's behalf to reflect that he had changed law firms from [      ] to [          ]. *Id*. at 6.

2

A certified public accountant ("Accountant") accompanied the Attorney in his move from [        ] to the Firm. As reflected on the petition's cover page, the Accountant was one of the Coalition's representatives in the 2021-22 Investigations. *Id.*

The Commission announced a unanimous negative determination on June 14, 2022, thus terminating the 2021-22 Investigations and denying the Coalition its requested relief. *Id.*

One reason for the negative injury determination was that Chinese FRCs could not be considered a cause of the alleged injury because of significant non-subject FRC imports from Mexico. *Id.*

### 2.    The 2022-23 Investigations.

Just days after certifying destruction of the confidential record from the 2021-22 Investigations, on September 28, 2022, the Coalition filed a second petition commencing the 2022-23 Investigations, this time naming imports from *Mexico* in addition to China. *Id.* at 7.

The petitioning party in each investigation was the Coalition, of which Amsted is a former member. *Id.* In the 2022-23 Investigations, the Coalition's two members were M&T and USW. *Id.* M&T is Amsted's industry competitor. The USW represented unionized workers at Amsted. The Coalition contended that the USW became a member "because of the impact of subject imports on USW workers," including purported job losses "in the domestic FRC industry." *Id.* at 38.

### 3.    Proceedings at Commerce.

On October 12, 2022, Amsted filed a letter with Commerce asking it to, among other things: (i) disqualify the Firm from further participation as counsel for the Coalition in the 2022-23 Investigations; and (ii) terminate the 2022-23 Investigations under Commerce's sanctions authority and/or dismiss the underlying antidumping and countervailing duty petitions as

Commerce cannot reasonably determine the accuracy and adequacy of the evidence provided in the petition. *See generally* Request to Disqualify.

On October 18, 2022, Commerce informed Plaintiffs, via a letter from Ms. Begnal, that Commerce would not make a determination as to whether the Firm should be disqualified from further participation in the 2022-23 Investigations. *See* Letter from Erin Begnal to Amsted Rail Company, Inc., re: Response to Request to Disqualify and Exclude Petitioner's Counsel from the Administrative Protective Order (Oct. 18, 2022), at 2, P.R. 78.

Specifically, ignoring its own prior administrative precedent, Commerce stated that its decision was premised on its position that 19 C.F.R. § 351.313 is not "intended to cover ethical conflicts uniquely within the province of local Bar authorities." *Id.*

On October 18, 2022, based on the allegations in the petition, Commerce initiated the Mexico Investigation. See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico: Initiation of Less-Than-Fair-Value Investigations, 87 Fed. Reg. 64,444-64,450 (Dep't of Commerce Oct. 25, 2022) ("Initiation Notice"), P.R. 82.

On October 31, 2022, Plaintiffs filed suit in this Court for injunctive and declaratory relief, pursuant to 28 U.S.C. § 1581(i), asking the Court to take the following several actions, including directing Commerce to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in the 2022-23 Investigations. *See* Verified Complaint or, in the Alternative, Petition for Writ of Mandamus, *Amsted Rail Company, Inc. v. U.S. Department of Commerce* (Oct. 31, 2022), Ct. No. 22-cv-00316 (the "*Prior DOC Appeal*"), CM/ECF Docket Entry No. 5.

Prior to filing suit in the *Prior DOC Appeal*, on October 14, 2022, the Plaintiffs filed suit against the Commission on similar grounds, also pursuant to 28 U.S.C. § 1581(i). Verified

Complaint, *Amsted Rail Company, Inc. v. U.S. International Trade Commission* (Oct. 14, 2022), Ct. No. 22-cv-00307 (the "*ITC CIT Appeal*"), CM/ECF Docket Entry No. 14.

On November 16, 2022, the Court in the *ITC CIT Appeal* dismissed Plaintiffs' complaint without prejudice to refiling under 28 U.S.C. 1581(c). *Amsted Rail I*, 600 F. Supp. 3d at 1330-31. The CIT did not address the merits of Plaintiffs' claims, but instead held that the remedy available to Plaintiffs under 28 U.S.C. § 1581(c) is not manifestly inadequate, and therefore jurisdiction under 28 U.S.C. § 1581(i) was not available. *Amsted Rail I*, 600 F. Supp. at 1330. Plaintiffs also moved unsuccessfully for an injunction pending appeal. *See Amsted Rail Co. v. United States Int'l Trade Comm.*, 46 CIT ___, 607 F. Supp. 3d 1283, 1295 (2022) ("*Amsted Rail II*"). Although it denied that motion on December 20, 2022, the CIT qualified that "Plaintiffs are entitled to their day in court" and "the Commission's determinations should be subject to appropriate judicial review." *Id*. at 1294. "Plaintiffs may reformat their challenges to agency determinations not to investigate allegations of APO and ethical misconduct as part of a § 1585(c) challenge to a reviewable final determination by the Commission." *Id*. Amsted subsequently appealed to the U.S. Court of Appeals for the Federal Circuit ("CAFC"). Notice of Appeal (Dec. 22, 2022), *ITC CIT Appeal*, CM/ECF Docket Entry No. 101.

On February 24, 2023, the CIT in the *Prior DOC Appeal* entered an order staying the action pending final resolution of all appellate review proceedings in the *ITC CAFC Appeal*. *See* Order (Feb. 24, 2023), *Prior DOC Appeal*, CM/ECF Docket Entry No. 59. The parties in the *ITC CAFC Appeal* completed briefing on February 27, 2023. *See* Plaintiffs-Appellants' Reply Brief (Feb. 27, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Fed. Cir. Ct. No. 23-1355, CM/ECF Docket Entry No. 48.

On June 30, 2023, the CAFC having not yet calendared oral argument and the Commission's final injury investigation nearing completion, the Plaintiffs decided that the passage of time had effectively mooted their request for the Commission to disqualify the Attorney, the Accountant, and the Firm from the pending final injury investigation. Accordingly, after securing the consent of the other parties, Plaintiffs filed a Joint Stipulation of Voluntary Dismissal of the *ITC CAFC Appeal* on June 30, 2023. Joint Stipulation of Voluntary Dismissal (June 30, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Fed. Cir. Ct. No. 23-1355, CM/ECF Docket Entry No. 89. The CAFC dismissed the *ITC CAFC Appeal* on July 5, 2023. Order (July 5, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Fed. Cir. Ct. No. 23-1355, CM/ECF Docket Entry No. 90.

On July 18, 2023, Plaintiffs filed a notice of dismissal of the *Prior DOC Appeal* pursuant to USITC Rule 41.(a)(1)(A)(i). Notice of Dismissal (July 18, 2023), *Prior DOC Appeal*, CM/ECF Docket No. 60. On July 19, 2023, the CIT entered dismissal of the *Prior DOC Appeal*. Order (July 19, 2023) *Prior DOC Appeal*, CM/ECF Docket No. 61.

**B.    Procedural History Relating to Commerce's Conduct of Investigation.**

In the Initiation Notice, Commerce adopted scope language designed to include coupler parts "that have been further processed or further assembled, *including those coupler parts attached to a railcar in third countries*." *Id*. (emphasis added); *see also id*. ("Subject freight railcar couplers and parts are included within the scope … whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar.").

On November 17, 2022, interested parties, including Amsted, filed comments on the proposed scope of the antidumping investigation. Amsted urged Commerce to revise the scope to remove the language purporting to cover FRCs attached to railcars.

On January 12, 2023, Amsted submitted additional factual information for the record regarding Petitioner's supplemental scope questionnaire response. Petitioner filed a rebuttal on January 19, 2023.

On March 2, 2023, Commerce submitted for the record a memorandum summarizing video calls that it had with U.S. Customs and Border Protection ("CBP") explaining its administration of the IIT provisions of U.S. law, and stating that "administrability of an AD/CVD order on freight rail couplers that are attached to or integrated with a freight rail car that is not entered into the United States would be very difficult and burdensome from a legal and operational point of view." CBP added that it "lacked the legal authority to subject freight rail couplers to AD/CVD if the couplers are attached to freight rail cars which are exempt from entry" under CBP's regulations.

On March 10, 2023, Commerce issued a questionnaire to Amsted, asking Amsted to provide full comparison market sales and cost information concerning Amsted's largest third-country market.

On April 26, 2023, Commerce issued a memorandum regarding "Amsted Home Market Viability Analysis for the Preliminary Determination of the Less-Than-Fair Value Investigation of Freight Rail Couplers from Mexico".

On May 3, 2023, Commerce published its preliminary determination in the antidumping investigation of FRCs from Mexico. Certain Freight Rail Couplers and Parts Thereof From Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 88 Fed. Reg. 27,864 (Dep't Commerce May 3, 2023). A.R. 317.

DMS_US.364917672.11

On August 15, 2023, Amsted and Petitioner filed case briefs. C.R. 350 (as refiled), C.R.

348. On August 22, 2023, Amsted and Petitioner filed rebuttal briefs. C.R. 351, C.R. 352.

On September 18, 2023, Commerce issued its Final Determination, along with a Final

Issues & Decision Memorandum. Commerce published its final determination in the September

21, 2023 Federal Register. *See* 88 Fed. Reg. 65,153 (Dep't Commerce Sept. 21, 2023) (final

determ.).

## ARGUMENT

**I.    COMMERCE'S FAILURE TO DISQUALIFY [                ], THE ATTORNEY, AND THE ACCOUNTANT RENDERS COMMERCE'S DETERMINATION TO BE OTHERWISE NOT IN ACCORDANCE WITH LAW.**

**A.    [          ], the Attorney, and the Accountant Represented the Coalition in a Substantially Related Matter Against Amsted, a Former Client, Which Never Consented to the Representation.**

The Attorney and [      ] represented the Coalition in both the 2021-22 and 2022-23

Investigations. Between June 2021 and September 2021, the Attorney represented Amsted and

the Coalition (including Amsted, which at that time was a member of the Coalition) in preparing

the petition for the 2021-22 investigation. *Supra* section III.A.1. The Attorney continued to

represent Amsted and the Coalition in the filing of the petition on September 29, 2021, and in the

initial days following the filing of the petition. *Id*. As a client, Amsted confided in the Attorney

its legal strategy for prosecuting antidumping and countervailing duty investigations against

FRCs from China. Complaint ¶¶ 23-27. These confidences included Amsted's decision-making

processes, as well as extensive business proprietary information relevant to establishing the

scope of the petition and certain key factors critical to establishing that the domestic FRC was

being materially injured by reason of subject imports from China. The injury factors for which

Amsted supplied business confidential information to the Attorney included information

regarding the domestic like product, the domestic industry, and the conditions of competition.

