## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| AMSTED RAIL COMPANY, INC. and ASF-K DE MEXICO S. DE R.L., DE C.V., | |
| Plaintiffs, | |
| v. | |
| UNITED STATES, | Court No. 23-242 |
| Defendant, | |
| and | |
| COALITION OF FREIGHT COUPLER PRODUCERS, | |
| Defendant-Intervenor. | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION
## FOR JUDGMENT ON THE AGENCY RECORD

Of Counsel:

SHELBY ANDERSON
Assistant Chief Counsel
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

October 25, 2024

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

EMMA E. BOND
Senior Trial Counsel
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
202-305-2034 | emma.e.bond@usdoj.gov

*Attorneys for Defendant*

## TABLE OF CONTENTS

**PAGE**

RULE 56.2 STATEMENT ................................................................................................ 1

    I.     The Administrative Determination Under Review ................................................. 1

    II.    Issues Presented For Review ................................................................................. 2

STATEMENT OF FACTS .............................................................................................. 3

    I.     Commerce Initiates An Investigation Of Certain Freight Rail Couplers From Mexico ............................................................................................................... 3

    II.    Amsted Reports Sales As Part Of A Duty Avoidance Program (IMMEX) That Incentivizes Export Of Goods Manufactured In Mexico...................................... 5

    II.    The Coalition Challenges The Viability Of Amsted's Home Market, Alleging That Amsted's Sales To Mexican Railcar Manufacturers Should Be Reclassified As U.S. Sales............................................................................................................. 7

    IV.   Commerce Determines That Amsted Lacks A Viable Home Market, Bases Normal Value On Third-Country Sales To Canada, And Issues A Preliminary Affirmative Less-Than-Fair-Value Determination ................................................. 8

    V.    Commerce Issues Final Affirmative Determination ........................................... 10

SUMMARY OF ARGUMENT ...................................................................................... 11

ARGUMENT ................................................................................................................. 12

    I.     Standard Of Review....................................................................................... 12

    II.    Commerce Lawfully Declined To Entertain Amsted's Disqualification Request Based On An Alleged Conflict Of Interest ........................................... 13

         A.    Commerce Has Authority To Fashion Its Own Procedures, Including Regulating Conduct Of Representatives Appearing Before Commerce... 13

         B.    Commerce May Suspend or Bar Representatives For "Good Cause," But Does Not Adjudicate Conflicts Of Interest Overseen By Local Bar Authorities............................................................................................... 14

C.     Commerce Lawfully Complied With Its Own Regulation Governing Attorneys And Non-Attorney Representatives ......................................... 18

D.     Commerce Did Not Depart From Any Established Practice ................... 21

E.     Authority To Regulate Attorney Conduct In Judicial Proceedings Does Not Authorize The Court To Compel Agency Action Pursuant To 19 U.S.C. § 1516a .................................................................................. 23

F.     The Court May Not Review Extra-Record Information ........................... 24

III.   Commerce's Determination Regarding The Viability Of Amsted's Home Market Is Lawful And Supported By Substantial Evidence ................................ 26

A.     Commerce Applies The Knowledge Test To Determine Whether A Sale Is For Export Or The Home Market.................................................... 28

B.     Substantial Evidence Supports Commerce's Determination That Amsted Knew Or Should Have Known That Its Sales Of Freight Rail Couplers To Mexican Manufacturers Were For Export, Not Domestic Consumption In Mexico ......................................................................... 30

C.     Substantial Evidence Supports That Amsted Knew Or Should Have Known That Its Freight Rail Couplers Sold In The IMMEX Program Were Not Further Processed Into Non-Subject Merchandise Before Export ..... 33

D.     Amsted Presents No Genuine Question Of Statutory Interpretation And, In Any Event, Misunderstands The Meaning Of Consumption ............... 36

       1.     Amsted Fails To Present A Genuine Question Of Statutory Interpretation ................................................................................... 36

       2.     Amsted's Proposed Interpretation Is Incorrect ............................. 37

E.     This Court Need Not Address Commerce's Practice Regarding Home Market Viability ................................................................................... 41

III.   Commerce's Treatment of Amsted's IMMEX Sales as Export Sales, Rather than U.S. Sales, Is Supported by Substantial Evidence and In Accordance with Law ........................................................................................................... 42

CONCLUSION ............................................................................................................ 43

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Adams v. United States*,
  59 F.4th 1349 (Fed. Cir.) (en banc), *cert. denied*,
  144 S. Ct. 278 (2023) ............................................................................ 21

*Allegheny Ludlum Corp. v. United States*,
  215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000) ...................................... 30, 33

*Amsted Rail Co., Inc. v. United States Int'l Trade Comm'n*,
  600 F. Supp. 3d 1308 (Ct. Int'l Trade 2022) *appeal dismissed*,
  No. 2023-1355, 2023 WL 4346710 (Fed. Cir. July 5, 2023).................... 25

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
  102 F.4th 1252 (Fed. Cir. 2024) .......................................................... 19, 20

*Ass'n of Am. Sch. Paper Suppliers v. United States*,
  34 C.I.T. 31 (2010) ............................................................................. 26, 27

*Axiom Res. Mgmt., Inc. v. United States*,
  564 F.3d 1374 (Fed. Cir. 2009)................................................................ 26

*Baldwin Hardware Corp. v. FrankSu Enter. Corp.*,
  78 F.3d 550 (Fed. Cir. 1996)................................................................... 23

*Bebitz Flanges Works Priv. Ltd. v. United States*,
  433 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ......................................... 17

*Camp v. Pitts*,
  411 U.S. 138 (1973)................................................................................ 26

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007)............................................................... 13

*Consol. Bearings Co. v. United States*,
  348 F.3d 997 (Fed. Cir. 2003)................................................................. 22

*Consol. Bearings Co. v. United States*,
  412 F.3d 1266 (Fed. Cir. 2005)............................................................... 22

*Consol. Edison Co. of N.Y. v. NLRB*,
  305 U.S. 197 (1938)................................................................................ 12

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ............................................................................................ 13

*Dietz v. Bouldin,*
  579 U.S. 40 (2016) .............................................................................................. 24

*Duferco Steel, Inc. v. United States,*
  296 F.3d 1087 (Fed. Cir. 2002) ......................................................................... 36

*Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.),*
  837 F. 3d 1280 (Fed. Cir. 2016) ........................................................................ 24

*FCC v. Schreiber,*
  381 U.S. 279 (1965) ..................................................................................... 14, 23

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ............................................................................................ 26

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ...................................................................................... 39, 40

*Freeman v. Chicago Musical Instrument Co.,*
  689 F.2d 715 (7th Cir. 1982) ............................................................................. 17

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996) ........................................................................... 12

*Galderma Lab'ys, L.P. v. Actavis Mid Atl. LLC,*
  927 F. Supp. 2d 390 (N.D. Tex. 2013) .............................................................. 17

*GEO Specialty Chemicals, Inc. v. Husisian,*
  951 F. Supp. 2d 32 (D.D.C. 2013) ..................................................................... 18

*Gray v. Rhode Island Dep't of Child., Youth, & Fams.,*
  937 F. Supp. 153 (D.R.I. 1996) ......................................................................... 17

*Gumbel v. Pitkin,*
  124 U.S. 131 (1888) ............................................................................................ 24

*In re Am. Airlines, Inc.,*
  972 F.2d 605 (5th Cir.1992) .............................................................................. 24

*INA Walzlager Schaeffler KG v. United States,*
  957 F. Supp. 251 (Ct. Int'l Trade 1997) *aff'd in part,*
  *vacated in part, remanded on other grounds,*

iv

5 F.4th 1341 (Fed. Cir. 2021) ................................................................ passim

*LG Semicon Co. v. United States*
23 C.I.T. 1074, 1999 WL 1458844 (Dec. 30, 1999).................................. 29

*Loper Bright Enterprises v. Raimondo*,
602 U.S. __, 144 S. Ct. 2244 Slip Op. 22-451 (June 28, 2024)................. 37

*Makita Corp. v. United States*,
17 C.I.T. 240, 819 F. Supp. 1099 (1993)................................................. 25

*Ningbo Dafa Chem. Fiber Co. v. United States*,
580 F.3d 1247 (Fed. Cir. 2009) .............................................................. 12

*NMB Singapore Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009) .............................................................. 22

*NTN Bearing Corp. v. United States*,
74 F.3d 1204 (Fed. Cir. 1995) ................................................................ 17

*Pakfood Pub. Co. v. United States*,
453 F. App'x 986 (Fed. Cir. 2011) .......................................................... 22

*PSC VSMPO–Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012) ........................................................... 14, 27

*Royal Brush Mfg., Inc. v. United States*,
75 F.4th 1250 (Fed. Cir. 2023) .......................................................... 14, 24

*Save Domestic Oil, Inc. v. United States*,
357 F.3d 1278 (Fed. Cir. 2004) .............................................................. 22

*SMA Surfaces, Inc. v. United States*,
658 F. Supp. 3d 1325 (Ct. Int'l Trade 2023) ......................................... 44

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) .............................................................. 44

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)................................................................................ 38

*Standing Committee on Discipline v. Ross*,
735 F.2d 1168 (9th Cir. 1984) ................................................................ 23

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) *aff'd in part, vacated in part, remanded on other grounds*,

5 F.4th 1341 (Fed. Cir. 2021) ..................................................................... 27

*Stupp Corp. v. United States*,
  359 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ........................................ 31

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,
  482 F.3d 1330 (Fed. Cir. 2007) ............................................................ 41

*Timken Co. v. United States*,
  201 F. Supp. 2d 1316 (Ct. Int'l Trade 2002) ........................................ 43

*Titanium Metals Corp. v. United States*,
  901 F. Supp. 362 (Ct. Int'l Trade 1995) .............................................. 39

*Trans–Border Customs Servs., Inc. v. United States*,
  843 F. Supp. 1482 (Ct. Int'l Trade 1994) ............................................ 39

*Tung Mung Dev. Co. v. United States*,
  25 C.I.T. 752, 2001 WL 844484 (2001) ........................................ 29, 33

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) .............................................................................. 12

*United Steel & Fasteners, Inc. v. United States*,
  947 F.3d 794 (Fed. Cir. 2020) .............................................................. 20

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ...................................................................... passim

*Watkins v. Trans Union, LLC*,
  869 F.3d 514 (7th Cir. 2017) .......................................................... 17, 23

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
  165 F.3d 43 (D.C. Cir. 1999) ......................................................... 19, 20

*Yue Pak, Ltd. v. United States*,
  20 C.I.T. 495 (1996) *aff'd*,
  111 F.3d 142 (Fed. Cir. 1997) .............................................................. 29

*Z.A. Sea Foods Priv. Ltd. v. United States*,
  569 F. Supp. 3d 1338, 1352-53 (Ct. Int'l Trade 2022) ......................... 30

## **STATUTES**

5 U.S.C. § 706 ........................................................................................ 26

19 U.S.C. § 1516a .................................................................................................. passim

19 U.S.C. § 1516a(b) ..................................................................................................... 27

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................. 25, 29

19 U.S.C. § 1516a(b)(2)(A) .......................................................................................... 25

19 U.S.C. §§ 1671d, 1673d .......................................................................................... 17

19 U.S.C. § 1673b(d)(2) .......................................................................................... 38, 39

19 U.S.C. § 1677a ........................................................................................................ 30

19 U.S.C. § 1677b ........................................................................................................ 30

19 U.S.C. § 1677b(a) .......................................................................................... 30, 38, 39

19 U.S.C. § 1677b(a)(1)(B)(i) ..................................................................................... 36

19 U.S.C. § 1677j(a)(1) ................................................................................................ 38

28 U.S.C. § 1581(i) ...................................................................................................... 25

28 U.S.C. § 2637(d) ..................................................................................................... 43

U.S.C. § 1516a(b)(2)(A) ............................................................................................. 25