In entering into an attorney-client relationship between Amsted on the one hand and

[      ] and the Attorney on the other hand, on June 17, 2021, the parties executed an

engagement agreement that purported to contain an advance waiver of potential future conflicts.

Complaint ¶12. By its terms, the advance waiver extended only to [      ] itself—not the

Attorney or others. Complaint ¶ 13. The advance waiver also expressly excluded "matters that

are substantially related to {[      ]} work for {Amsted}." *Id*.

Amsted withdrew its support for the 2021 petition shortly after it was filed and dropped

out as a member of the Coalition. *Supra* § III.A.1. But even after Amsted withdrew its support

for the petition and Faegre entered its appearance for Amsted in the 2021-22 investigations, the

Attorney (who had by then moved to a new law firm, [      ]) attempted to coach Amsted

into taking positions he would later use against Amsted in the Mexico investigation. Complaint ¶

32.

Ultimately, the 2021-22 investigations resulted in a negative final injury determination by

the Commission issued in early July 2022, which resulted in termination of the investigations

without imposition of either antidumping or countervailing duties against FRCs from China.

*Supra* § III.A.1.

Yet after the ink was barely dry on the ITC's final negative injury determination, the

Attorney betrayed Amsted by filing a new petition on September 28, 2022. *Supra* § III.A.2. The

new petition was targeted not only at China, but also at *Amsted's own imports from Mexico*. *Id*.

The attorney did so for the cynical, self-interested purpose of trying to "undo" the Commission's

negative injury determination in the 2021-22 investigations by including Mexico in the new

investigations. Complaint ¶ 109.

In short, the Attorney represented a current client—M&T and the USW as members of the reconstituted Coalition—in a substantially related matter against a materially adverse former client—Amsted—which never consented to the representation.

**B.    The Attorney's Representation of M&T and the USW in a Substantially Related Matter Adversely Against the Attorney's Former Client Amsted Violated the American Bar Association's Model Rules of Professional Conduct and the District of Columbia Rules of Professional Conduct.**

The Attorney represented current clients—the reconstituted Coalition and its members M&T and the USW—in a substantially related matter against a materially adverse former client—Amsted—which never consented to the representation. This violates Rule 1.9(a) of the American Bar Association ("ABA") Model Rules of Professional Conduct and its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct. Rule 1.9(a) governs lawyers' duties to former clients. It provides as follows:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Model Rules of Pro. Conduct r. 1.9(a) (1983); D.C. R. Pro. Conduct 1.9(a).

**C.    Commerce's Refusal to Act Was Unlawful.**

"Because motions to disqualify counsel are substantive motions affecting the rights of the parties, courts in the Federal Circuit apply standards developed under federal law." *Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.)*, 837 F. 3d 1280, 1284 (Fed. Cir. 2016) (internal quotation marks omitted). Two "sets of rules govern the grant of the motion to disqualify counsel in this case"—"the ABA Model Rules of Professional Conduct, the legal profession's national ethical rules," and the District of Columbia Rules of Professional Responsibility, "the state-specific adoption of the ABA Model Rules." *Id*.

DMS_US.364917672.11

Applying those rules, this is not a close case. The Attorney violated his ethical duties under Rule 1.9(a) of the ABA Model Rules and its analogue, Rule 1.9(a) of the District of Columbia Rules. This is equally true with respect to the Accountant, the Coalition's certified public accountant in both sets of investigations. "Where nonlawyers have had access to confidential information and subsequently change firms, courts have held them to the same standards of Rule 1.9." *Makita Corp. v. United States*, 17 CIT 240, 246, 819 F. Supp. 1099, 1104 (1993).

      1.     **The Attorney and the Accountant Had a Direct and Nonconsensual Conflict of Interest.**

"Rule 1.9(a) requires disqualification if four criteria are met: (1) the moving party and opposing counsel had a prior attorney-client relationship, (2) the interests of the opposing counsel's present client are adverse to the movant, (3) the matters involved in the present underlying lawsuit are substantially related to the matters for which the opposing counsel previously represented the moving party, and (4) the moving party does not consent." *Touchcom, Inc. v. Bereskin & Parr*, 299 F. App'x 953, 954 (Fed. Cir. 2008). Each of these criteria is met here.

      a.     **Amsted Was a Former Client.**

Amsted and the Attorney had a prior attorney-client relationship, as reflected in the June 2021 engagement letter and otherwise demonstrated by their course of conduct, including sending and receiving e-mails designated as attorney-client privileged communications. That the Coalition, and not Amsted itself, filed the petition in the 2021-22 investigations is immaterial. The relationship ran directly between Amsted and the Attorney.

b.    **Amsted Became Materially Adverse to the Coalition With Respect to the 2022-23 Investigations.**

In the 2022-23 investigations, Amsted's interests were materially adverse to the Coalition's interests. The Coalition turned from Amsted's ally in the 2021-22 investigations to its foe in the 2022-23 investigations. The Attorney sided with one client against the other.

In prior proceedings at Commerce and the earlier lawsuit before this Court, the Coalition argued that it was not materially adverse to Amsted in the 2022-23 investigations. Relying on an ethics opinion from the ABA's Committee on Ethics and Professional Responsibility, the Coalition contended that material adversity does not include situations where representation is merely harmful to another entity's economic or financial interests "without some specific tangible direct harm." ABA Comm. on Ethics & Pro. Responsibility, Formal Op. 497, at 3 (2021). In this vein, the Coalition contended that if it prevailed in the 2022-23 investigations, the fact that Amsted would be required to pay duties on imports from ASF-K's FRC products is insufficient to create material adversity between the Coalition and Amsted.

The Coalition misinterpreted the ethics opinion on which it relied. True, in a general context, that a lawyer's representation of a current client might cause a former client economic harm might not, by itself, constitute material adversity. For instances, "a lawyer does not have a Rule 1.9 conflict solely because the lawyer previously represented a competitor of a current client whose economic interests are adverse to the current client." *Id.* at 3. Where, however, the representation would cause economic harm *in a specific legal proceeding in which the former client is adverse to the current client on substantially related matters*, it constitutes material adversity. As the same ethics opinion makes clear, suing a former client on a substantially related matter—being on the opposite side of the "v."—"is a classic example of representing interests

that are directly adverse and therefore 'materially adverse' to the interests of a former client." *Id*. at 4.

Strictly speaking, there is no "v." in antidumping investigations, but that is a matter of form, not substance. Antidumping investigations are quasi-judicial in nature. *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1381-82 (Fed. Cir. 2001) ("The antidumping proceedings conducted by Commerce may of course be fairly characterized as 'relatively formal administrative procedures' that adjudicate parties' rights."). Commerce itself has explained as much. "Although it is true that Commerce performs investigatory functions (such as sending out questionnaires and conducting verifications), Commerce also performs quasi-judicial functions, such as considering case briefs from respondents and petitioners and rendering decisions." Brief of Defendant-Appellee United States at 31, *Paul Muller Industrie GMBH & Co. v. United States*, 283 F. App'x 789, No. 2007-1547, 2008 WL 700912 (Fed. Cir. filed Feb. 27, 2008); *see also* Reply Brief of Defendant-Appellant United States at 40, *Heveafil Sdn. Bhd. v. United States*, 58 F. App'x 843, No. 2002-1085, 2002 WL 32620069 (Fed. Cir. filed July 16, 2002) (although Congress "has always viewed these proceedings as investigatory in nature," "Commerce's antidumping proceedings share many of the same characteristics that exist in adjudications"). Those who support a petition with Commerce are comparable to plaintiffs; those who oppose it are comparable to defendants. Some preliminary and all final decisions may be appealed to this Court, where a "v." clearly exists. It exists in *this* action. The ethics opinion on which the Coalition relies explains that material adverseness "requires a conflict as to the legal rights and duties of the clients." Formal Op. 497, at 3, and the Federal Circuit has held that antidumping investigations "adjudicate parties' rights." *Pesquera Mares*, 266 F.3d at 1381.

The material adversity is just common sense. The *Makita* court had no difficulty grasping the intuitive point that eluded the Coalition. *Makita* itself involved an antidumping investigation. The petitioner there was found to be materially adverse to an interested party. *See* 819 F. Supp. at 1105 (attorney's representation of petitioner in antidumping investigation involving the attorney's former client was 'against its interests'). This Court should likewise find that the Coalition and Amsted were materially adverse to each other in the 2022-23 investigations.

        **c.**        **The Investigations Were Substantially Related To Each Other.**

Next, the 2022-23 investigations were substantially related to the 2021-22 investigations. "Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Model Rules of Pro. Conduct r. 1.9 (1983), cmt. 3.

There is no serious question as to whether the 2021-22 and 2022-23 investigations were substantially related. They were. The 2022-23 investigations were a reprise of the 2021-22 investigations. Both sets of investigations were and are quasi-judicial antidumping investigations before the Commission and Commerce pursuant to the same body of statutory and regulatory provisions. The petitioning party in each investigation was the Coalition, of which Amsted was a former member. The FRCs covered by the investigations include E, F, and E/F couplers and E and F knuckles. Amstead's BPI concerning its FRCs was used in the 2021-22 investigations; much of that same BPI was the focus of the 2022-23 investigations. The petitions in both commonly allege that FRCs are being or are likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act. In the 2021-22 investigations, on Amsted's behalf, the Attorney and the Accountant faulted Chinese imports. In the 2022-23 investigations, on the Coalition's behalf, they faulted Chinese imports and additionally faulted imports from Mexico

after Amsted allegedly shifted its U.S. production to Mexico. The periods of investigation also substantially overlap. And, in both sets of investigations, the Coalition demanded similar forms of trade relief.

### d.    Amsted Did Not Consent to the Conflict of Interest.

Amsted never consented to [          ]'s, the Attorney's, or the Accountant's representation in the 2022-23 investigations. Although the terms and conditions of the June 2021 engagement letter included an advance waiver of potential future conflicts, by its terms that waive covered only [       ]—not [          ], the Attorney, or the Accountant—and expressly excluded "matters that are substantially related to our work for you." The 2022-23 investigations were, of course, substantially related to the 2021-22 investigations.