## REGULATIONS

12 C.F.R. § 19.8 (2024) ............................................................................................... 16

19 C.F.R. § 351 ............................................................................................................ 14

19 C.F.R. § 351.301(c)(2)(i) ......................................................................................... 7

19 C.F.R. § 351.313 ............................................................................................... passim

19 C.F.R. § 351.404(a) ................................................................................................. 29

19 C.F.R. § 351.404(f) ................................................................................................. 29

## ADMINISTRATIVE DETERMINATIONS

*Tin Mill Products from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,*
    89 Fed. Reg. 1542 (Dep't of Commerce Jan. 10, 2024) .......................................... 32

*Certain Freight Rail Couplers and Parts Thereof from Mexico*,
88 Fed. Reg. 61,653 (Dep't of Commerce Sept. 21, 2023) ....................................... 1

*Certain Freight Rail Couplers and Parts Thereof from Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*,
88 Fed. Reg. 27,864 (Dep't of Commerce May 5, 2023) ......................................... 8

*Certain Lined Paper Products from India: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021* (*Paper from India*),
88 Fed. Reg. 21,971 (Dep't of Commerce, Apr. 12, 2023) ...................................... 30

*Certain Preserved Mushrooms from the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value*,
88 Fed. Reg. 18,115 (Dep't of Commerce, Mar. 27, 2023)...................................... 42

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2020–2021*,
88 Fed. Reg. 15,665 (Dep't of Commerce, Mar. 14, 2023)....................................... 9

*Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico: Initiation of Less-Than-Fair-Value Investigations* (*Initiation*),
87 Fed. Reg. 64,444 (Dep't of Commerce, Oct. 25, 2022)......................................... 2

*Agreement Suspending the Antidumping Duty Investigation on Sugar from Mexico; Preliminary Results of the 2019-2020 Administrative Review*,
87 Fed. Reg. 932 (Dep't of Commerce, Jan. 7, 2022) ................................................ 9

*Ripe Olives From Spain*,
86 Fed. Reg. 35,068-01 (Dep't of Commerce, July 1, 2021) ............................. 16, 21

*Regulation Strengthening Accountability of Attorneys and Non-Attorney Representatives Appearing Before the Department* (*Accountability Final Rule*),
78 Fed. Reg. 22,773 (Dep't of Commerce, Apr. 17, 2013) .............................. 3, 4, 15

*Certain Cut-to-Length Carbon-Quality Steel Plate Products from Italy: Final Results and Partial Rescission of Antidumping Duty Administrative Review*,
71 Fed. Reg. 39,299 (Dep't of Commerce July 12, 2006)....................................... 40

*Certain Hot–Rolled Carbon Steel Flat Products, Certain Corrosion Resistant Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Korea*,
58 Fed. Reg. 37,176 (Dep't of Commerce July 9, 1993)......................................... 33

**<u>OTHER AUTHORITIES</u>**

George M. Cohen, The Laws of Agency Lawyering,
   84 Fordham L. Rev. 1963 (2016) ............................................................................. 21

Keith Swisher *The Practice and Theory of Lawyer Disqualification*,
   27 Geo. J. Legal Ethics 71 (2014) ............................................................................ 21

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| AMSTED RAIL COMPANY, INC. and<br>ASF-K DE MEXICO S. DE R.L., DE C.V.,<br><br>       Plaintiffs,<br><br>     v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>  and<br><br>COALITION OF FREIGHT COUPLER<br>PRODUCERS,<br><br>       Defendant-Intervenor. | Court No. 23-242<br><br>PUBLIC VERSION<br><br>Confidential Information Omitted from<br>pp. 4, 5, 8, 33, 45 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment on the administrative record filed by plaintiffs, Amsted Rail Company, Inc. (Amsted Rail) and ASF-K de Mexico S. de R.L. de C.V. (ASF-K). ASF-K is a wholly-owned subsidiary of Amsted Rail located in Mexico, and Amsted Rail is a United States company responsible for making all sales relevant to this proceeding—with the two companies collectively referred to as Amsted.

Amsted contests the Department of Commerce's final determination in the less-than-fair-value investigation of certain freight rail couplers and parts thereof (freight rail couplers) from Mexico. As demonstrated below, Amsted's arguments are without merit. Accordingly, we respectfully request that the Court deny Amsted's motion for judgment on the agency record and sustain the final determination in its entirety.

## RULE 56.2 STATEMENT

I.    The Administrative Determination Under Review

The administrative determination under review is *Certain Freight Rail Couplers and Parts Thereof from Mexico*, 88 Fed. Reg. 65,153 (Dep't of Commerce, Sept. 21, 2023) (final determination), and accompanying Issues and Decision Memorandum (IDM) (P.R. 395). The final determination covers the period of investigation from July 1, 2021, through June 30, 2022.

II.    Issues Presented For Review

1.    In the regulatory preamble, Commerce explained that its regulation governing suspension of attorneys and non-attorney representatives, 19 C.F.R. § 351.313, does not cover ethical conflicts uniquely within the province of local Bar authorities. On that basis, Commerce declined to entertain Amsted's request for disqualification based on an alleged conflict of interest pursuant to Rule 1.9(a) of the American Bar Association's Model Rules of Professional Conduct and Rule 1.9(a) of the District of Columbia Rules of Professional Conduct. The issue is whether Commerce lawfully declined Amsted's request for disqualification.

2.    Amsted sold freight rail couplers to Mexican railcar manufacturers in the context of a Mexican tax-benefit program that is designed to incentivize export of goods manufactured in Mexico. Commerce found that the freight rail couplers were not further manufactured into non-subject merchandise in Mexico after sale and before export and, thus, were not sold for consumption in Mexico. Without these sales, Mexico lacked a viable home market for purposes of determining normal value. The issue is whether Commerce's determination that Amsted's sales to Mexican manufacturers were not home market sales is lawful and supported by substantial evidence.

3.      Commerce found that Amsted neither knew nor should have known the specific country to which its customers intended to export the freight rail couplers and, thus, Amsted's sales to the Mexican railcar manufacturers did not qualify as U.S. sales for purposes of determining the export price or constructed export price.  The issue is whether Commerce's determination that these sales are not U.S. sales is lawful and supported by substantial evidence.

## STATEMENT OF FACTS

I.      Commerce Initiates An Investigation Of Certain Freight Rail Couplers From Mexico

On September 28, 2022, petitioner, Coalition of Freight Coupler Producers (Coalition), filed an antidumping duty petition concerning imports of freight rail couplers from Mexico.  *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico: Initiation of Less-Than-Fair-Value Investigations* (*Initiation*), 87 Fed. Reg. 64,444 (Dep't of Commerce, Oct. 25, 2022) (P.R. 82).  The petition named Amsted's affiliated Mexican supplier, ASF-K, as the only producer or exporter of freight rail couplers in Mexico.  *Id.* at 64,448.

On October 12, 2022, days before Commerce's deadline to decide whether to initiate the investigations, Amsted and ASF-K sent a letter asking Commerce to disqualify the law firm representing the Coalition based on an alleged conflict of interest.  Amsted Request to Disqualify (Oct. 12, 2022) (P.R. 73).  As support for its request, Amsted cited Commerce's regulation governing attorneys and non-attorney representatives, 19 C.F.R. § 351.313.  *Id.* at 2.

By regulation, an attorney or non-attorney representative "may for good cause shown be suspended or barred from practicing before {Commerce}, or have imposed on him such lesser sanctions (e.g., public or private reprimand) as the Secretary deems appropriate, but only after he has been accorded an opportunity to present his views in the matter."  19 C.F.R. § 351.313.

Commerce "will maintain a public register of attorneys and representatives suspended or barred from practice." *Id.* The preamble to section 351.313 provides that the rule is "not intended to cover ethical conflicts uniquely within the province of local Bar authorities." *Regulation Strengthening Accountability of Attorneys and Non-Attorney Representatives Appearing Before the Department* (*Accountability Final Rule*), 78 Fed. Reg. 22,773 (Dep't of Commerce, Apr. 17, 2013).

Nevertheless, Amsted argued that representation of the Coalition by its lead counsel [ █████████ ] (the Attorney) and [ ████████████████████████ ] (the Accountant) resulted in a conflict of interest under "Rule 1.9(a) of the American Bar Association's Model Rules of Professional Conduct and its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct." Amsted Request to Disqualify at 2. Amsted argued that while at a prior law firm, [ ███████ ], both the Attorney and the Accountant formerly represented Amsted "in substantially related trade investigations," thus creating a conflict of interest in the current proceeding. *Id.* Amsted further claimed that the alleged conflict should be attributed to the entire firm, [ ████████████████████ ] (the Firm). *Id.* at 1-2. Amsted argued Commerce should remedy the alleged conflict of interest by disqualifying the Firm from the proceeding, excluding the Firm from the administrative protective order (APO), and terminating the investigation. *Id.*[1]

On October 18, 2022, the Coalition responded, in relevant part, that "(1) no conflict of interest exists; (2) even assuming arguendo that a conflict existed {Amsted} has expressly

---

[1] Amsted also argued that "disqualification and exclusion from the Current APO is independently justified because of {the Firm's} potential violation of the Predecessor APO." Amsted Request to Disqualify at 2 (P.R. 73). Commerce referred the allegation "to the director of the APO unit." Disqualification Letter at 2 (P.R. 78). Amsted no longer pursues relief based on an alleged violation of the APO.

CONFIDENTIAL MATERIAL OMITTED

waived any conflict and has agreed in writing [ ███████████████ ].”  Resp. to Req. to Disqualify at 1 (Oct. 18, 2022) (P.R. 77, C.R. 55).  The Coalition argued that although it was “now adverse to ASF-K,” such adversity did not create a conflict of interest because ASF-K was never “a client or former client” of the Attorney’s former or current law firms.  *Id.* at 2.

Commerce responded on October 18, 2022, declining “to address the ethical questions raised by Amsted’s filings at this time,” citing the preamble to its regulation governing attorneys and non-attorney representatives, 19 C.F.R. § 351.313.  Disqualification Letter at 2 (Oct. 18, 2022) (P.R. 78) (citing *Accountability Final Rule*, 78 Fed. Reg. 22,773).  As Commerce explained, the rule was “not intended to cover ethical conflicts uniquely within the province of local Bar authorities.”  *Id.* (citing *Accountability Final Rule*, 78 Fed. Reg. 22,773).  Addressing Amsted’s allegation regarding violations of the APO, Commerce referred the allegation “to the director of the APO unit.”  *Id.* at 2.  Finally, Commerce denied the request to dismiss the underlying petitions as a sanction, finding “no appropriate basis on which to grant this request.” *Id.*

Commerce then initiated an antidumping duty investigation covering freight rail couplers from Mexico.  *See Initiation*, 87 Fed. Reg. at 64,448 (P.R. 82).  Commerce examined ASF-K as the only known producer or exporter of subject merchandise.  *See id.*

II.    Amsted Reports Sales As Part Of A Duty Avoidance Program (IMMEX) That
       <u>Incentivizes Export Of Goods Manufactured In Mexico</u>

In the initial questionnaire, Commerce requested information regarding Amsted’s home market sales in Mexico, which “are the preferred basis for normal value.”  *See* Initial Questionnaire at 19-20, 135 (Oct. 31, 2022) (P.R. 83).  Commerce explained that to “calculate normal value based on sales in the home market, Commerce must determine that the volume of

sales is adequate in that market"—or, in other words, that there is a viable home market. *Id.* at 141.

In response, Amsted reported that it had a viable home market and that certain home market sales were made within the framework of Mexico's "IMMEX" program. *See* Amsted Section A Questionnaire Response at 2, 19-21 (Nov. 30, 2022) (P.R. 110-111, C.R. 57-86). The IMMEX program is an import-duty avoidance program that incentivizes foreign export manufacturing in Mexico by waiving duties on production inputs that are incorporated into finished exported goods. *Id.* at 5-7, 19.