### e.    Any Prior Joint Representation Does Not Eliminate the Conflict.

Confusing privilege issues with conflict issues, the Coalition argued to Commerce (and before this Court in the prior case) that the Attorney's representation of M&T and Amsted as members of the Coalition's prior iteration was a "joint representation" of the two industry competitors. The most this argument might purchase is that, if Amsted shared communications with M&T within the joint representation, then those communications are not now *privileged*.

Any jointness of the representation, however, does not eliminate the conflict of interest. "Rule 1.9 of the Model Rules was designed not only to protect client confidences, but to establish broader standards of attorney loyalty." *Touchcom*, 299 F. App'x at 956 (internal quotation marks omitted). *See also Dynamic 3D*, 837 F.3d at 1286 ("the obligation to protect a client's confidential information exists as part of the larger duty of loyalty owed to clients"). The comments to Rule 1.9(a) explicitly contradict the Coalition's "joint representation" theory: "Nor could a lawyer who has represented multiple clients in a matter represent one of the clients

15

against the others in the same or substantially related matter after a dispute arose among the

clients in that matter, unless all affected clients give informed consent." Model Rules of Pro.

Conduct r. 1.9, cmt. 1. That is precisely what occurred here, albeit without informed consent.

**2.    Amsted Was Harmed by Misuse of Its Confidential Information.**

Amsted was materially harmed by misuse of the Attorney's and the Accountant's

intimate knowledge of Amsted's legal strategy for prosecuting FRC-related trade investigations,

decision-making processes, and extensive FRC-related BPI. Specifically, Amsted, as the

importer of record, was harmed by the 48.10 percent dumping margin that Commerce imposed in

its final determination, which resulted from the Coalition's misuse of confidential information

that Amsted gave to the Attorney while he was preparing the petition for the 2021-22

investigations. *See* Final Determination, at 65,154 (finding 48.10 percent dumping margin).

"It is very difficult for the human mind to compartmentalize and selectively suppress

information once learned, no matter how well-intentioned the effort may be to do so.'" *In re*

*Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010) (quoting *FTC v. Exxon*

*Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980)).

Disqualification has been mandated on less egregious facts. In *Makita*, for instance,

earlier section 337 proceedings were held to be "substantially related" to later section 731

proceedings for purposes of applying Rule 1.9(a) where "the latter would appear to be

necessarily related to plaintiffs' business practices and data, which were at the core of {the

conflicted attorney's} former confidential involvement." 819 F. Supp. at 1106. On this basis, the

*Makita* court enjoined Commerce from allowing the conflicted attorney "any access to the ITA's

investigations of Makita Corporation *et alia* at the behest of petitioner." *Id.* at 1108. Although in

this action Amsted does not contest Commerce's decision in the 2022-23 investigations to allow

the Attorney access to information released under the administrative protective order, the same

16

reasoning certainly supports Amsted's request for this Court to order Commerce to redo its

antidumping investigation and to disqualify [            ], the Attorney, and the Accountant from

participating in that investigation.

### 3.    The Conflict of Interest Must Be Imputed to [            ] Generally.

The Attorney and the Accountant are operating under a disabling conflict of interest. This

conflict is not solely their problem—it is also [            ]'s problem. The conflict of interest is

imputed to [            ] at large under Rule 1.10 of the ABA Model Rules and the District of

Columbia Rules. Rule 1.10(a) provides that "{w}hile lawyers are associated in a firm, none of

them shall knowingly represent a client when any one of them practicing alone would be

prohibited from doing so by Rules 1.7 or 1.9," unless certain exceptions not applicable here

allow otherwise. Model Rules of Pro. Conduct r. 1.10 (1983); D.C. R. Pro. Conduct 1.10.

Imputation makes particular sense because the Attorney was the Coalition's lead counsel.

In that capacity, his ethical violation surely tainted every aspect of [            ]'s representation.

His conflict must be imputed to [            ] as a whole. *See Dynamic 3D*, 837 F.3d at 1289

(imputing conflict of interest to corporate legal department for Rule 1.9 violation absent

affirmative showing that attorney's knowledge of confidential information shall not be imputed

to other counsel).

### 4.    The Conflict Warranted Disqualification.

Ethical violations do not automatically mandate disqualification—there must be a

showing that the unethical conduct tainted the proceeding. This is because "there are important

societal rights implicated by attorney disqualification, such as the right of a party to counsel of

its choice and an attorney's right to freely practice his or her profession." *Id*. at 1286.

"However, there is an overriding countervailing concern suffusing the ethical rules: a

client's entitlement to an attorney's adherence to her duty of loyalty, encompassing a duty of

DMS_US.364917672.11

confidentiality." *Id*. "'That professional commitment is not furthered, but endangered, if the possibility exists that the lawyer will change sides later in a substantially related matter. Both the fact and the appearance of total professional commitment are endangered by adverse representation in related cases. From this standpoint it matters not whether confidences were in fact imparted to the lawyer by the client. *The substantial relationship between the two representations is itself sufficient to disqualify.*'" *Makita*, 17 CIT at 249, 819 F. Supp. at 1107 (quoting *Trone v. Smith*, 621 F.2d 994, 998-99 (9th Cir. 1980)) (emphasis added) *Kearns v. Fred Lavery Porsche Audi Co.*, 745 F.2d 600, 603 (Fed. Cir. 1984) ("a 'substantial relationship' *requires* the attorney's disqualification") (emphasis added); *W.L. Gore & Assocs. v. Int'l Med. Prosthetics Research Assocs.*, 745 F.2d 1463, 1466 (Fed. Cir. 1984) (that maters were substantially related "establishes *prima facie* the case for disqualification").

Amsted's "countervailing concern" about disloyalty and breach of confidentiality is "overriding" as against the Coalition's choice of counsel and the Attorney's and the Accountant's professional self-interests. *See Dynamic 3D*, 837 F.3d at 1286. Because client confidences passed to them in the course of the 2021-22 investigations, "that would plainly be ground for disqualification in the circumstances here." *EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1461 (Fed. Cir. 1984). Here, the Coalition exploited confidential information of Amsted to which the Attorney and the Accountant became privy in the course of their representation of Amsted in the 2021-22 investigations.

**5.      Because The Conflict Of Interest Tainted The Proceedings, The Court Must Redress Commerce's Refusal to Disqualify.**

Section 516A of the Tariff Act states that this Court "shall hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law …." 19 U.S.C. § 1516a(b)(1)(B)(i). The U.S.

DMS_US.364917672.11

Supreme Court recently held that "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, slip op. at 35 (U.S. June 28, 2024). Moreover, "courts need not and under the APO may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id*. Plaintiffs submit that the new standard for review of Commerce's interpretation of its obligations and authority under the Tariff Act is the same as the new standard of review of agency action under the APA, namely that this Court must evaluate Commerce's obligations and authority under the Tariff Act without deference to Commerce's own interpretation.

Here, Commerce improperly consigned Plaintiffs to a direct, ongoing, and nonconsensual conflict of interest in the 2022-23 investigations. The resulting taint to the proceeding demands redress, whether or not Commerce was willing or able to act. Instead, the Court must act independently:

> That {the trade} agency considers itself without authority to forestall a conflict of interest other than to offer the plaintiffs a choice comparable to that of Thomas Hobson, to wit, agree that your former confidant assist your adversary in a substantially-related manner against you or withdraw your inside information so that your adversary's version of the data can be accepted as true. This is the kind of predicament a conflict of interest can cause. They are to be guarded against by all who are bound by the lawyers' rules of professional conduct, and, in those instances when resolve under the rules appears weak, courts must and will intervene to protect the practices agreed upon.

*Makita*, 819. F. Supp. at 1108. Tolerating the conflict is contrary to the Rules of Professional Conduct. Tolerating the Coalition's unfair advantage also is unreasoned and an abuse of agency discretion. "Under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a, the procedural correctness of a countervailing duty determination, as well as the merits, are subject to judicial review." *Miller & Co. v. United States*, 824 F.2d 961, 964 (Fed. Cir. 1987).

19

Regardless, Commerce's actions were, in fact, contrary to law. It erred by refusing even to consider the ethical charges against [          ], the Attorney, and the Accountant. This was done on the premise that 19 C.F.R. § 351.313—which authorizes Commerce to, for "good cause shown," disqualify an attorney from practicing before Commerce—is not intended to cover attorney conflicts of interest. IDM, at 22.

As argued in Amsted's Case Brief, "{w}hether agency or court, any institution engaging in the adjudicative process must have the power to police the professionals who practice before it." Amsted Case Brief (Aug. 18, 2023), at 30, P.R. 384 (quoting *Polyhdoroff v. ICC*, 773 F.2d 372, 375 (D.C. Cir. 1985)). This principle is no less true in the context of an agency engaged in quasi-adjudicative processes. *See Goldsmith v. United States Bd. of Tax Appeals*, 270 U.S. 117, 121 (1926) (in light of "the quasi-judicial nature of its duties," an agency may require representatives to "be persons whose qualities as lawyers or accountants will secure proper service to their clients and to help the {agency} in the discharge of its important duties"); *Herman v. Acheson*, 108 F. Supp. 723, 725 (D.D.C. 1952), *aff'd sub nom. Herman v. Dulles*, 205 F.2d 715 (D.C. Cir. 1953). Antidumping and countervailing duty investigations are quasi-adjudicative in nature. *See* Amsted Case Brief, at 31 (collecting cases).

Petitioners in antidumping and countervailing duty investigations, therefore, do not enjoy an absolute right to counsel of their original choosing where that counsel's conflict of interest threatens the investigations' integrity. Here, the Attorney's, the Accountant's, and [          ]'s failures to meet their ethical duties created the intolerable situation in which they used a former's client's secrets to advantage a current client and disadvantage the former client. Commerce can and should act to remedy this blatant conflict of interest. Following an opportunity to present his or her views, an attorney may "for good cause shown" be suspended or barred from practicing

20

before Commerce or have imposed on him such lesser sanctions as Commerce deems
appropriate. 19 C.F.R. § 351.313(a). In its Case Brief, Amsted demonstrated that such "good
cause" includes violations of the Rules of Professional Responsibility. "State ethics rules provide
an important backdrop for the federal agency rules regulating lawyers who appear and practice
before the agencies." George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev.
1963, 1972 (2016). "Lawyers who practice before federal agencies must comply with state ethics
rules, typically based on the ABA Model Rules and applicable to all lawyers, as well as with the
specific rules applicable to lawyers engaged in agency practice." *Id.*

Indeed, Commerce itself recently applied the ABA Model Rules, including Rule 1.9(a),
to evaluate whether a lawyer or law firm should be disqualified from practicing in antidumping
investigations. *See* Memorandum, Enforcement & Compliance Office, U.S. Dep't of Commerce,
*Silicon Metal from the Republic of Kazakhstan: Representation of Tau-Ken Temir LLP by Squire
Patton Boggs*, DOC Inv. No. C-834-811 (Oct. 6, 2020) (attached hereto as Exhibit A). There is
no rational reason Commerce can interpret and enforce Rule 1.9(a) in the context of one
antidumping investigation but not another. Commerce's decision to bury its head in the sand in
the face of serious allegations is the antithesis of reasoned decision-making.