As Amsted explained, "{t}he IMMEX program differentiates between sales for consumption within the Mexican customs territory (the 'consumption' market) and sales that involve deliveries of products within the Mexican territory that are not intended for consumption in Mexico." *Id.* at 19 (P.R. 110, C.R. 57). The latter sales describe "deliveries to other maquiladora companies" in the IMMEX program. *Id.* Importations for use in *maquiladora* manufacturing are managed through import manifests known as "*pedimentos*." *Id.* at 20.[2] Companies generally qualify for tax avoidance by exporting merchandise or by transferring merchandise between two factories (known as *maquiladoras* or *maquilas*) operating within the IMMEX program. *Id.* at 5, 19-20.

---

[2] Where goods are processed by two maquiladoras, "virtual *pedimentos*" are used. *See* Section A Questionnaire at 20. This process – by which goods are virtually "exported" from one maquila and "imported" by another without physical export and re-import of products – is used to avoid the inter-maquila transfer being treated as an entry for consumption upon which VAT taxes would be owed. *Id.*

Amsted's Mexican manufacturing subsidiary, ASF-K, is a *maquila* within the IMMEX program.  *Id.* at 15.[3]  Although "production takes place on site at ASF-K . . . , the operational functions of the company are housed within Amsted Rail."  *Id.* at 7.  As the *maquila*, "ASF-K never takes title to the subject merchandise at any point in the production process even once fully produced, and thus, never makes a sale of the subject merchandise."  *Id.* at 7-8.  "All sales are made by Amsted Rail."  *Id.*; *see also* Section A Questionnaire Ex. 3 (C.R. 60) (detailing Amsted's organizational structure).

"Amsted reported two types of home market sales: original equipment manufacturer . . . and aftermarket."  Prelim. Issues & Decision Memorandum (PDM) at 9 (Apr. 27, 2023) (P.R. 307) (citing, *e.g.*, Section A Questionnaire at 26); *see also* Section A Questionnaire at 23 (describing the quantities of the different types of sales).  The sales to Mexican manufacturers involved sales to other *maquiladoras* "in the IMMEX program."  *See* Section A Questionnaire at 20, 22.  These sales were treated as inter-*maquila* transactions within the IMMEX framework.  *See id.* at Exhibit 10 (C.R. 67); *see also* Amsted First Suppl. Questionnaire Response at 5-6 (Jan. 24, 2023) (P.R. 170, C.R. 159).

Amsted stated that it "may presume that its customers' *maquila*s subsequently export{} the merchandise."  Section A Questionnaire at 20.  However, Amsted had "no confirmation of such export since the customer may pay the import duties in lieu of export."  Section A Questionnaire at 20.[4]

_____

[3]  IMMEX program rules require that assets, machinery, and raw materials be owned by a foreign principal, which in this case was ASF-K's U.S. based principal, Amsted Rail.  Therefore, Amsted Rail holds title to the merchandise and facilitates sales within the IMMEX program.  *See* Section A Questionnaire at 6-7.

[4]  Although merchandise produced in the IMMEX program *may* be consumed domestically in Mexico rather than exported, participants in the IMMEX program must

CONFIDENTIAL MATERIAL OMITTED

III.    The Coalition Challenges The Viability Of Amsted's Home Market, Alleging That
        <u>Amsted's Sales To Mexican Railcar Manufacturers Should Be Reclassified As U.S. Sales</u>

In December 2022,[5] the Coalition alleged that Amsted lacked a viable home market and

that Amsted's sales to Mexican *maquilas* in the IMMEX program should be reclassified as U.S.

sales.  *See* Resubmission of Market Viability Allegations at 1-2 (Dec. 20, 2022) (Market

Viability Allegation) (P.R. 128, C.R. 96).  The Coalition alleged that "Amsted has full

knowledge that its customers are also *maquiladoras* and consequently focused on export sales to

the U.S. market."  *See id.* at 7.  Among other evidence, the Coalition analyzed a sample sale to a

manufacturer where the invoice price [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ ], indicating that the reported home market sale [ ▮▮▮▮▮▮▮▮

▮▮▮▮ ].  Market Viability Allegation at 9 (citing Section A Questionnaire at Ex. 10 (C.R.

67)).

In response, Amsted argued that the "export" transactions [ ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ ], but that no goods were physically exported out of Mexico.  *See* Amsted Rebuttal

Comments Regarding Home Market Viability at 2-5 (Jan. 5, 2023) (P.R. 155, C.R. 101) (citing

Section A Questionnaire Ex. 22 (C.R. 75)).  Regarding the knowledge test, Amsted claimed that

it only knew that its freight rail couplers are "delivered to the Mexico address stated in the

*pedimento* documentation" and Amsted's commercial documentation, and could not "speculate"

---

undertake additional steps—including payment of import duties and value added tax—to achieve
that result.  Section A Questionnaire at 5, 19-20.

    [5]  The Coalition first submitted its allegation on December 16, 2022, but Commerce
rejected that filing due to bracketing issues, and the Coalition timely refiled on December 20,
2022.  *See* 19 C.F.R. § 351.301(c)(2)(i) (setting deadline for allegations regarding home market
viability).

as to the "final destination of the item as a coupler component attached to a railcar, exported or remaining in Mexico." *Id.* at 13.[6]

On March 10, 2023, Commerce requested third country sales data from Amsted. Commerce Third Country Questionnaire (Mar. 10, 2023) (P.R. 240). Amsted provided the requested information on May 12, 2023. Amsted Third Country Supplemental Questionnaire (May 12, 2023) (P.R. 328, C.R. 246).

IV. **Commerce Determines That Amsted Lacks A Viable Home Market, Bases Normal Value On Third-Country Sales To Canada, And Issues A Preliminary Affirmative Less-Than-Fair-Value Determination**

On May 3, 2023, Commerce published its preliminary affirmative determination that freight rail couplers from Mexico are being, or are likely to be, sold in the United States at less-than-fair-value. *See Certain Freight Rail Couplers and Parts Thereof from Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 88 Fed. Reg. 27,864 (Dep't of Commerce, May 5, 2023), and accompanying PDM (P.R. 307). Commerce preliminarily calculated an estimated weighted average dumping margin of 47.82 percent for ASF-K and "all others." *Id.* at 27,865.

In reaching this estimated dumping margin, Commerce preliminarily based normal value on Amsted's sales to a third country, Canada. PDM at 11. Commerce could not use the preferred approach of using home market sales for determining normal value because it

---

[6] Parties filed additional submissions related to home market viability on February 15, 2023. *See, e.g.*, Petitioner's Resubmission of Comments Regarding Amsted's First Supplemental Section A Questionnaire Response and Lack of a Viable Home Market (Feb. 15, 2023) (P.R. 205); Amsted's Additional Market Viability Rebuttal Comments (Feb. 15, 2023) (P.R. 211). Parties reiterated their arguments in pre-preliminary comments filed on March 28, 2023, and April 4, 2023. Coalition Pre-Preliminary Comments (Mar. 28, 2023) (P.R. 270, C.R. 204); Amsted Pre-Preliminary Comments (Apr. 4, 2023) (P.R. 279, C.R. 218).

determined that Amsted lacked a viable home market.  *See* Initial Questionnaire at 137, 141

(P.R. 83); PDM at 11.  This was because Amsted's sales to other *maquilas* in the IMMEX

program qualified as export sales, not home market sales.  PDM at 11.

As Commerce explained, given the "nature and purpose of the IMMEX program, . . .

Amsted knew, or should have known, that its freight rail couplers sold into the IMMEX program

ultimately were meant for export, rather than domestic consumption."  *See* PDM at 11.

Commerce acknowledged other cases in which sales in the IMMEX program were treated as

home market sales, but explained that those cases involved the purchaser further manufacturing

the subject merchandise into non-subject merchandise.  Home Market Viability Memorandum

(HM Viability Memo) at 4 (Apr. 26, 2023) (P.R. 315, C.R. 241) (citing *Light-Walled*

*Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative*

*Review; 2020–2021*, 88 Fed. Reg. 15,665 (Dep't of Commerce, Mar. 14, 2023) (*LWRPT from*

*Mexico 2020-2021 Final)* and accompanying IDM at Comment 4; *see also Agreement*

*Suspending the Antidumping Duty Investigation on Sugar from Mexico; Preliminary Results of*

*the 2019-2020 Administrative Review*, 87 Fed. Reg. 932 (Dep't of Commerce, Jan. 7, 2022), and

accompanying PDM at nn.65-68 and surrounding text, *unchanged in Sugar from Mexico* 2019-

2020 Final, 87 Fed. Reg. 40,178 (Dep't of Commerce, July 6, 2022), *corrected* 87 Fed. Reg.

42,156 (Dep't of Commerce, July 14, 2022)).  In this case, by contrast, the freight rail couplers

sold to Mexican railcar manufacturers were not further processed into non-subject merchandise,

but instead remained in-scope as "a distinct article of commerce even after they are attached to a

freight railcar by manufacturers."  HM Viability Memo at 5.

At the same time, Commerce declined to find that Amsted's IMMEX sales should be

considered U.S. sales, explaining that the Coalition failed to show that Amsted knew or should

have known that its reported Mexican sales were destined for the United States specifically, as opposed to some other export market. *Id.* at 3. Therefore, Commerce reclassified Amsted's reported sales as export sales without attributing them to any particular destination market.

Based on its analysis of Amsted's third country sales questionnaire response, Commerce based normal value on Amsted's sales to the largest third country market—Canada. PDM at 11; *see also* Post-Preliminary Analysis Memorandum at 4 (July 18, 2023) (P.R. 372) (continuing to base normal value on Canadian sales).

V.    Commerce Issues Final Affirmative Determination

On September 21, 2023, Commerce published its final determination that freight rail couplers from Mexico are being or are likely to be, sold in the United States at less-than fair value. *See* Final Determination (P.R. 400), and accompanying Issues and Decision Memorandum (IDM) (P.R. 395). Commerce calculated a final estimated weighted average dumping margin of 48.10 percent for Amsted and all-others. *Id.*

Commerce continued to find that Amsted's IMMEX sales to Mexican railcar manufacturers were not home market sales and, as such, Amsted lacked a viable home market. *See* IDM at 10-16. Commerce noted its normal practice not to revisit home market viability determinations in the final determination, explaining that changing the comparison market at that late stage would deprive parties of an opportunity to comment on methodological choices associated with the comparison market. *Id.* at 10-11. Commerce nonetheless analyzed the parties' comments on the merits and found that no change to the comparison market was warranted. *Id.* at 11-16. Commerce also declined to reclassify Amsted's IMMEX sales as U.S. sales, rather than export sales. *Id.* at 17. Commerce found that Amsted failed to develop any

new arguments or point to specific evidence undermining Commerce's preliminary decision not to classify the IMMEX sales as U.S. sales. *Id.*

Commerce also declined to reconsider its decision not to entertain Amsted's allegations regarding an alleged conflict of interest pursuant to D.C. Bar Rule 1.9 and the accompanying ABA Model Rule. IDM at 22-25. Commerce reiterated that the preamble to its regulation "provides clarity as to how Commerce interprets the phrase 'good cause shown,'" and specifies that "19 CFR 351.313 is not intended to cover alleged ethical violations such as the one Amsted claims here." IDM at 24 (citing *Accountability Final Rule*, 78 Fed. Reg. at 22,775).

Amsted filed a timely challenge in this Court pursuant to 19 U.S.C. § 1516a. *See* Compl., ECF No. 5.