### 6.    Commerce's Claimed Lack of Expertise in Conflict-of-Interest Rules Does Not Justify Ignoring Ethical Violations.

In its Issues & Decision Memo, Commerce attempts to justify its decision to ignore here
the egregious ethical violations by [            ], the Attorney, and the Accountant on the grounds
that "Commerce is not an expert in the complex area of conflict-of-interest rules." IDM, at 23.

This argument does not withstand scrutiny for at least two reasons. First, Commerce is
not an expert in numerous areas in which it is nevertheless expected to adjudicate in Title VII
investigations. For example, Commerce is often called upon to analyze tax laws of foreign

21

countries in order to determine whether a particular tax provision constitutes a countervailable subsidy, or how to treat the tax in terms of price adjustments in its dumping calculations. However, lack of expertise in a particular legal area—such as foreign tax law—does not excuse Commerce from analyzing the issue in its role as a quasi-adjudicative body. *See Zenith Elecs. Corp. v. United States*, 14 CIT 831, 852, 755 F. Supp. 397, 417 (1990) ("neither lack of expertise nor wide-ranging discretion would justify Commerce ignoring a thorough demonstration on the record of how the Japanese commodity tax would have applied in this case"), *aff'd*, 988 F.2d 1573 (Fed. Cir. 1993).

Second, numerous other Federal agencies do indeed require attorneys practicing before them to adhere to ethics rules and those agencies have established the right to review ethical violations. For example, the Securities and Exchange Commission ("SEC") has established regulations governing the standards of professional conduct for attorneys appearing and practicing before the SEC in representation of an issuer. *See* 17 C.F.R. § 205.1-.7 (2024). The SEC rules also empower the agency to impose sanctions for violations of the SEC's ethical rules. *See id*. § 205.6. As of 2016, forty-six agencies that have rules published in the Code of Federal Regulations have at least one ethics rule governing lawyers who practice before the agency. George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963, 1978, 1991 App. A (2016). Also as of 2016, ethics rules appear in twenty-six of the fifty titles of the Code of Federal Regulations. *Id*. at 1978, 1993 App. B. Some of the ethics rules covered by the various agencies specifically include detailed rules to prevent attorney conflicts of interest. For example, the Department of Treasury, Comptroller of the Currency has codified rules against attorney conflicts of interest:

> **§ 19.8 Conflicts of interest.**
> (a) ***Conflict of Interest in representation.*** No person may appear

22

as counsel for another person in an adjudicatory proceeding if it
reasonably appears that such representation may be materially
limited by that counsel's responsibilities to a third person or by the
counsel's own interest. The ALJ may take corrective measures at
any stage of a proceeding to cure a conflict of interest in
representation, including the issuance of an order limiting the
scope of representation or disqualifying an individual from
appearing in a representative capacity for the duration of the
proceeding.

(b) *Certification and waiver.* If any person appearing as counsel
represents two or more parties to an adjudicatory proceeding or
also represents a non-party on a matter relevant to an issue in the
proceeding, counsel must certify in writing at the time of filing of
the notice of appearance required by § 19.6(a):

(1) That the counsel has personally and fully discussed the
possibility of conflicts of interest with each party and non-party;
and

(2) That each such party and non-party waives any right it might
otherwise have had to assert any known conflicts of interest or to
assert any non-material conflicts of interest during the course of
the proceeding.

12 C.F.R. § 19.8 (2024).

Of course, the Office of Comptroller of the Currency has no more "expertise" in conflict-of-interest rules than does Commerce. Yet the Comptroller's lack of expertise did not prevent it from taking seriously its responsibilities to review conflicts of interest by attorneys practicing before the agency.

### 7.    The Court Should Reject Commerce's Reliance on the Preamble to 19 C.F.R. § 351.313.

In its Final Determination, Commerce relies heavily on the Preamble to 19 C.F.R. § 351.313, which it asserts that its regulation of attorneys does not "cover ethical conflicts uniquely within the province of local Bar authorities." *Regulation Strengthening Accountability of Attorneys and Non-Attorney Representatives Appearing Before the Department*, 78 Fed. Reg. 22,773-02 (Dep't of Commerce Apr. 17, 2013).

Commerce's citation to its preamble is meritless. The regulation's preamble is not

binding. Agency statements having "general applicability and legal effect" must be published in

the Code of Federal Regulations, 1 C.F.R. § 8.1(a). This preamble is not. Nor could it be. "A

regulatory preamble, such as the one at issue in this case, is not subject to notice and comment.

As a result, the preamble is not legally binding." *Peabody Coal Co. v. Dir., Off. of Workers*

*Comp. Prog's*, 746 F.3d 1119, 1125 (9th Cir. 2013). "{W}hile the preamble can inform the

interpretation of the regulation, it is not binding and cannot be read to conflict with the language

of the regulation itself." *Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998

(10th Cir. 2019). "Here, the limitations that appear in the preamble do not appear in the language

of the regulation," *id*., because the regulation itself broadly applies whenever there is "good

cause shown." 19 C.F.R. § 351.313. That easily encompasses violations of ethics rules. The

Court should "refuse to engraft those limitations onto the language." *Peabody*, 931 F.3d at 998.

In its Issues & Decision Memo, Commerce states that it disagrees that the preamble is

inconsistent with the regulation, citing dicta in a 1999 D.C. Circuit case, *Wyoming Outdoor*

*Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999), for the proposition that "the

preamble to a regulation is evidence of an agency's contemporaneous understanding of its

proposed rules." IDM, at 24 & n.125 (internal quotation marks omitted). The actual *holding* of

*Wyoming Outdoor Council*, however, was that the regulation at issue was ambiguous as well as

the preamble underlying the regulation and therefore the Court deferred to the agency's

interpretation because it was not "plainly erroneous." *Wyoming Outdoor Council*, 165 F.3d at 53-

54. The test that the D.C. Circuit applied in 1999—that courts must defer to an agency

interpretation of its own regulations unless "plainly erroneous"—is no longer good law. In 2019,

the Supreme Court handed down *Kisor v. Wilkie*, 139 S.Ct. 2400, 2416 (2019), which discredited

24

the "plainly erroneous" standard, concluded that agency constructions of rules do not receive greater deference than agency constructions of statutes under the *Chevron* doctrine, and severely limited deference to the agency's interpretation of its own regulation to a narrow range of cases in which the regulation is "genuinely ambiguous" and a court has "exhaust{ed} all the 'traditional tools' of construction"). And on June 28 of this year, the Supreme Court overruled *Chevron* itself. *See Loper Bright*, slip op. at 35 (U.S. June 28, 2024). In short, this Court should not rely on *Wyoming Outdoor Council*—or any other case purporting to favor agency interpretations of their own regulations—as a substitute for a Court's independent analysis of the regulation itself. Here, the plain language of 19 C.F.R. § 351.313 cannot be ignored in favor of Commerce's interpretation of what constitutes "good cause shown."  Rather than providing "clarity" to the regulation, Commerce is in fact trying to use the Preamble to *overturn* the regulation, which under current controlling Supreme Court precedent this Court cannot allow.

### 8.    Commerce's Passing the Buck to Local Bar Authorities Leaves Amsted With No Adequate Remedy.

In its Issues & Decision Memo, Commerce declares that "{w}e will not police the compliance of attorneys with the local Bar rules" because "Commerce is not an expert in the complex area of conflict-of-interest rules."  IDM, at 23.

This approach is misguided, because a discipline-only approach leaves Amsted without an adequate remedy:

> Perhaps more importantly, discipline on the merits pales in comparison to the disqualification remedy; discipline will not cure the violation in the same way that disqualification could. Disqualification stops (*i.e.*, enjoins) the conflict. Discipline, however, effectively permits the conflict to continue for months or years as the disciplinary investigation ensues (assuming it ensues), and even after the investigation and potential subsequent prosecution conclude, discipline (or a malpractice action) almost never involves an injunction against a specific representation. To be sure, if the disciplinary sanction is disbarment or suspension, all

> representations are effectively enjoined. Such a substantial
> sanction for first-time (or even second-time) conflicts of interest is
> rare, however. When other, more common sanctions are imposed
> (*e.g.*, reprimand, admonishment, or censure), this "remedy" is not
> much of a remedy for continuing-violation cases; it does not
> retroactively protect the confidential information or restore the
> lawyer's loyalty to the client, for example.

Keith Swisher, *The Practice and Theory of Lawyer Disqualification*, 27 Geo. J. Legal Ethics 71,

115 (2014). "Because disqualification is a unique and effective remedy, discipline cannot fully

replace disqualification." *Id.* at 116.[1]  In other words, it simply will not do for Commerce to pass

the buck to the Bar authorities, because it provides no actual *remedy* to compensate Amsted for

these ethical violations.

Moreover, in Amsted's 2022 interlocutory attempt to appeal the Commission's refusal to

evaluate the same ethics issue, this Court dismissed the case on jurisdictional grounds as

essentially premature, but in so doing assured Amsted if it waits until the end of the investigation

and appeals under Section 1581(c) jurisdiction, the Court possesses "the power to remedy

violations of professional ethics with disqualification, sanctions, or other relief." *Amsted Rail

Co., Inc. v. U.S. Int'l Trade Comm'n*, 46 CIT ___, 600 F. Supp. 3d 1308, 1329 (2022). Despite

Commerce's attempt to evade its own responsibility to police attorneys practicing before the

agency, this Court has plenary power to remedy ethical violations, and based on this court case,

it can do so by overturning Commerce's final determination and requiring Commerce to conduct

the investigation again, without representation by [          ], the Attorney, or the Accountant.