## SUMMARY OF ARGUMENT

Commerce's final results should be sustained in their entirety. First, Commerce reasonably declined to entertain Amsted's request to disqualify the Firm based on an alleged conflict of interest. Although Commerce is authorized to regulate the conduct of representatives for "good cause," Commerce explained in the preamble to its regulation that it will not entertain challenges based on alleged conflicts of interest that are governed by state ethics rules. Agencies are generally free to fashion their own rules of procedure as they see fit, and Commerce acted within its significant discretion in declining to delve into complex conflict-of-interest matters in which it does not possess expertise.

Second, Commerce reasonably determined that Amsted's sales of freight rail couplers to Mexican manufacturers were not home market sales because Amsted knew or should have known that these sales were destined for exportation, not for domestic consumption. Once these sales were classified as export sales, Mexico lacked a viable home market for freight rail

couplers during the period of investigation. Substantial evidence supports Commerce's finding that Amsted knew or should have known that its sales to Mexican manufacturers were not for consumption in Mexico. Amsted's sales were made as part of the IMMEX tax-benefit program to incentivize exports of goods manufactured in Mexico. Although such goods may nonetheless qualify as sold for consumption when further processed into non-subject merchandise in Mexico, in this case, the freight rail couplers were not further manufactured into non-subject merchandise before export—and thus did not qualify as sales for consumption in the home market.

Finally, substantial evidence supports Commerce's detailed factual findings explaining that although Amsted knew or should have known that its sales to Mexican manufacturers were destined for export, Amsted did not have reason to know the specific country of exportation. Thus, Commerce reasonably declined to treat the sales as U.S. sales.

## **ARGUMENT**

I.    Standard Of Review

In reviewing Commerce's countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

Commerce's factual findings "are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009).

Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). An agency decision may not be overturned "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

II.    **Commerce Lawfully Declined To Entertain Amsted's Disqualification Request Based On An Alleged Conflict Of Interest**

Consistent with the regulatory preamble, Commerce declined to entertain Amsted's request to disqualify the Firm based on an alleged conflict of interest. Commerce's decision complies with the language of the regulation and Commerce's contemporaneous understanding of the rule when it was originally proposed. Although Amsted claims that Commerce's decision leaves it with no adequate remedy for the alleged violation of state ethics rules, Commerce has authority to establish its own procedures—including regulation of attorneys and non-attorney representatives—and has discretion not to use its limited resources to police state ethics rules that are outside of Commerce's expertise. Amsted's arguments to the contrary are unpersuasive and—to the extent Amsted relies on materials not presented to Commerce—outside of this Court's authority to review.

A.    **Commerce Has Authority To Fashion Its Own Procedures, Including Regulating Conduct Of Representatives Appearing Before Commerce**

Commerce has authority to fashion its own procedures, including deciding when (and when not) to regulate the conduct of attorney and non-attorney representatives appearing before Commerce. "Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue

methods of inquiry capable of permitting them to discharge their multitudinous duties." *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1261 (Fed. Cir. 2023) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543-544 (1978)).  This rule is "an outgrowth of the congressional determination that administrative agencies and administrators will be familiar with the industries which they regulate and will be in a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved." *Vt. Yankee*, 435 U.S. at 543 (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)).

In *Vermont Yankee*, for example, the Court reversed the lower's court's decision, declaring that the court had improperly engrafted its "own notions of proper procedures upon agencies entrusted with substantive functions by Congress."  435 U.S. at 525.  As the Court reasoned, to the extent a court could ever be justified "in overturning agency action because of a failure to employ procedures beyond those required by the statute," such circumstances "are extremely rare." *Vt. Yankee*, 435 U.S. at 524.  Consistent with this general rule, the Federal Circuit has recognized that Commerce generally has discretion to create its own rules of procedure regarding "the development of the agency record." *PSC VSMPO–Avisma Corp. v. United States*, 688 F.3d 751, 760–61 (Fed. Cir. 2012) (citing, *e.g.*, *Vt. Yankee*, 435 U.S. at 543).

B.    Commerce May Suspend Or Bar Representatives For "Good Cause," But Does Not Adjudicate Conflicts Of Interest Overseen By Local Bar Authorities

Pursuant to this authority, Commerce has promulgated regulations relating to the submission of information and argument in antidumping and countervailing duty investigations and administrative reviews.  *See* 19 C.F.R. Part 351, Subpart C (listing regulations for time limits, format and certification of documents, verification of information, and more).  Among

other areas, Commerce has issued a regulation governing "attorneys or representatives" who may submit information and argument before Commerce.  19 C.F.R. § 351.313.

Generally, Commerce allows both attorneys and non-attorney representatives to submit information and argument in antidumping and countervailing duty proceedings.  19 C.F.R. § 351.313.  Although Commerce neither maintains a register of advocates, nor requires an "application for admission to practice," "{a}ny person desiring to appear as attorney or representative . . . may be required to show to the satisfaction of the Secretary his acceptability in that capacity."  *Id.*

Additionally, Commerce may suspend or bar attorneys or other representatives "for good cause shown."  19 C.F.R. § 351.331.  "Any attorney or representative . . . may for good cause shown be suspended or barred from practicing . . . , or have imposed on him such lesser sanctions (*e.g.*, public or private reprimand) as the Secretary deems appropriate"—but only after the opportunity for the attorney or representative to "present his views in the matter."  *Id.* Commerce "will maintain a public register of attorneys and representatives suspended or barred from practice."  *Id.*

When enacting the regulation, Commerce explained that "{m}any administrative agencies, including the Department, are frequently required to exercise discretion based upon a standard of 'good cause.'"  *Accountability Final Rule*, 78 Fed. Reg. at 22,775.  Commerce explained that it was not able to "define every possible act" that could amount to improper conduct, but listed examples of "{c}learly improper conduct" as including "knowingly providing incorrect information to the agency; knowingly making misrepresentations of fact or law; {or} knowingly making false accusations in a proceeding."  *Id*.

Commerce also explained that its regulation of attorneys for good cause does not "cover ethical conflicts uniquely within the province of local Bar authorities." *Id.* Commerce "will not consider claims . . . that a former law firm lawyer is representing a new client whose interest conflicts with the attorney's former clients." *Id.* "Instead, to the extent a law firm or individual attorney believes that an ethical breach is occurring or has occurred, they should follow the appropriate professional responsibility guidelines and ethical canons." *Id.* Consistent with this rule, Commerce has historically declined to intervene in disagreements over conflicts of interest between attorneys and former clients.[7] Consistent with that approach, Commerce declined to entertain Amsted's request for disqualification based on an alleged conflict of interest. *See* IDM at 22-24.

Amsted challenges Commerce's decision not to police alleged conflicts of interest, arguing that there are good reasons for administrative agencies to enforce conflicts-of-interest rules, and highlighting that the Treasury Office of the Comptroller of the Currency adopted a regulation governing conflicts of interest. *See* Amsted Br. at 21-23, 25-26 (citing, *e.g.*, George M. Cohen, The Laws of Agency Lawyering, 84 Fordham L. Rev. 1963, 1978 (2016); Keith Swisher, *The Practice and Theory of Lawyer Disqualification*, 27 Geo. J. Legal Ethics 71, 115 (2014); 12 C.F.R. § 19.8 (2024)).

Although these arguments reflect agency authority to adopt procedures, Amsted fails to show that Federal agencies "are *required* to engraft separate legal ethics rules onto their own

---

[7] *See, e.g.*, *Ripe Olives From Spain*, 86 Fed. Reg. 35,068 (Dep't of Commerce, July 1, 2021) (Final Results of Antidumping Duty Administrative Review 2018-2019), and IDM at cmt. 13) (stating that "to the extent that BCF alleges that Musco's counsel may have had a conflict of interest and may have violated DC Bar Rules of Professional Conduct, *this is not a matter for Commerce to resolve* because Commerce is not an appropriate tribunal for resolving allegations of professional misconduct by DC Bar members") (emphasis added).

rules of practice{.}" *See* IDM at 22-23 (citation omitted) (emphasis added). Commerce is an expert in the area of unfair trade practices and remedies, but "is not an expert in the complex area of conflict-of-interest rules," and reasonably declined to "police the compliance of attorneys with the local Bar rules." IDM at 22-23. As Commerce explained, "{t}he local Bar authority is in the best position to determine whether or not an ethical breach is occurring or has occurred under its ethics rules." IDM at 23.

Amsted argues that Commerce frequently acts outside its area of expertise in complex matters that arise in antidumping and countervailing duty proceedings. Amsted Br. at 21-23. But the complexity of antidumping and countervailing duty proceedings *supports*, rather than undermines, Commerce's determination that it will not delve into high-stakes conflict-of-interest matters in which it is not an expert. The antidumping and countervailing duty proceedings administered by Commerce already involve a multitude of complex determinations and tight time limits. *See, e.g.*, 19 U.S.C. §§ 1671d, 1673d. When adopting procedures, Commerce is "free to fashion" rules that enable it to "discharge {its} multitudinous duties"—including, as relevant here, administering the antidumping and countervailing duty laws. *See Vt. Yankee*, 435 U.S. at 543 (citation omitted).

Furthermore, motions to disqualify attorneys based upon conflicts of interest are high stakes and carry significant "potential for abuse." *Galderma Lab'ys, L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 394–95 (N.D. Tex. 2013); *Gray v. Rhode Island Dep't of Child., Youth & Fams.*, 937 F. Supp. 153, 156 (D.R.I. 1996) (noting the "increasingly strategic manner" in which motions to disqualify are used). An erroneous decision to disqualify an attorney has the potential to delay and derail an ongoing agency proceeding, and often carries "'immediate, severe, and often irreparable consequences' for the party and the disqualified attorney." *Watkins*

*v. Trans Union, LLC*, 869 F.3d 514, 519 (7th Cir. 2017) (quoting *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 719 (7th Cir. 1982)).  Commerce is not required to devote its limited resources and time to such proceedings.  By declining to do so, Commerce reasonably maintains its focus on its primary obligation—"to carry out its statutory duty" of timely and accurately conducting antidumping and countervailing duty investigations and reviews.  *See Bebitz Flanges Works Priv. Ltd. v. United States*, 433 F. Supp. 3d 1309, 1316 (Ct. Int'l Trade 2020) (quoting *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995)) (emphasizing the focus on Commerce's statutory duties in evaluating the reasonableness of its decisions).

Although Amsted is not entitled to a remedy from Commerce, Amsted is incorrect that Commerce's practice deprives Amsted of the opportunity to seek *any* adequate relief.  Amsted Br. at 25-26.  For example, Amsted may report the alleged conflict of interest to the District of Columbia Bar.  If appropriate, Amsted may also attempt to pursue judicial relief against the Attorney or the Firm.  *See, e.g.*, *GEO Specialty Chemicals, Inc. v. Husisian*, 951 F. Supp. 2d 32, 37 (D.D.C. 2013) (involving a malpractice lawsuit alleging a conflict of interest).  However, Amsted may not overcome Commerce's authority to establish its own procedures governing the conduct of attorneys and non-attorneys appearing in Commerce proceedings.  *See Vt. Yankee*, 435 U.S. at 543.

  C. Commerce Lawfully Complied With Its Own Regulation Governing Attorneys And Non-Attorney Representatives

Commerce lawfully applied its regulation governing attorney and non-attorney representatives.  *See* IDM at 22-24; 19 C.F.R. § 351.313.  As Commerce explained, section 351.313 is "the source of Commerce's authority to disqualify an attorney from practicing before

Commerce for 'good cause shown.'"  IDM at 23 (citation omitted).[8]  The preamble to section 351.313 "provides clarity as to how Commerce interprets the phrase 'good cause shown' in the regulation, and specifies that 19 CFR 351.313 is not intended to cover alleged ethical violations such as the one Amsted claims here."  IDM at 24.