That appears to be within the Court's power, since the Court insisted that interlocutory relief

---

[1] Amsted included this quote in its case brief, but, bizarrely, Commerce rejected Amsted's case brief and required Amsted to redact this quote from the case brief and refile it on the grounds that this quote from *a law review article* constituted "new factual information."  Letter from Commerce to Amsted Rail Company (Aug. 17, 2023), at 1, P.R. 382.

26

under Section 1581(i) jurisdiction was not "manifestly inadequate" and this appears to be the only remedy left for Plaintiffs.

**D.    Because of the Ethical Violations Committed by [          ], the Attorney, and the Accountant, the Court Should Remand to Commerce With Instructions to Terminate the Investigation.**

All of the conflict of interest violations described herein are intolerable and tainted Commerce's investigation. In refusing to make a determination whether [          ], the Attorney, and the Accountant violated their ethical responsibilities, Commerce abrogated its responsibility to maintain the integrity of its proceeding. As a result, this Court should order disqualification of [          ], the Attorney, and the Accountant from this investigation. But merely ordering a redo of the investigation without their participation is not sufficient. As the Federal Circuit has explained, "continuing a case after disqualification without dismissal would greatly prejudice a party because the case would be tried on a record developed primarily through the fruits of the disqualified attorney's unethical labor." *Dynamic 3D*, 837 F.3d at 1291 (citations omitted). Here, "forcing {Plaintiffs} to break new ground with a fresh complaint and clean docket rather than to continue drawing from a poisoned well" would abate "the improper use of {Plaintiffs'} confidential information in preparing the original {petition}." *Id*. (affirming dismissal of case based on attorney disqualification). All aspects of the proceedings were contaminated by the Attorney's actions, from the preparation of the petition to the determination of the product scope. *See id*. ("Dynamic 3D's pleadings were drafted by lawyers presumed to possess Schlumberger's confidential information and that the significant prejudice that Schlumberger would face, if the case were to continue, outweighed the harsh result of dismissal. We do not dispute the court's conclusion. All aspects of the case were contaminated by Rutherford's actions, from the purchase of the '319 patent, to preparation for suit against Schlumberger, to the actual filing of the suit.").

27

## II.  COMMERCE'S DETERMINATION THAT AMSTED'S HOME MARKET WAS NOT VIABLE IS NOT IN ACCORDANCE WITH LAW AND IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

### A.    Standard of Review.

Under the Tariff Act, this Court cannot affirm Commerce's determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The U.S. Court of Appeals for the Federal Circuit had previously reviewed questions of statutory interpretation of Title VII of the Tariff Act using the two-step *Chevron* analysis. *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1380 (Fed. Cir. 2001) (explaining *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) and finding courts have an "obligation to afford *Chevron* deference to Commerce's interpretations of ambiguous statutory terms articulated in the course of Commerce' antidumping determinations"). Under *Chevron*, the court determines "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *see also Shanxi Hairui Trade Co., Ltd. v. United States*, 39 F.4th 1357, 1360-61 (Fed. Cir. 2022) (quoting *Chevron*). "If the intent of Congress is clear," the court "must give effect to that intent." *Id.* (internal quotation marks omitted). "But if the statute is silent or ambiguous with respect to the specific issue," the court "then under *Chevron* Step Two…must defer to Commerce's interpretation if its answer is based on a permissible construction of the statute." *Id.* (internal quotation marks omitted).

*Chevron*, however, is no longer good law. *See Loper Bright Enters. v. Raimondo*, slip op. at 35 (U.S. June 28, 2024) ("*Chevron* is overruled"). In overruling *Chevron*, the U.S. Supreme Court has held that "agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 15 (emphasis original). The Court in *Loper Bright* explained as follows:

> In an agency case as in any other, though, even if some judges might (or might not) consider the statute to be ambiguous, there is a best reading all the same—the reading the court would have reached if no agency were involved. It therefore makes no sense to speak of a "permissible" interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best. In the business of statutory interpretation, if it is not the best, it is not permissible.

*Id*. at 23 (cleaned up). That is because "{t}he very point of traditional tools of statutory construction—the tools courts use every day—is to resolve statutory ambiguities." *Id*. Unlike agencies, "{c}ourts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." *Id*. at 26.

In *Loper Bright*, the Supreme Court stated that in exercising its independent judgment to interpret the statutes that agencies administer, "courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes." *Id*. at 16 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). As such, the agency's interpretation of the statute is not entitled to the degree of deference provided in *Chevron*; the weight that courts may give to the agency's interpretation would "depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

But returning to the task of interpreting the statute—which under *Loper Bright* rests squarely with the courts without deference to the agency—the tools of statutory construction undoubtedly include—and arguably start with—dictionary definitions. The Federal Circuit as held repeatedly that "in order to ascertain the established meaning of a term, it is appropriate to consult dictionaries". *Agro Dutch Industries Ltd. v. United States*, 508 F.3d 1024, 1031 (Fed. Cir. 2007) (cleaned up) (citing *Pesquera Mares*, 266 F.3d at 1382); *see also*, *e.g., Mid Continent*

DMS_US.364917672.11

*Steel & Wire, Inc. v. United States*, 941 F.3d 530, 538-39 (Fed. Cir. 2019) (relying on dictionary definition to divine the "ordinary understanding" of the term "available" in 19 U.S.C. § 1677b(e)(2)(B)).

### B.    Background Concerning Commerce's Determination of Normal Value.

The issue here concerns Commerce's treatment of sales that Amsted made of FRCs produced by ASF-K by selling them to OEM railcar manufacturers located in Mexico that use the FRCs to make an end-of-car subassembly, which in turn the OEM uses to manufacture a complete railcar in Mexico. Amsted's sale to the OEM railcar manufacturers is executed through what is known as the "IMMEX" program. Amsted originally explained the nature of its sales through the IMMEX program in its Section A questionnaire response on November 30, 2022.[2] Amsted Section A Response (Nov. 30, 2022), at 5, P.R. Doc. 110.

Amsted reported its Section B questionnaire response using Mexico as the comparison market on January 11, 2023. Amsted Section B Response (Jan. 11, 2023), P.R. 157. On March 10, 2023, Commerce issued a questionnaire requesting that Amsted report third country sales data. Commerce Third Country Questionnaire (Mar. 10, 2023), P.R. 240. Commerce issued its preliminary scope determination on March 28, 2023, determining that FRCs mounted to rail cars should remain within the scope of the investigation. Preliminary Scope Determination (Mar. 28, 2023), P.R. 268. On March 31, 2023, Amsted submitted its

---

[2] The IMMEX program is an import-duty avoidance program that allows manufacturers to avoid import duties upon the condition that the imported goods are later exported or shipped within Mexico to another IMMEX participant within a set time frame. If the goods are not exported or shipped within Mexico to another IMMEX participant within the set time frame, the IMMEX program then merely provides for the deferral of duties as they would become due upon failure to export. Factories that participate in the IMMEX program are known as *maquiladoras* or *maquilas*. Amsted Section A Response (Nov. 30, 2022), at 5, P.R. 110. Mexico manages the temporary import of material for use in *maquiladora* manufacturing via *pedimentos*. A *pedimento* is the legal document used to import materials and components incorporated into the production of goods into Mexico. It allows them to be temporarily entered into Mexican territory to be subsequently transformed or used to create and end product. The end product can either be exported or entered into the Mexican customs territory upon payment of import duties. *Id*. at 20.

third country questionnaire response providing data with respect to its Canadian market sales. Amsted

Third Country Response (Mar. 10, 2023), P.R. 273.

Commerce first made a decision regarding Amsted's home market viability in its Preliminary

Determination. Home Market Viability Memorandum (Apr. 27, 2023), C.R. 241.  Commerce framed its

analysis at that time as three issues: (1) whether Amsted's sales were in fact exported to the U.S.; (2)

whether Amsted had knowledge that its sales were destined for the U.S. market; and (3) whether

Amsted's IMMEX sales were home market sales. *Id.* Commerce analyzed Amsted's IMMEX sales

without any reference to knowledge regarding consumption in the home market. Commerce's determined

that when mounted FRCs "continue to be a distinct article of commerce even after they are {mounted

onto railcars}," then FRCs "are not consumed in Mexico during the production of railcars." *Id.* at 5.

Commerce also preliminarily determined that "since these sales are part of the IMMEX program … these

couplers are not sold for consumption in Mexico." *Id.*

For purposes of its Final Determination, rather than answer the straightforward and predicate

question of whether Amsted's FRCs *are actually consumed* in the home market, Commerce continued to

frame the issue based on facts specific to Amsted's participation in the IMMEX program and for the first

time introduced a specific knowledge component to its analysis.  IDM, at 12, 15. Specifically, Commerce

placed an affirmative burden on Amsted with respect to its knowledge at the time of sale, asking "whether

Amsted knew or should have known that its freight rail couplers sold into the IMMEX program would be

consumed in Mexico." *Id.* at 12.  Commerce then defined consumption for purposes of this affirmative

knowledge requirement as a "test of whether IMMEX sales are consumed in the home market {is}

whether the buyers process the foreign like product into non-subject merchandise." *Id*. at 15.

Essentially, Commerce casts the issue of home market viability in a results-driven manner as its

analysis boils down to whether Amsted knew that the sales it made to OEMs in Mexico were transformed

into non-subject merchandise.  The answer is no, because Amsted's home market customers—the

OEMs—generally consume FRCs to produce freight rail cars. In the real world that would be considered

a substantial transformation and would constitute a consumption of the FRCs, That Commerce's scope of

31

investigation includes FRCs integrated into a rail car should have no bearing on a consumption analysis. Nonetheless, by hinging its home market viability determination on this scope provision Commerce incorrectly concluded that Amsted's sales to OEM buyers through IMMEX are not home market sales. *Id*. at 15.

As explained below, Commerce's analysis ultimately fails on its basic principles because (1) Amsted's FRCs are "consumed" pursuant to the plain and ordinary meaning of the word as required by *Loper Bright*; and (2) even assuming *arguendo* that an analysis of Amsted's knowledge at the time of sale is required under the facts of this case to determine whether there are home market sales, Commerce applied the wrong standard by placing an affirmative burden on the respondent, thus its decision requires no deference under *Skidmore*.

### C. Commerce's Determination that Consumption in the Home Market Requires Subject Merchandise be Transformed into Non-Subject Merchandise is Not in Accordance with the Law.

#### 1. Determination of the Sales to be Used to Ascertain Normal Value Requires Interpretation of the Term "Consumption".