Commerce properly considered the language of the preamble stating that section 351.313 "is not intended to cover ethical conflicts uniquely within the province of local Bar authorities." IDM at 24 (quoting *Accountability Final Rule*, 78 Fed. Reg. at 22,775).  "Although 'language in the preamble of a regulation is not controlling over the language of the regulation itself, {courts} have often recognized that the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules.'"  IDM at 24 (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999)).

The preamble addresses conflict-of-interest rules specifically, stating that Commerce "will not consider claims that a prior attorney refuses to provide a client's file to the current attorney or that a former law firm lawyer is representing a new client whose interest conflicts with the attorney's former clients."  IDM at 24 (quoting *Accountability Final Rule*, 78 Fed. Reg. at 22,775).  As explained in the preamble, "parties should not file requests covering such matters with the Department believing that the Department will notify appropriate Bar counsel of the possible ethical conflict."  IDM at 24 (quoting *Accountability Final Rule*, 78 Fed. Reg. at 22,775).  Commerce "will not entertain such requests and will not refer such conflicts to Bar counsel."  IDM at 24 (quoting *Accountability Final Rule*, 78 Fed. Reg. at 22,775).  "Instead, to the extent a law firm or individual attorney believes that an ethical breach is occurring or has

---

[8]  Amsted's arguments to Commerce recognized section 351.313 as the relevant authority.  *See* Amsted Case Brief at 31 (Aug. 18, 2023) (P.R. 384, C.R. 350).

occurred, they should follow the appropriate professional responsibility guidelines and ethical

canons." IDM at 24 (quoting *Accountability Final Rule*, 78 Fed. Reg. at 22,775). This language

supports Commerce's decision not to entertain Amsted's disqualification request based on an

alleged conflict of interest.

Amsted claims that the preamble's limitation is not present in the regulation, which

applies when "there is 'good cause shown,'" and argues that *Wyoming Outdoor Council* (cited by

Commerce) is no longer good law after the Supreme Court's decision in *Kisor v. Wilkie*. Amsted

Br. at 24-25 (citing, *e.g.*, *Kisor v. Wilkie*, 588 U.S. 558, 568–69 (2019); *Wyo. Outdoor Council*,

165 F.3d at 53-54). However, to the extent Amsted argues that Commerce misinterpreted the

meaning of "good cause" in Commerce's regulation, 19 C.F.R. § 351.313, Amsted is wrong, for

several reasons.

First, this case involves Commerce's discretion to apply a "general" regulatory standard

to the facts of a particular case, rather than the interpretation of an "ambiguous" regulation

governed by *Kisor*. *Cf. Asociacion de Exportadores e Industriales de Aceitunas de Mesa v.*

*United States*, 102 F.4th 1252, 1261 (Fed. Cir. 2024) (applying a similar analysis in a case

involving statutory interpretation). Under the general "good cause" standard, 19 C.F.R.

§ 351.313, Commerce reasonably exercised its discretion by declining to entertain a

disqualification request involving alleged conflicts of interest—a decision that aligns with the

preamble to the regulation. *Accountability Final Rule*, 78 Fed. Reg. at 22,775.

Second, even if the regulatory term "good cause" is ambiguous, Commerce is entitled to

deference in interpreting its own regulation. "When it applies, *Auer* deference gives an agency

significant leeway to say what its own rules mean." *Kisor*, 588 U.S. at 580. "In so doing, the

doctrine enables the agency to fill out the regulatory scheme Congress has placed under its supervision." *Id.* That is precisely the case here.

To be sure, the Court "will not defer to an agency's interpretation of a regulation when the evidence shows that 'the proffered interpretation runs contrary to the intent of the agency at the time of enactment of the regulation.'" *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 802 (Fed. Cir. 2020) (citations omitted). But in this case, Commerce followed the clear guidance in the preamble to the regulation, reflecting agency intent at the time of enactment. *See* IDM at 24. Similarly, deference is not warranted "when a 'regulatory interpretation'" consists of "ad hoc statement{s}" rather than the "agency's authoritative or official position." *Adams v. United States*, 59 F.4th 1349, 1361 (Fed. Cir.) (en banc), *cert. denied*, 144 S. Ct. 278 (2023) (citations and quotation marks omitted). In this case, however, Commerce's preamble reflects a formal expression of its position. *See* IDM at 24 (citing *Accountability Final Rule*, 78 Fed. Reg. at 22,775). Amsted fails to meaningfully develop any argument that Commerce's preamble is not entitled to deference under these standards. *See* Amsted Br. at 24-25.

  D. <u>Commerce Did Not Depart From Any Established Practice</u>

Commerce's decision also aligns with its practice, as reflected in the regulatory preamble and prior cases. *See* IDM at 23 (citing *Ripe Olives From Spain*, 86 Fed. Reg. 35,068-01 (Dep't of Commerce, July 1, 2021) (Final Results of Antidumping Duty Administrative Review 2018-2019, and IDM at cmt. 13).

In *Ripe Olives from Spain*, for example, Commerce declined to entertain a request for disqualification based on an alleged conflict of interest under the DC bar rules. IDM at 23 (citing *Ripe Olives from Spain* IDM at cmt. 13). Commerce explained that even assuming the

presence of a conflict of interest, "this is not a matter for Commerce to resolve because Commerce is not an appropriate tribunal for resolving allegations of professional misconduct by D.C. Bar members." *Ripe Olives from Spain* IDM at cmt. 13. This approach was "consistent with the regulatory preamble," which provided that the rule was "not intended to cover ethical conflicts uniquely within the province of local Bar authorities," such as alleged conflicts of interest. IDM at 23-24 (citing *Accountability Final Rule*, 78 Fed. Reg. at 22,775). Thus, Commerce's approach in this case aligns with Commerce's past practice—as announced in the regulatory preamble and as applied in *Ripe Olives from Spain*.[9]

Amsted fails to show that Commerce departed from any contrary established practice. *See* Amsted Br. at 21. As the party asserting an unreasoned departure from past practice, Amsted bears the burden of showing that "Commerce consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice." *See Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1272 (Fed. Cir. 2005) (quoting *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003)).

Amsted has not demonstrated any "established" or "routine" practice contrary to the one that Commerce applied in this proceeding. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1328-1329 (Fed. Cir. 2009) (citations omitted); *see also id.* (quoting *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004)). Amsted contends that Commerce "recently applied the ABA Model Rules" in a letter in another proceeding. Amsted Br. at 21 (citing Ex. A, Memorandum, Enforcement & Compliance Office, U.S. Dep't of

---

[9] A single contrary letter in a prior proceeding does not establish a contrary past practice. *See Pakfood Pub. Co. v. United States*, 453 F. App'x 986, 990 (Fed. Cir. 2011) (non-precedential) (finding that a "single out-of-context characterization of Commerce's practice . . . does not rebut the substantial evidence of Commerce's actual established practice").

Commerce, *Silicon Metal from the Republic of Kazakhstan (Kazakhstan): Representation of Tau-Ken Temir LLP by Squire Patton Boggs*, DOC Inv. No. C-834-811 (Oct. 6, 2020)).  The cited letter stated that Commerce had declined to disqualify counsel—explaining that there was no conflict.  *See* Amsted Br. at Ex. A.

As Commerce explained, however, this letter does not amount to a "practice" to adjudicate arguments made under state ethics rules.  IDM at 23.  To the contrary, "Commerce's practice is detailed in the preamble to its regulations and exemplified in the other cases, such as *Ripe Olives from Spain*."  IDM at 23 (citing *Ripe Olives from Spain* IDM at cmt. 13).  The single letter cited by Amsted does not establish any consistent "practice" contrary to the rule announced in the preamble to section 351.313.

E.    Authority To Regulate Attorney Conduct In Judicial Proceedings Does Not Authorize The Court To Compel Agency Action Pursuant To 19 U.S.C. § 1516a

Amsted's arguments regarding the Court's "plenary" authority also miss the mark.  Amsted claims that the Court has "plenary" power to oversee attorney conduct, and argues the Court should engage in *de novo* review of Amsted's challenges under state and model ethics rules.  Amsted Br. at 10, 26.  This argument misunderstands the difference between a court's inherent authority to regulate the conduct of attorneys appearing before it, and a court's authority to require an agency to adopt particular procedures.  Although this Court possesses authority to disqualify attorneys from a "judicial proceeding" otherwise within the Court's jurisdiction, *Watkins v. Trans Union, LLC*, 869 F.3d 514, 519 (7th Cir. 2017), it may not devise its own rules relating to the submission of information and argument before Commerce.  To do so would "depart{} from the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure."  *Vt. Yankee*, 435 U.S. at 544 (citing *FCC*, 381 U.S. at 290).

24

Courts have inherent authority to regulate the conduct of attorneys appearing before the court.  "Any court which has the power to admit attorneys to practice may also sanction them for unprofessional conduct."  *Baldwin Hardware Corp. v. FrankSu Enter. Corp.*, 78 F.3d 550, 562 (Fed. Cir. 1996), *as modified on reh'g* (May 22, 1996) (quoting *Standing Committee on Discipline v. Ross,* 735 F.2d 1168, 1170 (9th Cir. 1984)).  Cases cited by Amsted falls within this rubric, *see* Amsted Br. at 10, and provide that when exercising such inherent authority, "Federal courts may adopt state or ABA rules as their ethical standards."  *Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.)*, 837 F. 3d 1280, 1284 (Fed. Cir. 2016) (quoting *In re Am. Airlines, Inc.*, 972 F.2d 605, 609 (5th Cir.1992)) (holding that application of those rules involves "questions of federal law).

In this case, however, Amsted has not asked this Court to disqualify counsel only in ongoing judicial proceedings.  Instead, Amsted asks the Court to order Commerce to alter *Commerce's own procedures*, and to require Commerce to terminate an investigation and dismiss a petition that complies with all statutory requirements.  *See, e.g.*, Amsted Br. at 27.  Even assuming that Commerce would have "inherent authority to dismiss a petition or end an investigation due to misconduct or ethical violations" (an issue that Commerce did not decide), *see* IDM at 24, that would not authorize the Court to step into Commerce's shoes to make such a decision.  Just as court have inherent authority to "'adopt procedures to manage their own affairs'" (such as regulating attorney conduct), "{s}o do administrative agencies."  *Cf. Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1261 (Fed. Cir. 2023) (quoting *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016); *Gumbel v. Pitkin*, 124 U.S. 131 (1888)) (addressing protective orders).  Thus, the question is not whether the Court believes that it would be desirable to apply conflict-

of-interest rules in Commerce proceedings, but rather whether Commerce lawfully implemented and followed its *own* procedures.

     F.    <u>The Court May Not Review Extra-Record Information</u>

The bulk of Amsted's remaining arguments address the merits of the conflict-of-interest allegations (which was not adjudicated by Commerce), and rely on extra-record information that was not presented to Commerce for inclusion in the administrative record.  *See* Amsted Br. at 10-19.  These arguments exceed the scope of the Court's standard of review.  This Court's authority pursuant to 19 U.S.C. § 1516a is limited to reviewing whether Commerce's final determination is "unsupported by substantial evidence *on the record*, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (emphasis added).  Thus, the Court does not possess authority to review determinations that were not made by Commerce, or evidence that is not part of the record before Commerce.

By statute, the record subject to review generally consists of: (i) "a copy of all information presented to or obtained by" Commerce during the administrative proceeding, and (ii) "a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register."  19 U.S.C. § 1516a(b)(2)(A).  The administrative record in this case includes all materials contemplated by statute.  *See* ECF No. 28 (administrative record index).  The record includes, for example, Amsted's request for disqualification (P.R. 73), the Coalition's response (P.R. 77), and Commerce's letter (P.R. 78), as well as applicable case briefs (P.R. 384, C.R. 350), and Commerce's final determination (IDM at 24).

However, in presenting arguments to this Court, Amsted relies on extra-record materials, including allegations in its complaint and numerous statements without any citation at all. *See* Amsted Br. at 8-18.[10] These arguments ignore the correct standard of review.