Section 773 of the Tariff Act (19 U.S.C. § 1677b) details how Commerce is to determine "normal value" for purposes of its dumping calculations. The statute establishes a presumption— a default rule—that Commerce must base normal value on the price of the respondent's sales in the home market, specifically:

> the price at which the foreign like product is first sold (or in the absence of a sale, offered for sale) *for consumption in the exporting country*, in the usual commercial quantities and the ordinary course of trade ….

19 U.S.C. § 1677b(a)(1)(B) (emphasis added); *see also Z.A. Sea Foods Priv. Ltd. v. United States*, 47 CIT ___, 606 F. Supp. 3d 1335, 1339 (2023) ("the default method under the current statutory scheme … is to use home market sales value" for normal value), *aff'd mem.* 2024 WL 2873428 (Fed. Cir. June 7, 2024). The statute allows Commerce, as an alternative, to use third country sales as the basis for normal value only if "the foreign like product is *not sold (or offered*

*for sale) for consumption* in the exporting country …." 19 U.S.C. § 1677b(a)(1)(C)(i); *see also*

*Z.A. Sea Foods*, 47 CIT at ___, 606 F. Supp. 3d at 1339.

Thus, by the plain language of the statute, in this case the statute required Commerce to

use Amsted's home market sales as the basis for normal value—*not* third country sales—unless

Commerce determined that the foreign like product was not sold *for consumption* in Mexico (the

exporting country).

> **2.    The Plain and Ordinary Meaning of the Term "Consumption" Is the "Use of Something".**

Title VII of the Tariff Act does not define the term "consume" or "consumption." In the

absence of a statutory definition, in the administrative proceeding Amsted pointed to the ordinary

dictionary definition of "consumption" as the "use of something" Amsted Case Brief, at 8 & n.25

(quoting Merriam-Webster online dictionary), https://www.merriam-

webster.com/dictionary/consumption.

> **3.    Amsted's FRCs Are "Consumed" When Used by Railcar Manufacturers in Mexico to Manufacture a Freight Railcar.**

Undoubtedly, an FRC is used in Mexico once mounted onto a freight railcar and

subsequently used to transport the railcar itself and/or goods inside the railcar. The assembly

process described by Commerce in its Final Scope Memorandum describes consumption of the

FRC as it is used to make a separate end-of-car subassembly, which is then consumed in the

process of manufacturing the freight railcar. Amsted Case Brief, at 8 & n.26 (citing Final Scope

Memorandum (May 16, 2023), at 9, P.R. 332). Moreover, the finished railcar is then connected

to other railcars and to the locomotive, to make a working freight train, which is then used

(including the FRC and all of the parts that have been transformed) by traveling in Mexico, until

it eventually is used for freight operations in Mexico or is exported. *Id.*

DMS_US.364917672.11

The administrability of the scope as it concerns FRCs mounted to freight rail cars, in particular with respect to non-consumption entries as instruments of international trade, was a significant issue in the underlying investigation.  Accordingly, Commerce sought CBP's guidance on the entry of FRCs mounted to freight rail cars and memorialized the inter-agency discussions in a Memorandum to the File.  *See* Memorandum to the File from Peter Zukowski, re:  Certain Freight Rail Couplers and Parts Thereof from Mexico and the People's Republic of China:  Video Calls with Customs and Border Protection" (Mar. 2, 2023).  P.R. 222.  CBP's views on the nature of a freight rail coupler's function respective to a freight railcar necessitate a commonsense view that consumption occurs in the home market further support a reasonable interpretation that the FRC is consumed by mounting it onto a freight rail car.

Specifically, CBP stated that "if a freight rail car is exempt from entry requirements under {instrument of international traffic provisions}, the exemption extends to the rail car's constituent components" which include FRCs.  *Id.* at 2. Moreover, CBP stated that FRCs are "a part of" freight railcars.  CBP also called an FRC a "component" of a freight railcar.  *Id.*  Finally, CBP also treated attaching an FRC to a freight railcar as equivalent to *integrating* an FRC to a freight railcar.  *Id.*  Although a different agency, but nevertheless in the context of the same antidumping proceeding, CBP's view of consumption agrees with the plain meaning of the term consumption and contradicts Commerce's twisted definition of consumption.  Commerce's statutory interpretation of the term consumption, as used in 19 U.S.C. § 1677b(a)(1)(B), is not even a reasonable interpretation, much less the *best* interpretation, which *Loper Bright* commands this Court to determine.

DMS_US.364917672.11

4.      **Commerce's Determination To the Contrary Conflicts With the Plain Language of the Statute.**

Nowhere in its Final Determination does Commerce offer an alternative dictionary definition of the term "consumption" or present an argument that the term "consumption" itself should be assigned anything other than its ordinary meaning. That should be the end of the matter, given this Court's sole responsibility under *Loper Bright* to interpret the statute. However, even applying the *Skidmore* test, this Court should reject Commerce's gloss on the statute because it does not evince "thoroughness" in its consideration, "validity" in its reasoning, or "consistency with earlier and later pronouncements." *See Skidmore*, 323 U.S. at 140.

a.      **Commerce's Reliance on a "Knowledge" Test Is a Red Herring.**

Instead of presenting a straightforward interpretation of the statutory term "consumption," Commerce avoids the terms of the statute itself. Commerce cites *Tung Mung Development Co., Ltd. v. United States*—a 2001 opinion of this Court and therefore not binding precedent—for the proposition that "sales should be reported as home market sales if the producer 'knew or should have known that the merchandise {it sold} was for home consumption based upon the particular facts and circumstances surrounding the sales.'" I&D Memo, at 11 (quoting *Tung Mung Dev. Co. v. United States*, 25 CIT 752, 783 (2001)). However, Commerce misses the point here, because it is indisputable on this administrative record that Amsted knows that it is selling the FRCs to railcar manufacturers in Mexico. *Amsted's knowledge as to what happens to the railcars after production in Mexico is irrelevant to the statutory construction issue here.* Instead, the issue is whether FRCs that are used by the railcar manufacturers in Mexico are *used to make an end-of-car subassembly* and thus are *consumed in the manufacture of a railcar in Mexico*, regardless of whether the railcar is then shipped to the United States, shipped to a third country, or remains in Mexico.

> b. **Commerce's Assumption That FRCs Must be Transformed Into "Non-Subject Merchandise" to be "Consumed" Is Unsupported by the Plain Meaning of the Statute.**

Commerce also relies on its past determination in *Sugar from Mexico*, in which it also examined sales made pursuant to the IMMEX program.

In *Sugar from Mexico*, Commerce found that "'{w}here the sugar is further manufactured into non-subject merchandise and consumed in Mexico, the sale of {sic} the such sugar may properly be treated as a home market sale.'" I&D Memo, at 12 & n.59 (quoting *Agreement Suspending the Antidumping Duty Investigation on Sugar from Mexico*, 87 Fed. Reg. 932 (Dep't Commerce. Jan. 7, 2022) (prelim. results), and accompanying Preliminary Decision Memo at 8).

But the passage that Commerce quotes in *Sugar from Mexico* does not stand for the proposition that the FRCs must be not only "used" to be "consumed," but also must be transformed into an out-of-scope product to be considered to be "consumed" in the home market and therefore usable as the basis for normal value. In fact, in *Sugar from Mexico* Commerce did *not* consider a situation where the in-scope product is transformed into a downstream product that itself is nevertheless still within the scope. Instead, in that case Commerce simply addressed the opposite situation—where in-scope sugar *was* further manufactured into a downstream product in Mexico—and concluded that in that situation, the sale of the sugar was properly treated as a home market sale, and therefore usable for normal value. *Id*. In other words, *Sugar from Mexico* merely said that transformation in the home market from an in-scope to an out-of-scope product was *sufficient* to confer home market status but did not hold that transformation to an out-of-scope process was *necessary* to confer home market status.[3]

---

[3] Similarly, in *Tung Mung*, the court cited previous Commerce determinations for the proposition that "{m}erchandise sold in the home market, even if ultimately destined for export, is

DMS_US.364917672.11

Furthermore, the IMMEX program does not change the analysis. In the home market, Amsted's original equipment manufacturer ("OEM") customers pick up the sale of Amsted's FRCs (which ASF-K produces for Amsted in a manner akin to a toll producer) on an *ex works* basis. Amsted Section A Response, at 7, 19. On paper (using the *pedimento*), the FRC is "virtually exported" to the United States (to avoid Mexican VAT), but physically the FRC is shipped directly from ASF-K to a second *maquila* in Mexico, which is the OEM railcar manufacturer. Amsted First Supplemental Questionnaire Response (Jan. 24, 2023), at 4-6, C.R. 159. The OEM railcar manufacturer then manufactures the end-of-car subassembly and eventually the final product—a railcar that, if exported to the United States or a third country, can avoid liability for Mexican VAT. Alternatively, the railcar manufacturer could leave the railcar for use within Mexico, but then VAT would be owed. As Commerce itself conceded in the information, "the IMMEX program allows the subject merchandise to be sold into the Mexican market and does not require export." Amsted Case Brief, at 11 (citing Preliminary Home Market Viability Memorandum, at 5, C.R. 241).

<blockquote>

c.      **Even If the Court Were to Decide That Amsted's Knowledge of the Disposition of the FRCs It Sold to OEMs in Mexico Matters, Commerce's Past Practice Does Not Allow It to Assume That Amsted Knew Its FRCs Would Be Exported.**

</blockquote>

As noted above, Amsted's knowledge (or lack thereof) as to the ultimate destination of FRCs that it sold to OEMs in Mexico does not matter for determining whether Amsted's home market was viable, because, under the ordinary dictionary meaning of "consumption" (*See, e.g., Sugar from Mexico*, at 8, basing its viability determination solely on consumption without a single reference to the respondent's knowledge), Amsted's sales to OEMs in Mexico were

---

'consumed' in the home market if it is used there to produce non-subject merchandise prior to exportation." *Tung Mung*, 25 CIT at 783.

consumed in Mexico because they were used there in the manufacture of end-of-car subassemblies and incorporation into railcars. As a result, Amsted sold FRCs *for consumption* in its home market, within the meaning of 19 U.S.C. § 1677b(a)(1)(B), regardless of what Amsted did or did not "know".