When reviewing Commerce's determination in an antidumping duty proceeding pursuant to 19 U.S.C. § 1516a, "{t}he scope of the record for purposes of judicial review must be based upon information which was 'before the relevant decision-maker' and was presented and considered 'at the time the decision was rendered.'" *Ass'n of Am. Sch. Paper Suppliers v. United States*, 34 C.I.T. 31, 37 (2010) (quoting *Beker Indus. Corp. v. United States*, 7 C.I.T. 313, 315 (1984)). "This information, which constitutes the formal record is the only information upon which the factual findings and legal conclusions underlying the challenged determination could have been based." *Beker*, 7 C.I.T. at 316. "An attempt to supplement the record now in the fashion attempted by plaintiff is tantamount to seeking *de novo* review through the back door." *Ass'n of Am. Sch. Paper Suppliers*, 34 C.I.T. at 37 (quoting *Beker*, 7 C.I.T. at 316).

This basic principal is foundational to record-review cases like this one. Requests to supplement the administrative record are disfavored in Administrative Procedure Act (APA) cases. "In *Camp v. Pitts*, the Supreme Court stated that 'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in

---

[10] Amsted also relies on cases—such as *Makita Corp. v. United States*, 819 F. Supp. 1099, 1104 (1993)—that do not arise under 19 U.S.C. § 1516a. *See* Amsted Br. at 11, 14, 16, 18, 19. This Court previously distinguished *Makita* in a case filed by Amsted against the United States International Trade Commission under 28 U.S.C. § 1581(i), explaining that unlike in *Makita*, Amsted's "allegations of attorney misconduct in this case, just like their APO breach allegations, are too threadbare to meet the more specific showing of manifest inadequacy under § 1581(i)." *Amsted Rail Co., Inc. v. United States Int'l Trade Comm'n*, 600 F. Supp. 3d 1308, 1327 (Ct. Int'l Trade 2022), *appeal dismissed*, No. 2023-1355, 2023 WL 4346710 (Fed. Cir. July 5, 2023). Amsted's reliance on *Makita* remains inapposite at the current posture because it ignores the actual determination made by Commerce and the administrative record developed during the underlying proceeding.

the reviewing court.'" *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379–80 (Fed. Cir. 2009) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based *on the record the agency presents to the reviewing court.*"  *Id.* (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44 (1985)) (emphasis added).

The standard is just as strict—if not more so—in cases arising under 19 U.S.C. § 1516a, which are limited to substantial evidence review of the record, as defined by statute.  The formal record developed before Commerce provides "the only information upon which the factual findings and legal conclusions underlying the challenged determination could have been based." *Ass'n of Am. Sch. Paper Suppliers*, 34 C.I.T. at 37 (quoting *Beker*, 7 C.I.T. at 316).  "Commerce is entitled to broad discretion regarding the manner in which it develops" this record in an antidumping investigation.  *Stupp Corp. v. United States*, 5 F.4th 1341, 1350 (Fed. Cir. 2021) (quoting *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012)). Amsted has not even attempted to show that supplementation is appropriate here, or that Commerce was required to include additional information in the administrative record.  In short, there is no basis for the Court to entertain arguments based on information that was not submitted to or considered by Commerce.

Nor may the Court reach the ultimate question of whether there is a conflict or the consequences of such a determination when Commerce did not do so.  *See* IDM at 24-25.  As discussed above, Commerce lawfully declined to entertain the merits of the conflict allegation, in light of its practice not to review ethical matters uniquely within the authority of state ethics officials.  *Id.*  Again, the Court's role is to review Commerce's final determination, to determine whether it is lawful and supported by substantial evidence in the record.  19 U.S.C. § 1516a(b).

Because Commerce did not address the ultimate question of whether a conflict exists, the Court may not reach that issue in the first instance. Nor may the Court decide what action might be appropriate under 19 C.F.R. § 351.313 if a conflict is found to exist. To the extent the Court determines that Commerce was required to adjudicate disputes regarding alleged conflicts of interest (and it is not), a remand would be required for Commerce to address the issue in the first instance.

III.     Commerce's Determination Regarding The Viability Of Amsted's Home Market Is Lawful And Supported By Substantial Evidence

Commerce reasonably determined that Amsted's sales of freight rail couplers to Mexican manufacturers were not home market sales because Amsted knew or should have known that these sales were destined for exportation, not for domestic consumption. IDM at 10-16. Once these sales were classified as export sales, Mexico lacked a viable home market for freight rail couplers during the period of investigation. Thus, Commerce based normal value on Amsted's sales of freight rail couplers to a third country—Canada. IDM at 10-16, PDM at 11; Post-Prelim Analysis at 2-4 (P.R. 372).

Amsted challenges Commerce's determination that Amsted's sales through the IMMEX program are export sales. *See* Amsted Br. a 28-43. Amsted's arguments are incorrect. Commerce's analysis comports with the statute and longstanding practice, and substantial evidence supports Commerce's finding that Amsted knew or should have known that the relevant sales were not for consumption in Mexico. Indeed, the sales were made as part of the IMMEX tax-benefit program to incentivize exports of goods manufactured in Mexico. Although such goods may nonetheless qualify as sold for consumption when further processed into non-subject merchandise in Mexico, in this case, the freight rail couplers were not further

manufactured into non-subject merchandise before export.  Each of these points is discussed in further detail below.

A.    Commerce Applies The Knowledge Test To Determine Whether A Sale Is For Export Or The Home Market

As an initial matter, Commerce's analysis complies with the statute governing the calculation of normal value.  Normal value is typically calculated based on the "price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) *for consumption* in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i) (emphasis added).  If the home market is not viable—for example, due to an insufficient "quantity" of sales, 19 C.F.R. § 351.404(a)—Commerce will generally base normal value on the price at which the foreign like product is sold for consumption in a third country.  *Id.* § 1677b(a)(1)(B)(ii); 19 C.F.R. 351.404(a), (f).[11]

Thus, assessing the viability of the home market requires categorizing sales in the correct destination market.  However, "{t}he statutory scheme does not provide explicit criteria for determining whether a sale is for export or is a home market sale."  *Tung Mung Dev. Co. v. United States* (*Tung Mung*), 25 C.I.T. 752, 2001 WL 844484 at *22 (2001) (citation omitted).

To associate sales with the correct destination market—whether in the home market, a third country, or the United States—Commerce applies a "knowledge" test.  The knowledge test "reflects the guidance of the Statement of Administrative Action" accompanying the Trade Agreements Act of 1979.  *Id.* at *23; *see also* S. Rep. No. 96–249, at 411 (1979), as reprinted in

---

[11]  Although Commerce may also calculate normal value based on constructed value, Commerce "normally will calculate normal value based on sales to a third country rather than on constructed value if adequate information is available and verifiable."  19 C.F.R. § 351.404(f).

1979 U.S.C.C.A.N. 381, 682.  Specifically, "if the producer *knew or had reason to know* that the goods were for sale to an unrelated U.S. buyer . . . the producer's sales price will be used as purchase price" (now called export price) "to be compared with that producer's foreign market value'" (or normal value).  *Tung Mung*, 25 C.I.T. 752, 2001 WL 844484 at *23 (quoting S.R. Doc. No. 96–249, at 411 (1979)) (emphasis added); *see also id.* (citing *LG Semicon Co. v. United States,* 23 C.I.T. 1074, 1999 WL 1458844 at *4 (Dec. 30, 1999) (listing examples of Commerce's application of the knowledge test); *Yue Pak, Ltd. v. United States ITA,* 20 C.I.T. 495 (1996), *aff'd,* 111 F.3d 142 (Fed. Cir. 1997)).  Commerce uses this analysis when assessing whether a sale qualifies as a U.S. sale used to calculate the export price or constructed export price.[12]  *See* 19 U.S.C. § 1677a (defining export price and constructed export price).

Similarly, when assessing normal value under 19 U.S.C. § 1677b(a), Commerce does not classify sales as home market sales if the producer "knew or should have known that the merchandise was not for home consumption based upon the particular facts and circumstances surrounding the sales."  *INA Walzlager Schaeffler KG v. United States*, 957 F. Supp. 251, 264 (Ct. Int'l Trade 1997) (footnotes omitted).  Thus, Commerce employs a knowledge test under 19 U.S.C. § 1677b to determine whether the respondent knew or should have known that its merchandise was for home "consumption."  *See Z.A. Sea Foods Priv. Ltd. v. United States*, 569 F. Supp. 3d 1338, 1352-53 (Ct. Int'l Trade 2022) (quoting *Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1331 (Ct. Int'l Trade 2000)).  "Where a respondent has no knowledge as to the destination of subject merchandise, except that it is for export, Commerce will classify such sales as export sales and exclude them from the home market sales database."

---

[12] "Export price" and "constructed export price" represent the price at which subject merchandise is first sold (or agreed to be sold) in the United States, as defined in 19 U.S.C. § 1677a.

*See, e.g.*, *Certain Lined Paper Products from India: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021* (*Paper from India*), 88 Fed. Reg. 21,971 (Dep't of Commerce, Apr. 12, 2023), and accompanying IDM cmt. 1 (footnote omitted).

      B.      Substantial Evidence Supports Commerce's Determination That Amsted Knew Or Should Have Known That Its Sales Of Freight Rail Couplers To Mexican Manufacturers Were For Export, Not Domestic Consumption In Mexico

Commerce reasonably found that Amsted "knew or should have known" that its sales of freight rail couplers to Mexican railcar manufacturers were for export rather than domestic consumption in Mexico.  IDM at 10-15; HM Viability Memo at  3, 5-6 (P.R. 315, C.R. 241). This is a question of fact based on examination of "the particular facts and circumstances of each case."  *See INA Walzlager Schaeffler KG*, 957 F. Supp. at 264 n.2; *see also Stupp Corp. v. United States*, 359 F. Supp. 3d 1293, 1310 (Ct. Int'l Trade 2019), *aff'd in part, vacated in part, remanded on other grounds*, 5 F.4th 1341 (Fed. Cir. 2021) (explaining that Commerce bases its decision on "all relevant facts and circumstances") (citations omitted).

Substantial evidence supports Commerce's finding.  During the period of investigation, Amsted reported selling its couplers to railcar manufacturers operating within Mexico's IMMEX program.  Section A Questionnaire at 5 (P.R. 110, C.R. 57).  Again, the IMMEX program is a tax-benefit program, in which foreign companies are exempt from paying Mexican import duties on production inputs if the *maquiladora* operating in Mexico produces finished goods that are either exported or sold to another *maquiladora* through a "virtual" export.  *See id.* at 5, 19-20. Although companies are not required to export merchandise out of the IMMEX program, participants lose duty-free tax benefits (*i.e.*, they must pay import duties and VAT) on merchandise that is consumed domestically.  *Id.* at 5, 19-20.  Indeed, the very purpose of

participating in the IMMEX program is to obtain tax benefits that *only* apply where the merchandise is exported or sold to another *maquiladora* for further processing and export. Thus, the nature and purpose of the IMMEX program supports Commerce's decision to classify Amsted's sales as export sales.

In this case, moreover, Amsted's direct sales to manufacturers in the IMMEX program are classified as "virtual" exports—meaning that they do not enter Mexico for consumption and VAT is not assessed on the sales. *See* Section A Questionnaire at 19 (describing inter-*maquila* transactions as the "not for consumption" market), 20 (describing virtual *pedimento* process). Sample sales documentation on the record confirms that the Amsted's IMMEX transactions [ ▮▮▮▮▮▮▮▮ ]. *See* HM Viability Memo at 4 (P.R. 315, C.R. 241) (describing sample home market sale, at Section A Questionnaire at Ex. 10 (C.R. 67)).