Commerce's past practice is *not* to presume that a foreign producer's lack of knowledge as to the ultimate disposition or location of its home market sales forecloses such sales from being treated as home market sales. Rather, the opposite is true, in making an assessment on knowledge, the question is whether a producer "knew or should have known that the merchandise was *not* for home consumption." *Stupp Corp. v. United States*, 43 CIT ___, 359 F. Supp. 3d 1293, 1310 (Ct. Int'l Trade 2019) (*aff'd in part, vacated in part, remanded*, 5 F. 4th 1341 (Fed Cir. 2021); *see also INA Walzlager Schaeffler KG v. United States*, 21 CIT 110, 123-24, 957 F. Supp. 251, 263-64 (Ct. Int'l Trade 1997) (*aff'd* 108 F. 3d 301 (Fed. Cir. 1997) (framing Commerce's review of knowledge with respect to home market sales as a question of whether respondents knew or should have known that the sales were *not* consumed, *i.e.* were for export, not whether they could affirmatively prove consumption) *cf.* I&D Memo at 14 (finding that Amsted's position that its *lack* of knowledge as to the disposition of the downstream sale is not the appropriate standard for measuring home market viability). Again, it is for this reason that the question of knowledge as it related to the home market is inapposite because Amsted does have affirmative knowledge that its sales were consumed by its OEM customers.

Nonetheless assuming, *arguendo*, that the Court finds there is not affirmative evidence of consumption pursuant to the OEM customers use of the FRCs in downstream, Amsted still lacks any affirmative knowledge that the FRC once mounted onto a freight rail car were destined for export. It bears repeating that Commerce acknowledged the IMMEX program does not require

the downstream freight rail cars be exported if VAT is paid by Amsted's OEM customers.  *See, e.g.,* Amsted Case Brief, at 11 (citing Preliminary Home Market Viability Memorandum, at 5, C.R. 241).  Importantly, the courts have framed the burden of excluding sales from the home market as being on the party seeking to exclude those sales, and, in particular, requiring a showing that the respondent "knew or should have known that the merchandise was *not* for home market consumption." *INA Walzlager Schaeffler*, 21 CIT at 123-24, 957 F. Supp. at 263-64. Accordingly, Commerce cannot meet this burden with respect to Amsted's home market sales given its clear acknowledgement of the potential for sales to be consumed in the home market.

In a recent investigation involving *Tin Mill Products from Canada*, Commerce summarized this position, stating as follows:

> If a respondent does not know, or have reasons to know, at the time of sale whether merchandise sold to domestic customers is domestically further processed into non-scope merchandise or otherwise consumed before exportation, the respondent does not know, or have reasons to know, that merchandise sold domestically is exported for purposes of classifying such sales as home market sales and finding its home market viable.

*Tin Mill Products from Canada*, 89 Fed. Reg. 1542 (Dep't Commerce Jan. 10, 2024) (final determ.) and accompanying IDM, at 7-8; *id*. at 8 n.38 (collecting cases). To put a fine point on it, Commerce explained further:

> For purposes of finding home market viability, to determine that Dofasco {the respondent} knew, or had reasons to know, at the time of sale that merchandise it sold to Canadian customers was exported to third countries, Dofasco had to know at the time of sale that the merchandise was exported to third countries as in-scope merchandise without domestic consumption or further processing into non-scope merchandise. Information on the record of this investigation does not support a conclusion that Dofasco knew, or should have known, that its domestic sales that it reported as home market sales were exported to third countries without domestic consumption or further processing.

*Id*. at 8. As a result, Commerce determined that the respondent's sales to customers in its Canadian home market were properly treated as home market sales—and thus formed the basis for calculating normal value—despite the petitioners' protest that the respondent made these sales based on the general knowledge and understanding that the customers would export them to third-country markets and would not consume them in Canada. *Id*. at 4.

In other words, Commerce's past practice does not require respondents to prove actual or imputed knowledge that the merchandise was to be consumed in the home market, rather there is a burden on the party advocating for exclusion to demonstrate affirmative evidence that the sales were *not* for home market consumption.  So, again, assuming *arguendo* that mounting an FRC to a freight rail car does not amount to affirmative knowledge of consumption which Amsted avers it has proven, then Commerce's analysis still fails.

Indeed, the Court must conclude that Amsted's home market was viable, because there is nothing on the record demonstrating affirmatively that Amsted had specific knowledge that the railcars that the OEMs manufactured in Mexico (using Amsted FRCs) were exported. Commerce only relies on the "nature of the IMMEX program {as} to encourage export" while simultaneously acknowledging that the IMMEX program does not require export of the downstream merchandise to impute knowledge of export to Amsted.  *See, e.g.,* Amsted Case Brief, at 11 (citing Preliminary Home Market Viability Memorandum, at 5, C.R. 241).

Commerce fails to include a single piece of record information related to the sales at issue that Amsted had any knowledge as to the destination of the downstream freight rail car. *See, e.g.,* Verification Report (July 12, 2023), C.R. 314.  Rather, the record shows that Amsted's OEM customers are unaffiliated producers for which Amsted is in no position to demonstrate with documentary or physical evidence at the time of sale that the FRC sold will be mounted

onto a freight rail car and subsequently exported or not.  *See, e.g., Tin Mill Products from Canada*, 89 Fed. Reg. 1,542 (Dep't Commerce Jan. 10, 2024) (final determ.) and accompanying IDM, at 12.  Commerce's investigation in *Tin Mill Products from Canada* found that the respondent's relationship to its home market customer was relevant for determining whether a respondent could even provide such evidence.  *Id. cf.* I&D Memo at 14 (placing the burden on Amsted to demonstrate that its downstream customers paid VAT on domestic sales).  Just like the investigation in *Tin Mill Products from Canada*, there is no evidence that Amsted knew the ultimate disposition of the downstream sale or even a reason to believe that such evidence should exist.  *Id.*

> **d.      That Amsted's FRCs remain Subject Merchandise Once Mounted Onto a Freight Rail Car Matters Not When Considering Knowledge of Consumption in the Home Market.**

Notably, Commerce's Issues & Decision Memo fails to address the well-established practices outlined above, stating that the only thing "pertinent to this question of consumption in the home market" is Commerce's final scope determination which found that FRCs "attached to railcars remain a distinct article of commerce and are within the scope of the investigations." IDM, at 14.  Yet, application of the appropriate knowledge paradigm (again assuming *arguendo* that the agency need even reach this level of analysis) wholly upends this contention.  When considering knowledge, not consumption, the fact that once sold to an OEM the merchandise was not transformed into merchandise outside the scope, matters not.

Consider home market sales to resellers which are regularly accepted as home market sales without issue or further analysis by Commerce.  Sales to resellers are accepted as home market sales under the paradigm that respondents need not prove whether each home market sale is for consumption in the home market, rather the appropriate question is whether the respondent had reason to know that the sale was not for home market consumption.  *See, e.g., INA*

41

*Walzlager Schaeffler KG v. United States,* 21 CIT at 123-24, 957 F. Supp. at 263-64.

Accordingly, if the Court were to accept Commerce's position that lack of knowledge is not the appropriate standard, but rather that a respondent *must* affirmatively prove consumption in the home market (notwithstanding Amsted's position that it does indeed do so here), an inundation of cases challenging home market viability should be expected. Commerce attempts to waive this similarity away by claiming that the facts here are "unique". Nevertheless, Commerce provides no explanation as to why a sale to a reseller which remains subject merchandise at the time of the subsequent downstream sale, and the sale by Amsted's OEM customer of a mounted FRC which remains subject merchandise at the time of the downstream sale, are not functionally the same.

For the reasons stated above, Commerce's attempt here to impute to Amsted knowledge that its FRCs would *not* remain in Mexico after being used to manufacture railcars in Mexico— and therefore that its sales to these OEMs in Mexico were *not* home market sales—is inconsistent with Commerce's recent practice and therefore is not entitled to any *Skidmore* deference.

### D. The Court Must Reject Commerce's Position that the Issue of Home Market Viability Cannot be Reassessed During the Course of a Proceeding.

In its Issues & Decision Memo, Commerce initially attempts to dismiss Amsted's home market viability argument because of "Commerce's consistent practice of not revisiting comparison market viability determinations at the final determination stage." *See* IDM, at 10 (citing *Certain Preserved Mushrooms from the Netherlands*, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 23, 2023) (final determ.) and accompanying IDM, at cmt. 16).

This Court should reject Commerce's initial attempt to brush off Amsted's market viability argument on expediency grounds. There is no jurisdiction-stripping or other authority

that prevents this Court from reviewing whether Commerce's home market viability

determination is based on an incorrect interpretation of the statute. Commerce's framing is

inconsistent with its practice in other proceedings where the agency has revisited its choice for

comparison market at various stages, including in remands.  *See Z.A. Sea Foods*, 606 F. Supp. 3d

at 1343 (addressing interpretation of "for consumption" for purposes of determining normal

value). To hold otherwise would strip respondents of their judicial and administrative remedies.

III.    **IF AMSTED'S SALES OF FRCS TO OEMS IN MEXICO ARE NOT HOME
        MARKET SALES, THEN COMMERCE'S DECISION NOT TO TREAT THEM
        AS U.S. SALES IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND/OR
        NOT IN ACCORDANCE WITH LAW.**

Based on Commerce's reasoning that specific record evidence exists that Amsted's

IMMEX sales to OEMs in Mexico are for export, and thus are not consumed in the home market,

logically the same evidence should have led Commerce to treat Amsted's Mexican sales as U.S.

sales.  *See* Home Market Viability Memorandum, at 6.  Apparently, however, Commerce treated

these sales as neither fish nor fowl.  The exact basis for Commerce's decision to do so is not

entirely clear: is it based on Commerce's interpretation of particular statutory terms of Section

773 of the Tariff Act (19 U.S.C. § 1677b), its interpretation of particular statutory terms of

Section 772 of the Tariff Act (19 U.S.C. § 1677a), or simply based on its evaluation of the record

evidence applied to agreed-upon statutory definitions. But whatever the basis this Court might

divine from the Final Determination, Commerce's decision to treat these sales as neither home

market nor U.S. market sales is unsupported by substantial evidence and/or is not in accordance

with law.