Further, consistent with the nature and purpose of the IMMEX system, [ ▮▮▮▮



]. *See Id.* at 3 (citing Market Viability Allegation at 7-8 and Exs. 1-3 (P.R. 128, C.R. 96)). Although Commerce found this documentation was insufficient to demonstrate knowledge of U.S. destination, it still showed a [ ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ ]. *See id.*

Amsted attempts to wave away this substantial evidence by arguing that excluding sales from the home market database requires an affirmative showing that the respondent "knew or should have known that the merchandise was *not* for home market consumption." *See* Amsted Br. at 39-40 (citing *Tin Mill Products from Canada*, 89 Fed. Reg. 1542 (Dep't of Commerce, Jan. 10, 2024) (*Tin Mill Products*), and accompanying IDM) (emphasis added). As Commerce stated in *Tin Mill Products*, however, sales in the IMMEX program create a "presumption of the

respondent's actual or imputed knowledge that its domestic sales through the IMMEX program were destined for exportation." *Tin Mill Products*, and accompanying IDM at cmt. 1.  To rebut this presumption and claim that its sales were home market sales, it was Amsted's burden to demonstrate knowledge that its merchandise sold through the IMMEX program were consumed in Mexico. *Id.*[13]  Amsted made no such showing here and, therefore, Commerce appropriately classified the sales as export sales. *See, e.g.*, PDM at 11.

For similar reasons, Commerce reasonably treated sales within the IMMEX program as distinct from ordinary transactions involving resellers in the home market. *See* Amsted Br. at 41-42.  According to Amsted, sales to home market resellers are routinely accepted as home market sales "under the paradigm that respondents need not prove whether each home market sale is for consumption in the home market" and sustaining Commerce's determination here would result in an "inundation of cases challenging home market viability." *See id.* at 41 (citation omitted).  But not every reseller is operating within a legal framework specifically designed to encourage exportation.  Because Commerce's determination here was "based on the specific factual situation of this case," it is distinct from—and does not disturb—Commerce's normal practice in cases involving home market resellers. *See* IDM at 14.

C.    Substantial Evidence Supports That Amsted Knew Or Should Have Known That Its Freight Rail Couplers Sold In The IMMEX Program Were Not Further Processed Into Non-Subject Merchandise Before Export

Substantial evidence also supports Commerce's finding that Amsted's sales of freight rail couplers to other *maquilas* in the IMMEX program were not "consumed" in Mexico by virtue of

---

[13] The respondent in *Tin Mill Products* made its domestic sales "directly to unaffiliated Canadian customers without going through any special export oriented government program similar to IMMEX." *See id.* and accompanying IDM at cmt 1.  Therefore, the language that Amsted quotes from *Tin Mill Products* did not involve a similar fact pattern.

further processing into non-subject merchandise.  *See* IDM at 12-14.  "Merchandise sold in the home market, even if ultimately destined for export, is 'consumed' in the home market if it is used there to produce non-subject merchandise prior to exportation."  *Allegheny*, 215 F. Supp. 2d at 1332 (citing, *e.g.*, *Certain Hot–Rolled Carbon Steel Flat Products, Certain Corrosion Resistant Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Korea*, 58 Fed. Reg. 37,176, 37,182 (Dep't of Commerce, July 9, 1993) (final determination of sales at less-than-fair-value) (*Steel Products from Korea*)); *Tung Mung*, 25 C.I.T. 752, 2001 WL 844484 at *23.  In such cases, the respondent's sale is treated as a home market sale because any merchandise leaving the home market after processing is no longer "in-scope, subject merchandise," and, thus, cannot be classified as an export sale.  *See LWRPT from Mexico 2020-2021 Final*, 88 Fed. Reg. 15,665, and accompanying IDM at cmt. 4.

In this case, however, Amsted's customers through the IMMEX program did not process the freight rail couplers into non-subject merchandise.  *See* HM Viability Memo at 5-6 (P.R. 315, C.R. 241).  As Commerce explained, the freight rail couplers sold to Mexican railcar manufacturers were not further processed into non-subject merchandise, but instead remained in-scope as "a distinct article of commerce even after they are attached to a freight railcar by manufacturers."  *Id.* at 5.

This determination is supported by Commerce's scope determination that "the attachment of freight rail couplers to freight railcars does not turn freight rail couplers into a new article of commerce."  Final Scope Determination at 1, 8-12 (May 16, 2023) (P.R. 332).  The scope of the antidumping duty order covers freight rail couplers that are imported alone or attached or mounted to a railcar, but not the railcar itself.  *See id.* at 8.  During the investigation, interested parties argued that freight rail couplers are substantially transformed into a distinct class or kind

of merchandise when they are attached to a freight railcar.  Commerce disagreed, explaining that "when a freight rail coupler is attached to or mounted on a freight railcar, it neither loses its identity nor is transformed into a new product with a new name, character, and use."  *See id.* at 11.  As support, Commerce cited evidence that freight rail couplers are not a permanently affixed component of a railcar and do not undergo further processing or physical changes when attached to or removed from railcars.  *See id*. at 10.

Amsted does not challenge the scope of the order before this Court (and, thus, waived the issue),[14] but nonetheless asserts that in the "real world that would be considered a substantial transformation and would constitute a consumption of the FRCs."  *See* Amsted Br. at 31, 33. This argument is unsupported by the record.  Again, freight rail couplers "do not undergo further processing or physical changes when attached to or removed from railcars."  *See* Final Scope Memorandum at 10; IDM at 12-13.  Thus, Amsted's claim that its freight rail couplers are "used" or "consumed" in the production of railcars is unsupported.

Amsted next urges this Court to rely on "{U.S. Customs and Border Protection (CBP)}'s view of consumption" rather than Commerce's.  *See* Amsted Br. at 33-34.  This argument is misplaced because CBP did not actually express any views regarding when a railcar is deemed to be sold "for consumption" in Mexico nor did CBP equate consumption with use.  Rather, Commerce sought CBP's input regarding the administrability of certain scope language pertaining to instruments of international traffic (IIT), which allows certain goods to be imported

---

[14]  Commerce addressed scope issues in a single scope memorandum covering three separate proceedings (China (antidumping and countervailing duty) and Mexico (antidumping duty).  Parties have challenged the scope determination only as it relates to the antidumping and countervailing duty orders on freight rail couplers from China.  *See* Court Nos. 23-160, -161. Amsted is not a party to that litigation, and no interested party challenges the scope of the antidumping duty order on freight rail couplers from Mexico.

without entering the United States for consumption (and thus without certain duties being owed).
*See* IDM at 13-14; CBP Memo at 1-2 (Mar. 1, 2023) (P.R. 222); *see also* Final Scope
Determination at 13-17 (P.R. 332).  CBP explained that it does not differentiate between the
attached coupler and the freight rail car when designating an import as an instrument of
international traffic.  *See* CBP Memo at 2.[15]  Such reasoning does not implicate Commerce's
determination regarding sales for consumption in Mexico.

In any event, CBP does not define "which merchandise is within the scope" of an
antidumping duty order—Commerce does.  *See generally Duferco Steel, Inc. v. United States*,
296 F.3d 1087, 1096 (Fed. Cir. 2002).  Here, Commerce found that freight rail couplers are
unchanged when attached to a railcar and remain in-scope.  Final Scope Determination at 1 (P.R.
322).  Because Amsted knew or should have known that its sales to railcar manufacturers were
destined for export, and because the railcar manufacturers did not process the freight rail
couplers into non-subject merchandise, Commerce reasonably determined that they were export
sales that were not sold "for consumption" in the home market.  *See* 19 U.S.C.
§ 1677b(a)(1)(B)(i).

Amsted's effort to second-guess Commerce's practice is no more persuasive.  *See*
Amsted Br. at 36.  Amsted contends that *Sugar from Mexico* does not support the conclusion that
"transformation to an out-of-scope process was *necessary* to confer home market status."  *See*
Amsted Br. at 36 (citing *Sugar from Mexico*, and accompanying PDM at 8).  This is a confusing
argument.  Not only is *Sugar from Mexico* consistent with Commerce's approach in this case, *see*

---

[15]  Indeed, the fact that CBP distinguishes between imports and entries for "consumption"
merely underscores that the word "consumption" carries a legal meaning distinct from mere sale
or use.

IDM at 12, but there are numerous other cases in which Commerce has applied the same practice.

In *Steel Products from Korea*, for example, Commerce included in the home market sales database "local sales which are further manufactured into merchandise outside the scope of the{} investigations" prior to exportation, but excluded sales where the merchandise was further processed into both subject and non-subject merchandise and "there is no way to determine the nature of the finished product that was exported from Korea." *See Steel Products from Korea*, 58 Fed. Reg. at 37,182. Similarly, in *CORE from Taiwan*, Commerce declined to reclassify U.S. sales that were painted in the home market prior to exportation, concluding that painting is not home market "consumption" under the statute. *See Certain Corrosion-Resistant Steel Products from Taiwan; 2017-2018*, 85 Fed. Reg. 16,613 (Dep't of Commerce, Mar. 24, 2020), and accompanying IDM at cmt. 4. Consistent with its approach in this case, Commerce explained that its practice focuses on whether "merchandise was processed into non-subject merchandise." *See id*. Thus, Commerce's analysis in this case is supported by its practice and substantial record evidence.

     D.     **Amsted Presents No Genuine Question Of Statutory Interpretation And, In Any Event, Misunderstands The Meaning Of Consumption**

Amsted nonetheless argues that it is irrelevant whether its freight rail couplers were later exported because they were first "consumed" in Mexico during the railcar assembly process as a matter of law. *See* Amsted Br. at 32-37. The Court should reject this assertion, which is premised on a misunderstanding of the statute, the record, and Commerce's past practice.

     1.     Amsted Fails To Present A Genuine Question Of Statutory Interpretation

As this Court has previously explained, there is no "bright-line test" for determining the destination of goods. *INA Walzlager Schaeffler KG v. United States*, 957 F. Supp. at 264 n.2.

Instead, "{t}he appropriate method for determining the existence of knowledge of the destination of goods is to examine the particular facts and circumstances of each case." *Id.* That is precisely what Commerce did in this case, and Commerce's findings are supported by substantial evidence. *See* Section II.C.

Attempting to avoid deferential substantial evidence review, Amsted contends that the case can be resolved as a matter of statutory interpretation—claiming that consumption means any "use" of the merchandise in Mexico. Amsted Br. at 33. Amsted argues that the plain meaning of the term "consumption" is the "use of something," such that its freight rail couplers were consumed in the home market when used once "mounted onto a freight railcar." *See id.* (quoting *Merriam Webster Online Dictionary*, available at https://www.merriam-webster.com/dictionary/consumption). The Court should reject this effort to convert a question of fact into a pure question of statutory interpretation.

Not only is Amsted's interpretation incorrect (as discussed below), but Amsted has not shown that its proffered statutory interpretation would resolve the case. Even if consumption means "use," that would not resolve the factual question of whether the Mexican purchasers "used" freight rail couplers merely by attaching them to freight cars without processing the freight rail couplers into non-subject merchandise. *See* IDM at 12-13. Having failed to disturb the substantial evidence supporting Commerce's findings on these points, *see* Section II.B&C, Amsted cannot demonstrate that its sales of freight rail couplers to railcar manufacturers were for "consumption" in Mexico—under any meaning of the term.

2.    <u>Amsted's Proposed Interpretation Is Incorrect</u>

Regardless, Amsted is wrong in claiming that its proposed definition of consumption as "use" is the "best" interpretation of the statute.  *See* Amsted Br. at 28-29 (quoting *Loper Bright Enterprises v. Raimondo*, 602 U.S. __, 144 S. Ct. 2244, Slip Op. 22-451 (June 28, 2024)).