While Commerce does not explicitly cite to the record for its determination, the only

record evidence supporting Amsted's imputed knowledge of export comes from information

placed on the record by the Petitioner. *See, e.g.,* Petitioner's Comments in Advance of the

Preliminary Determination (March 27, 2023) at 8-12.  The Petitioner has maintained throughout this investigation that Amsted's sales are not only destined for export, but for export to the United States.  *Id.*  While Amsted continues to aver that this record evidence does not meet the standard of the knowledge test, if Commerce is to accept that it supports a determination as to export, it must also accept that it supports a determination as to export to the United States. In the Final Determination, Commerce simply points to its Preliminary Home Market Viability Memorandum and asserts that it cannot "comport itself exactly with all market viability arguments made by the petitioner". IDM, at 17. But this simply misses the point. Commerce cannot have it both ways by finding on the one hand that the large quantity of sales of FRCs by Amsted to OEMs in Mexico, through the IMMEX program, are not home market sales because they must ultimately be exported, yet at the same time also cannot be U.S. sales. Commerce's attempt to assume all such sales are therefore somehow third-country exports and therefore may be ignored on *both* sides of Commerce's dumping calculation is a conclusion unsupported by substantial evidence and/or is not in accordance with law.

## IV.    CONCLUSION AND PRAYER FOR RELIEF.

For all of the above reasons, this Court should hold Commerce's Final Determination to be unsupported by substantial evidence and not in accordance with law. With respect to the conflict of interest issue, this Court should remand the matter to Commerce with instructions to dismiss the petition and terminate the investigation. Should this Court decide not to order termination of the investigation, the Court should remand to Commerce to recalculate the dumping margin using Amsted's sales to OEMs in Mexico under the IMMEX program as home market sales adequate to form the basis for normal value. Finally, if the Court declines to order

PUBLIC VERSION

Commerce to treat these sales as home market sales, the Court should remand to order

Commerce to treat these sales as U.S. sales.

Dated: July 15, 2024                                     Respectfully submitted,

                                                        /s/ Richard P. Ferrin
                                                        Douglas J. Heffner
                                                        Brian P. Perryman
                                                        Richard P. Ferrin
                                                        Carolyn Bethea Connolly
                                                        FAEGRE DRINKER
                                                        BIDDLE & REATH LLP
                                                        1500 K Street, NW, Suite 1100
                                                        Washington, DC 20005
                                                        (202) 230-5803

                                                        *Counsel for Plaintiffs*
                                                        *Amsted Rail Company, Inc. and*
                                                        *ASF-K de Mexico S. de R.L. de C.V.*

45

**PUBLIC VERSION**

**Certification of Compliance with Standard Chamber Procedures Rule 2(B)(1)(a)**

The undersigned hereby certifies that the foregoing brief contains 13,911 words, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum word count limitation of 14,000 for primary briefs set forth in Standard Chamber Procedures Rule 2(B)(1)(a).

/s/ Richard P. Ferrin
Douglas J. Heffner
Brian Perryman
Richard P. Ferrin
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel to Plaintiffs*

Exhibit A

Barcode:4037358-01 C-834-811 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-834-811
Investigation
**Public Document**
E&C OV: JMN

October 6, 2020

**MEMORANDUM TO:**     The File

**FROM:**     Justin M. Neuman
Senior International Trade Analyst
Enforcement & Compliance, Office V

**RE:**     Silicon Metal from the Republic of Kazakhstan:  Representation of
Tau-Ken Temir LLP by Squire Patton Boggs

---

**Background:**  On September 8, 2020, Mississippi Silicon LLC (the petitioner), requested that the Department of Commerce (Commerce) disqualify and require immediate withdrawal from this proceeding of respondent Tau-Ken Temir LLP's (TKT) current counsel, Peter J. Koenig and Squire Patton Boggs (US) LLP (collectively, Squire Patton Boggs) due to a direct and ongoing conflict of interest.[1]  The petitioner explained that Squire Patton Boggs' representation of TKT in this case is inappropriate because the firm represented the petitioner's parent company, Rima Industrial S/A (Rima), and its affiliate, Polymet Alloys Inc., in the previous investigations of silicon metal exports by TKT, an adverse party, and other foreign producers.  The petitioner notes that as part of its representation, Squire Patton Boggs directly provided legal counsel to the petitioner in the preparation of questionnaire responses before the International Trade Commission (ITC) involving confidential and business proprietary information.  The petitioner alleges that this prior representation creates a conflict of interest under Rule 1.9 of the DC Rules of Professional Code of Conduct because it is "substantially related" to the current countervailing duty investigation of silicon metal from the Republic of Kazakhstan (Kazakhstan), and that information provided by the petitioner in the previous investigation could be used to advance TKT's position in the current proceeding.

On September 17, 2020, TKT refuted the petitioner's claims, noting that Squire Patton Boggs' prior representation of the petitioner occurred before a different agency (*i.e.*, the ITC), covered different subject matter over a different period of time, and that countervailing duty investigations are separate and distinct proceedings.[2]  TKT further notes that both it and Rima had the same interest in the prior referenced ITC matters (*i.e.*, to broadly oppose the imposition of antidumping and countervailing duties except as to the People's Republic of China (China)), and that Rima was aware of Squire Patton Boggs' representation of TKT.[3]

---

[1] *See* Letter from the petitioner, "Silicon Metal from Kazakhstan:  Request to Disqualify Squire Patton Boggs (US) LLP as Counsel to Tau-Ken Temir LLP," dated September 8, 2020.
[2] *See* Letter from TKT, "Silicon Metal from Kazakhstan," dated September 17, 2020.
[3] *See id.*

PUBLIC DOCUMENT
NON-CONFIDENTIAL



On September 21, 2020, the petitioner responded to TKT's letter, noting that it contained no support for its claims, and failed to address the consequences of its conflict.[4]  The petitioner refuted TKT's claim that no conflict of interest exists, arguing that such a conflict can exist despite there being different proceedings before different agencies, and that such proceedings may nonetheless be "substantially related."[5]  The petitioner further argued that the prior silicon metal proceedings from 2017 and the current investigation are substantially related matters, and that Squire Patton Boggs failed to acquire the necessary informed consent of the petitioner to represent TKT in the instant investigation.[6]

**Analysis:**  Commerce previously addressed a similar situation in *GEO Specialty Chemicals, Inc. v. Husisian*,[7] in which Husisian was an attorney at Thompson Hines LLP from 2007-2008 and represented the domestic producer, GEO Specialty, before Commerce in a proceeding involving exports of glycine from China.  In 2009, Husisian left Thompson Hines for another law firm, Foley and Lardner LLP.  Thereafter, Husisian and Foley represented two Chinese companies in a new shipper review of Glycine from China.  Husisian never communicated his new representation to GEO Specialty, and GEO Specialty demanded that Husisian and Foley withdraw their representation based on conflict of interest and that Commerce deny access to documents under the associated administrative protective order.

Rule 1.9 of the DC Rules of Professional Conduct reads: "{a} lawyer who has formerly represented a client in a *matter* shall not thereafter represent another person in the same or a *substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent."[8]  Matters are substantially related when "they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."[9]  However, the Court of International Trade (CIT) found that a lawyer who recurrently handled a type of problem for a former client was not precluded from later representing another client in a wholly distinct problem of that type, even though the subsequent representation involves a position adverse to the prior client.[10]  The CIT then noted that each

> "review or proceeding—including a new shipper review—is its own 'administrative proceeding, ... claim, [or] investigation' and therefore qualifies as its own 'matter.'  It would be contrary to this definition, not to mention common sense, for this Court to lump together every glycine review that has occurred in the past eighteen years and

---

[4] *See* Letter from the petitioner, "Silicon Metal from Kazakhstan: Response to Squire Patton Boggs (US) LLP 9/17 Letter Concerning Conflict of Interest as Counsel for Tau-Ken Temir LLP," dated September 21, 2020 (Petitioner's Response to TKT's 9/17 Letter).
[5] *See id. (citing GEO Specialty Chem., Inc. v. Husisian*, 951 F. Supp. 2d 32, 42 (D.D.C. 2013) (*Geo Specialty*); *see also, Makita v. United States*, 819 F. Supp. 1099, 1106 (CIT 1993)).
[6] *See* Petitioner's Response to TKT's 9/17 Letter.
[7] *See Geo Specialty*.
[8] D.C. Rules of Prof'l Conduct R. 1.9 (emphasis added).
[9] *Geo Specialty,* at 42.
[10] *Id.*

PUBLIC DOCUMENT
NON-CONFIDENTIAL

Barcode:4037358-01 C-834-811 INV - Investigation -

that occurs indefinitely into the future simply because they deal with the same general subject matter under the same administrative I.D. number."[11]

Finally, the CIT held that GEO Specialty failed to explain how the information learned in the representation of GEO Specialty might be useful to the two Chinese companies or impact the new shipper review.[12]

Here, the petitioner levies similar conflict of interest allegations as those presented in *GEO Specialty*. The petitioner alleges that under Rule 1.9, Mr. Koenig and Squire Patton Boggs are barred from representing TKT in the present investigation because of their involvement in the previous countervailing duty investigation of silicon metal from Kazakhstan, where Mr. Koenig and Squire Patton Boggs provided counsel to the petitioner and its parent and affiliate companies. Moreover, the petitioner has not demonstrated how the information it provided to Mr. Koenig and Squire Patton Boggs in the course of its representation of the petitioner may be useful to TKT, given that TKT is now a party being investigated, whereas in the previous proceeding the petitioner's parent company was merely acting as an interested party that provided information to the ITC. Therefore, it is unclear how prior knowledge of the petitioner is relevant. Thus, based on the foregoing reasons, we do not find that there is an ongoing conflict of interest because the cases are not substantially related. Accordingly, the petitioner's argument is directly inconsistent with the conclusions of the Court in *GEO Specialty*.

**Recommendation:** Based on the above, Commerce does not find that an ongoing conflict of interest exists because the two countervailing duty investigations of silicon metal from Kazakhstan are not substantially related. Based on the findings in *GEO Specialty*, the current investigation must be treated as a separate matter, irrespective of the fact that it covers the same subject matter, as the time periods of the investigations are not contemporaneous, the investigations are before different agencies, and because the petitioner has not demonstrated that TKT can make any improper use of any information provided by the petitioner to Squire Patton Boggs.

☒            ☐
_____     _____
Agree        Disagree

_____
Shawn Thompson
Director, Office V
Antidumping and Countervailing Duty Operations

---

[11] *Id.* at 43.
[12] *Id.*

Filed By: Justin Neuman, Filed Date: 10/6/20 11:59 AM, Submission Status: Approved

PUBLIC DOCUMENT
NON-CONFIDENTIAL