Although Amsted purports to provide the "ordinary meaning" of the term "consumption," Amsted's preferred definition is *third* in a list that defines consumption in multiple different ways.[16]  *See* Amsted Br. at 33, 35.  Amsted's proposed definition would also conflict with relevant canons of statutory interpretation.  "{W}hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'"  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (citation omitted).  Unlike the reference to "consumption" in section 1677b(a), other parts of the statute specifically refer to "use."  *See, e.g.*, 19 U.S.C. § 1677j(a)(1) (permitting Commerce to include within the scope of an order "imported parts or components . . . that are *used* in the completion or assembly of the merchandise in the United States{.}" (emphasis added)).  Congress thus "knew how to specify" use when it wanted to, *Sosa*, 542 U.S. at 711 n.9, but did not do so when defining normal value in 19 U.S.C. § 1677b(a).

Amsted's interpretation also diverges from the meaning of consumption elsewhere in the statute governing antidumping duties.  For example, after an affirmative preliminary less-than-fair-value determination, Commerce "shall order the suspension of liquidation of all entries of

---

[16]  Notably, the first definition of consumption is "the act or process of consuming," and "consuming" is defined as "to do away with completely."  *See Merriam Webster Online Dictionary,* available at https://www.merriam-webster.com/dictionary/consume.  As discussed above, freight rail couplers are not "done away with completely" when they are assembled into a railcar.  Rather, they are physically unchanged after being attached to (or removed from) a railcar.  *See* Preliminary Scope Decision Memorandum at 9-10 (P.R. 268); Final Scope Memorandum at 1, 8-10 (P.R. 332).

merchandise subject to the determination which are *entered, or withdrawn from warehouse, for consumption*" at the relevant time.  19 U.S.C. § 1673b(d)(2) (emphasis added).  When interpreting "consumption" in this context, the Court recognized that "manufacturing or processing" in the United States was not necessarily "sufficient to reject Commerce's determination that the goods are not 'entered for *consumption*.'"  *See Titanium Metals Corp. v. United States*, 901 F. Supp. 362, 364, 366 (Ct. Int'l Trade 1995) (emphasis added).  Similarly, temporary importation bond entries "are temporary in nature and not 'entered for *consumption*.'"  *Id.* (quoting *Trans–Border Customs Servs., Inc. v. United States,* 843 F. Supp. 1482 (Ct. Int'l Trade 1994)) (emphasis added).

To be sure, this case involves statutory language applying when merchandise is "sold" for consumption in the home country, *see* 19 U.S.C. § 1677b(a)—rather than merchandise "entered" or "withdrawn from warehouse" for consumption, as in 19 U.S.C. § 1673b(d)(2).  Nevertheless, the meaning of "consumption" in section 1673b(d) confirms that Amsted's proposed interpretation does not reflect the plain meaning of the term "consumption" used throughout the antidumping duty statute.  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks and citation omitted).  Amsted's proposed interpretation would violate this canon by manufacturing conflict among different provisions in the statutory scheme.

Amsted's own references to "consumption" throughout its filings to Commerce confirm that its proposed interpretation of consumption as any "use" is overly broad.  In its Section A Response, Amsted stated that the IMMEX program "differentiates between sales for consumption within the Mexican customs territory (the 'consumption' market) and sales that

involve deliveries of products within the Mexican territory that are not intended for consumption in Mexico." *See* Section A Questionnaire at 19 (P.R. 110, C.R. 57). Amsted described this second category of sales as "deliveries to other *maquiladora* companies which use those products as subassemblies and may later export the finished product (*i.e.,* the 'not for consumption' market){.}" *Id.* Amsted also explains that companies "may defer paying the requisite import taxes until the time limits under IMMEX have run, upon which the finished products then enter the Mexican territory for consumption." *See id.* Thus, by Amsted's own framing, its sales to *maquiladoras* that manufacture railcars were not sales "for consumption" in Mexico, despite Amsted's claims that the couplers were purportedly "used" in Mexico prior to export.

Finally, if accepted, Amsted's interpretation of the statute would create a loophole that could not have been intended by Congress. Under Amsted's definition, a party could sell subject merchandise with knowledge that it will undergo some processing before export (e.g., packaging, painting, etc.) that does not remove the product from the scope of an order. *See, e.g.*, Amsted Br. at 36. If Commerce were required to treat that sale as a home market sale (because the subject merchandise was "used" in further processing), then any subsequent export to the United States might evade the dumping laws because the same transaction cannot be *both* a U.S. and home market sale.[17] Commerce's interpretation correctly avoids the possibility of manipulation or

---

[17] Under Commerce's practice, the relevant sale for purposes of export price is "the price at which the first party in the chain of distribution who has knowledge of the U.S. destination of the merchandise sells the subject merchandise, either directly to a U.S. purchaser or to an intermediary such as a trading company." *See Certain Cut-to-Length Carbon-Quality Steel Plate Products from Italy*, 71 Fed. Reg. 39,299 (Dep't of Commerce, July 12, 2006), and accompanying IDM at cmt. 1.

inaccuracy by equating further processing with consumption only if the processing removes the product from the scope of an order.

      E.      This Court Need Not Address Commerce's Practice Regarding Home Market Viability

      Amsted also challenges Commerce's practice not to revisit market viability at the final determination stage, arguing that the Court should "reject Commerce's initial attempt to brush off Amsted's market viability argument on expediency grounds." *See* Amsted Br. at 42-43. This argument is unpersuasive.

      As an initial matter, Amsted fails to demonstrate any justiciable controversy regarding Commerce's practice not to revisit market viability because Commerce addressed Amsted's arguments in the final determination. "{F}ederal courts are to decide only actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it." *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.,* 482 F.3d 1330, 1337-38 (Fed. Cir. 2007) (citation and quotation marks omitted). In this case, there is no justiciable controversy over Amsted's argument regarding the timing of Commerce's market-viability determination because Commerce *did* address Amsted's argument in the final determination and found that no change to the comparison market was warranted. IDM at 12-16. Thus, Amsted cannot establish any harm from Commerce's general practice not to revisit market viability in the final determination.

      To the extent the Court nonetheless reaches the question, Commerce's practice not to revisit comparison market viability in the final determination is reasonable and consistent with Congressional intent. Pursuant to the Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act, "Commerce must determine whether the home market is

viable at an early stage in each proceeding to inform exporters which sales to report." Uruguay Round Agreements Act, SAA, 103d Cong. H.R. Doc. 103-316 at 821 (1994). As Commerce explained, "making a change to the comparison market" at the end of the proceeding (in the final determination) "would deprive parties of an opportunity to comment on margin calculation methodological choices associated with the comparison market and would thus be inappropriate." *See* IDM at 11.

In sum, Commerce's practice is reasonable and—in any event—did not alter the outcome in this case. Accordingly, Amsted's argument regarding the timing of the market viability analysis provides no reason for remanding Commerce's determination.

IV.    Commerce's Treatment of Amsted's IMMEX Sales as Export Sales, Rather than U.S. Sales, Is Supported by Substantial Evidence and In Accordance with Law

Finally, Amsted argues that if its IMMEX sales are not home market sales, then they must be U.S. sales rather than general export sales. Amsted Br. at 43-44. However, Amsted fails to preserve any cogent argument on this point.

As an initial matter, Amsted argues that the evidence that led Commerce to classify its IMMEX sales as "third-country exports" should have required treatment of "Amsted's Mexican sales as U.S. sales." Amsted Br. at 43-44. This argument misunderstands Commerce's decision. Commerce did not determine that the IMMEX sales necessarily *were* exported to third countries, but instead that Amsted knew or had reason to know that its couplers would be exported out of Mexico. *See generally* HM Viability Memo (P.R. 315, C.R. 241). Again, where a respondent has no knowledge as to the destination of subject merchandise, except that it is for export, Commerce will classify such sales as export sales and exclude them from the home market sales database. *See* IDM at 11; *Paper from India* IDM at cmt. 1.

CONFIDENTIAL MATERIAL OMITTED

Although the Coalition argued that Amsted's sales were destined for export to the United

States, Commerce reasonably disagreed that the Coalition's proffered evidence established the

additional element of Amsted's knowledge of a U.S. destination.  IDM at 17.  As Commerce

explained, the consolidated *maquila* entity report did not [ ███████████████████████

████████████████ ].  *See* HM Viability Memo at 3 (P.R. 315, C.R. 241).  Indeed, the

maquila entity report noted that [ ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ ] *Id.* (emphasis added) (citing Section A

Questionnaire, Ex. 22, at 7 (C.R. 75)).  Commerce also found that the [ ███████████████

████████████████████████ ] merely indicated a "[ ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ ]."  *See* HM

Viability Memo at 3 (emphasis added).  Finally, although a declaration provided by the Coalition

[ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ ]. *Id.*[18]

Amsted has failed to preserve any cogent challenge to Commerce's findings regarding

Amsted's knowledge of export to the United States.  The Court of International Trade "shall,

---

[18]  As Amsted itself argued during the underlying investigation, even railcars exported to
the United States do not necessarily enter the United States for consumption.  *See* Amsted
Rebuttal Comments Regarding Home Market Viability at 14-15 (P.R. 155, C.R. 101); *see also*
Section A Questionnaire at 20 (P.R. 110, C.R. 57) (stating that "ASF-K has no visibility into the
virtual import *pedimento* issued by" its customer and "Amsted has no knowledge of the exact
market for export").

where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). To

exhaust administrative remedies, a party must "alert{} the agency to the argument with

reasonable clarity" so the agency has "an opportunity to address it." *Timken Co. v. United

States*, 201 F. Supp. 2d 1316, 1340-1341 (Ct. Int'l Trade 2002) (citations omitted). A party

"cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad

issue without raising a particular argument." *Id.* Amsted's arguments to Commerce fell short of

this standard because its case brief did not point to any specific evidence undermining

Commerce's preliminary findings. *See* Amsted Case Br. at 20-21 (P.R. 384, C.R. 350). Instead,

Amsted merely referenced the Coalition's pre-preliminary determination comments, *id.*, which

Commerce had already addressed and rejected in its preliminary determination. *See* HM

Viability Memo at 2-3 (P.R. 315, C.R. 241). By failing to present any challenge to Commerce's

findings with reasonable clarity, Amsted failed to exhaust administrative remedies.

    Amsted's brief before this Court is similarly deficient. Arguments before the Court must

be "developed for judicial review; perfunctory statements or summary incorporation of prior

arguments cannot preserve an issue." *SMA Surfaces, Inc. v. United States*, 658 F. Supp. 3d 1325,

1329 (Ct. Int'l Trade 2023) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312,

1320 (Fed. Cir. 2006)). By failing to present any specific challenge to Commerce's findings

regarding U.S. sales, Amsted has waived objections that Commerce's decision is not supported

by substantial evidence.

## **CONCLUSION**

    For these reasons, we respectfully request that the Court deny Amsted's motion for

judgment on the administrative record and sustain Commerce's final determination and enter

judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

OF COUNSEL:

/s/ Emma E. Bond
EMMA E. BOND
Senior Trial Counsel
SHELBY ANDERSON                          Commercial Litigation Branch
Assistant Chief Counsel                  U.S. Department of Justice
Office of the Chief Counsel              P.O. Box 480
    for Trade Enforcement & Compliance     Washington, DC 20044
U.S. Department of Commerce              (202) 305-2034
                                         Email: emma.e.bond@usdoj.gov

October 25, 2024                         Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 13,930 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Emma E. Bond

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| AMSTED RAIL COMPANY, INC. and<br>ASF-K DE MEXICO S. DE R.L., DE C.V.,<br><br>         Plaintiffs,<br><br>     v.<br><br>UNITED STATES,<br><br>         Defendant,<br><br>    and<br><br>COALITION OF FREIGHT COUPLER<br>PRODUCERS,<br><br>         Defendant-Intervenor. | Court No. 23-242 |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for judgment on the agency record, all responses thereto, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment shall enter in favor of the United States.

_____
JUDGE

Dated:_____, 2024
     New York, NY