*NON-CONFIDENTIAL VERSION*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

AMSTED RAIL COMPANY, INC. and
ASF-K DE MEXICO S. DE R.L. DE C.V.,

      Plaintiffs,

v.

UNITED STATES,

      Defendant,

and

COALITION OF FREIGHT COUPLER
PRODUCERS,

      Defendant-Intervenor.

Court No.:  23-00242

## RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel B. Pickard, Esq.
Amanda L. Wetzel, Esq.
Claire M. Webster, Esq.

Buchanan Ingersoll & Rooney PC
1700 K Street, NW, Suite 300
Washington, D.C. 20006
(202) 452-7000

*Counsel to Coalition of Freight
Coupler Producers*

Dated: October 25, 2024

# Table of Contents

I.    INTRODUCTION ................................................................................................ 1

II.    RULE 56.2 STATEMENT .................................................................................. 1

    A.   Administrative Decision Under Review ...................................................... 1

    B.   Issues Presented and Summary of the Argument......................................... 1

III.   STATEMENT OF FACTS ................................................................................. 3

    A.   Procedural History to Commerce's Determination of Normal Value............ 3

    B.   Procedural History to the Conflict-of-Interest Claim.................................. 5

IV.  STANDARD OF REVIEW ................................................................................ 7

V.    ARGUMENT....................................................................................................... 8

    A.   This Court Should Only Consider Facts and Legal Arguments Contained in the Administrative Record Before Commerce........................................................ 8

        1.   Factual Allegations Raised in this Appeal Must Have Been Raised in the Case Below........................................................................................................ 8

        2.   Legal Allegations Raised in this Appeal Must Have Been Raised in Commerce's Investigation ............................................................................ 9

        3.   New Facts and Legal Arguments Submitted in Plaintiffs' Complaint and Memorandum of Law That Are Not Part of the Administrative Record Should be Rejected ....................................................................................... 10

    B.   Commerce's Decision Not to Treat ASF-K's Sales of FRCs Under the IMMEX Program as Home Market Sales and Commerce's Decision that ASF-K's Home Market was Not Viable was Supported by Substantial Evidence and in Accordance With the Law ................................................................................ 11

        1.   Commerce Acted in Accordance With the Law and Agency Practice When it Decided Not to Change the Comparison Market from Canada to Mexico ..... 11

        2.   Commerce's Application of its Knowledge Standard to Determine Whether ASF-K's Foreign Like Product was Sold for Consumption in the Exporting Country was Supported by Substantial Evidence and in Accordance With the Law ......................... 12

        3.   Commerce's Definition of Consumption Should be Credited and this Court Should Reject Plaintiffs' Request to Redefine Pursuant to Plaintiffs' Flawed Loper Bright Analysis .................................................................................... 18

    C.   Commerce's Decision Not to Treat ASF-K's Sales of FRCs to OEMs in Mexico as U.S. Sales is Supported by Substantial Evidence and in Accordance with the Law ...... 25

    D.   Commerce's Decision to Decline to Consider the Conflict-of-Interest Claims Raised by Plaintiffs was In Accordance with the Law.................................... 25

        1.   Commerce's Decision Not to Adjudicate ARC's Conflict-of-Interest Claim was in Accordance with the Law ................................................................... 26

        2.   The Context of ARC's Frivolous Ethical Allegation is a Relevant Consideration in This Case ........................................................................... 31

i

VI.  CONCLUSION ..................................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
515 F.3d 1372 (Fed. Cir. 2008)................................................................39

*Agro Dutch Industries, Ltd. v. United States*,
508 F.3d 1024 (Fed. Cir. 2007)................................................................21

*Allegaert v. Perot*,
565 F.2d 246 (2nd Cir. 1977)...................................................................34

*Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n*,
600 F. Supp. 3d 1308 (Ct. Int'l Trade 2022), *appeal dismissed*, No. 2023-
1355, 2023 WL 4346710 (Fed. Cir. July 5, 2023).............................................6, 36

*Ass'n of Am. Sch. Paper Suppliers v. United States*,
34 CIT 31 (2010) ...............................................................................8

*Auer v. Robbins*,
519 U.S. 452 (1997)....................................................................3, 8, 28, 29

*Bd. of Regents of Univ. of Nebraska v. BASF Corp.*,
No. 4:04CV3356, 2006 WL 2385363 (D. Neb. Aug. 17, 2006)...............................35

*Beker Indus. Corp. v. United States*,
7 CIT 313 (1984) ..............................................................................8

*Comm. Overseeing Action for Lumber Intl. Trade Investigations or Negotiations
v. United States*,
483 F. Supp. 3d 1253 (Ct. Int'l. Trade 2020) ......................................................22

*Delverde, SrL v. United States*,
202 F.3d 1360 (Fed. Cir. 2000), *as amended on denial of reh'g and reh'g en
banc* (June 20, 2000)..........................................................................22

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481, 126 S. Ct. 1252 (2006)........................................................22

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996).................................................................7

*GEO Specialty Chemical, Inc. v. Husisian*,
951 F. Supp. 2d 32 (D.D.C. 2013) ...........................................................35

i

*Gulf States Tube Div. of Quanex Corp. v. United States*,
   21 CIT 1013, 981 F. Supp. 630 (1997) ...................................................................38

*Hall CA-NV, LLC v. Ladera Dev., LLC*,
   No. 318CV00124RCJWGC, 2020 WL 1033560 (D. Nev. Mar. 2, 2020) .............................37

*Heckler v. Chaney*,
   470 U.S. 821 (1985) .................................................................................31, 32

*INA Walzlager Schaeffler KG*,
   21 CIT 110, 957 F. Supp. 251 (1997) .......................................................15, 16, 17

*Kempner v. Oppenheimer & Co., Inc*.,
   662 F. Supp. 1271 (S.D.N.Y 1987) .......................................................................34

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) .............................................................................3, 8, 28, 29

*Laker Airways Ltd. v. Pan Am. World Airways*,
   103 F.R.D. 22 (D.D.C. 1984) ...............................................................................39

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ................................................................................ *passim*

*Luoyang Bearing Corp. (Grp.) v. United States*,
   450 F. Supp. 3d 1402 (Ct. Int'l Trade 2020), *aff'd*, 844 F. App'x 368 (Fed.
   Cir. 2021) ...........................................................................................................9

*Makita Corp. v. United States*,
   17 CIT 240, 819 F. Supp. 1099 (1993) ...............................................................35

*Mid Continent Steel & Wire, Inc. v. United States*,
   941 F.3d 530 (Fed. Cir. 2019) ...........................................................................21

*Nakajima All Co. v. United States*,
   2 CIT 25 (1981) ...................................................................................................8

*Navneet Educ. Ltd. v. United States*,
   No. 1:22-CV-00132, 2023 WL 9018387 (Ct. Int'l Trade Dec. 29, 2023) .............10

*NEC Corp. v. U.S. Dep't of Com*.,
   21 CIT 933, 978 F. Supp. 314 (Ct. Int'l Trade 1997) .............................................38

*NEXTEEL Co. v. United States*,
   28 F.4th 1226 (Fed. Cir. 2022) ...........................................................................39

*Nippon Steel Corp. v. Int'l Trade Comm'n*,
   345 F.3d 1379 (Fed. Cir. 2003) ...........................................................................39

*Peabody Coal Co. v. Dir., Off. of Workers' Comp. Programs*,
  746 F.3d 1119 (9th Cir. 2014) ........................................................27

*Peabody Twentymile Mining, LLC v. Sec'y of Lab.*,
  931 F.3d 992 (10th Cir. 2019) ........................................................28

*Pesquera Mares Australes Ltda. v. United States*,
  266 F.3d 1372 (Fed. Cir. 2001).......................................................38

*In re Shared Memory Graphics LLC*,
  659 F.3d 1336 (Fed. Cir. 2011)........................................................37

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944).........................................................2, 8, 21, 23

*Stupp Corp. v. United States*,
  359 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) .............................15, 16

*Torrington Co. v. United States*,
  15 CIT 456, 772 F. Supp. 1284 (1991).............................................32

*Tung Mung Dev. Co. v. United States*,
  25 CIT 752 (2001) ..................................................13, 14, 15, 16

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)..........................................................................7

*Usinor v. United States*,
  28 CIT 1107, 342 F. Supp. 2d 1267 (2004) .......................................7

*Wyoming Outdoor Council v. U.S. Forest Serv.*,
  165 F.3d 43 (D.C. Cir. 1999)...........................................................28

*Z.A. Sea Foods Priv. Ltd. v. United States*,
  569 F. Supp. 3d 1338 (Ct. Int'l Trade 2022) .....................................7

*Z.A. Sea Foods Priv. Ltd. v. United States*,
  606 F. Supp. 3d 1335 (Ct. Int'l Trade 2022), *aff'd*, No. 2023-1469, 2024 WL
  2873428 (Fed. Cir. June 7, 2024) ....................................................23

*Zenith Elecs. Corp. v. United States*,
  14 CIT 831, 755 F. Supp. 397 (1990), aff'd, 988 F.2d 1573 (Fed. Cir. 1993) .......................30

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................7

19 U.S.C. § 1516a(b)(2)(A)(i) ............................................................9

19 U.S.C. § 1677b(a)(1)(B)(i).............................................................................18, 21, 22, 24

28 U.S.C. § 2637(d) ..................................................................................................................9

Statement of Administrative Action accompanying Uruguay Round Agreements
    Act (SAA), H.R. Doc. No. 103-316, at 821 (1994), reprinted in 1994
    U.S.C.C.A.N. 3773, 4662 ..............................................................................................12

**Regulations**

12 C.F.R. § 19.1 ......................................................................................................................31

17 C.F.R. § 205.1-205.7 ..........................................................................................................30

19 C.F.R. § 351.309 ..................................................................................................................9

19 C.F.R § 351.313 ........................................................................................................ *passim*

**Other Authorities**

Preliminary Decision Memorandum accompanying *Agreement Suspending the
    Antidumping Duty Investigation on Sugar From Mexico: Preliminary Results
    of the Administrative Review*, 87 Fed. Reg. 932 (Dep't Commerce Jan. 7,
    2022) .............................................................................................................................19

*Certain Freight Rail Couplers and Parts Thereof from China and Mexico:
    Initiation of Less-Than-Fair Value Investigations*, 87 Fed. Reg. 64,444 (Dep't
    Commerce Oct. 25, 2022) ................................................................................................3

*Certain Freight Rail Couplers and Parts Thereof from Mexico: Final Affirmative
    Determination of Sales at Less Than Fair Value and Final Negative
    Determination of Critical Circumstances*, 88 Fed. Reg. 65,153 (Dep't
    Commerce Sept. 21, 2023) ................................................................................................1

*Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbons
    Steel Flat Products, Certain Corrosion-Resistant Carbon Steel Flat Products,
    and Certain Cut-to-Length Carbon Steel Plate from Korea: Final
    Determinations of Sales at Less Than Fair Value*,
    58 Fed. Reg. 37,176 (Dep't Commerce July 9, 1983) ..............................................15

Issues and Decisions Memorandum accompanying *Certain Oil Country Tubular
    Goods from Saudi Arabia: Final Determination of Sales at Less than Fair
    Value*, 79 Fed. Reg. 41,986 (Dep't Commerce July 18, 2014).........................11, 12

Issues and Decisions Memorandum accompanying *Light-Walled Rectangular
    Pipe and Tube from Mexico: Final Results of Antidumping Duty
    Administrative Review*, 88 Fed. Reg. 15,665 (Dep't Commerce Mar. 14, 2023)..............19, 20

Plaintiffs' Notice of Voluntary Dismissal Without Prejudice, *Amsted Rail
    Company Inc. et al. v. U.S. Dep't Commerce*, CIT Case No. 22-00316 (Ct.
    Int'l Trade July 18, 2023) ..............................................................................6

*Regulation Strengthening Accountability of Attorneys and Non-Attorney
    Representatives Appearing Before the Department*, 78 Fed. Reg. 22,773
    (Dep't Commerce Apr. 17, 2013) (publishing rule 19 C.F.R. § 351.313)..............................26

Issues and Decisions Memorandum accompanying *Ripe Olives From Spain: Final
    Results of Antidumping Duty Administrative Review, 2018-2019*, 86 Fed. Reg.
    35,068 (Dep't Commerce July 1, 2021)..............................27

Memorandum to the File from Senior Commerce Trade Analyst, *Silicon Metal
    from the Republic of Kazakhstan: Representation of Tau-Ken Temir LLP by
    Squire Patton Boggs*,
    Inv. No. C-834-811 (Oct. 6, 2020)..............................27

Issues and Decisions Memorandum accompanying *Tin Mill Products from
    Canada: Final Affirmative Determination of Sales at Less Than Fair Value
    and Final Negative Determination of Critical Circumstances*, 89 Fed. Reg.
    1,542 (Dep't Commerce Jan. 10, 2024)..............................17

ABA Formal Op. 95-390 ..............................................................................34

ABA Formal Op. 21-497 ..............................................................................36

S. Rep. No. 96–249 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381. ..............................................38

D.C. Bar Ethics Opinion 317 ..............................................................................36

## I.    <u>INTRODUCTION</u>

On behalf of Defendant-Intervenor, the Coalition of Freight Coupler Producers ("CFCP"), we hereby submit the following response to the July 15, 2024, brief in support (hereinafter "Memorandum of Law") of the motion for judgment on the agency record filed by Amsted Rail Company, Inc. (hereinafter "ARC") and ASF-K de Mexico S. de R.L. de C.V. (hereinafter "ASF-K") (collectively, Plaintiffs). Pls.' Br. in Supp. of Pls.' Mot. For J. on the Agency R. (July 15, 2024), ECF No. 36 (BPI), ECF No. 37 (Public) (hereinafter "Memorandum of Law").  For the reasons discussed in this brief, Defendant-Intervenor respectfully requests that this Court reject the arguments raised by Plaintiffs and affirm the Final Determination of the U.S. Department of Commerce in its antidumping (AD) investigation on *Certain Freight Rail Couplers and Parts Thereof from Mexico* (hereinafter "The Investigation Under Review").

## II.    <u>RULE 56.2 STATEMENT</u>

### A.    <u>Administrative Decision Under Review</u>

The administrative determination challenged in this appeal is Commerce's final determination in the antidumping investigation of *Certain Freight Rail Couplers and Parts Thereof from Mexico*. *See Certain Freight Rail Couplers and Parts Thereof from Mexico: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 88 Fed. Reg. 65,153 (Dep't Commerce Sept. 21, 2023). ("Final Determination" and accompanying Final Issues and Decision Memorandum ("Final IDM")), Final Determination, P.R. 400; Final IDM, P.R. 395.

### B.    <u>Issues Presented and Summary of the Argument</u>

- Whether factual and legal arguments raised in the Plaintiffs' Complaint and Memorandum of Law in Support of the Motion for Judgment on the Agency Record that do not appear in the administrative record before Commerce of *Certain Freight Rail Couplers and Parts Thereof from Mexico* should be disregarded by the U.S. Court of International Trade?

The Court should limit its review of Plaintiffs' Complaint and Memorandum of Law to the factual submissions and legal arguments that were made before Commerce in the Investigation Under Review. Plaintiffs have made factual and legal assertions, particularly in relation to their conflict-of-interest claims, which were not submitted on the record of the Investigation Under Review. Consequently, the factual and legal arguments made by Plaintiffs that are not part of the administrative record before Commerce and/or were not exhausted before Commerce should be disregarded by this Court.

- Whether Commerce's decision to use a third country's sales as a basis for normal value because there was not a viable home market, which turned on a determination that Plaintiffs did not know if the foreign like product was sold for consumption in the exporting country (here Mexico), is supported by substantial evidence and in accordance with the law?

Yes. Commerce's application of the "knowledge" test for whether those freight rail couplers sold by ASF-K through the IMMEX program, where ASF-K conceded that it did not know where the FRC's were ultimately destined, is in accordance with law. Moreover, Commerce's application of the term "consumption" as defined by Commerce's practice is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Even if a statutory interpretation analysis under *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) were applied, Commerce's definition of "consumption" is the best definition and this Court should alternatively affirm Commerce's decision on that basis.

- Whether Commerce's determination that ASF-K's sales via the IMMEX program were not U.S. sales, when Plaintiffs did not know whether such products were actually exported to the United States, was supported by substantial evidence and/or in accordance with the law?

Yes. Plaintiffs illogically claim that if ASF-K's sales into the IMMEX program are not home market sales then they must in the alternative be deemed to be U.S. sales. However, Plaintiffs explicitly represented to Commerce that they did not know the country of destination.

*See* P.R. 395 at 11-12; P.R. 384 at 15, C.R. 350 at 15. Plaintiffs, in their argument, overlook the obvious fact that all export sales are not necessarily U.S. sales, especially in light of their significant exports to Canada.

- Whether Commerce's decision not to reach a determination on Plaintiffs' conflict-of-interest allegations was in accordance with the law?

Commerce acted in accordance with its regulation found at 19 C.F.R § 351.313 and the associated regulatory preamble and declined to investigate the meritless claim. Commerce's action in accordance with the regulatory preamble was proper, and Commerce's interpretation of its regulations is entitled to deference by this Court under *Auer v. Robbins*, 519 U.S. 452 (1997) and *Kisor v. Wilkie*, 588 U.S. 558 (2019). Moreover, the frivolous nature of Plaintiff's argument further supports Commerce's decision.[1]

## III.    <u>STATEMENT OF FACTS</u>

### A.    <u>Procedural History to Commerce's Determination of Normal Value</u>

On September 28, 2022, CFCP[2] filed antidumping Petitions before Commerce and the Commission in *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China and the United Mexican States.  See Certain Freight Rail Couplers and Parts Thereof from China and Mexico: Initiation of Less-Than-Fair Value Investigations*, 87 Fed. Reg. 64,444 (Dep't Commerce Oct. 25, 2022), P.R. 82. Commerce initiated its antidumping investigation into freight rail couplers from Mexico on October 18, 2022. ASF-K, the Mexican company, and not ARC, a U.S. entity, was the mandatory respondent in Commerce's antidumping investigation.  *See Id.*; P.R. 395 at 1.

---

[1] Plaintiffs' Complaint includes a Count IV in which it argues that Commerce erred in initiating and conducing an MNC investigation. (ECF 5).  However, Plaintiffs make no mention of this Claim in their Motion for Judgment on the Agency Record or their Memorandum of Law. Motion, ECF 35 (Public); Memorandum of Law, ECF 36 (BPI), ECF 37 (Public). Consequently, this Court should deem Count IV and Plaintiffs MNC related claims as abandoned.
[2] The CFCP is comprised of McConway & Torley LLC and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (hereinafter "USW").

On April 26, 2023, Commerce issued its Home Market Viability Analysis that focused on ASF-K as the sole respondent.  P.R. 315, C.R. 241.  Commerce's analysis examined whether ASF-K had knowledge that its IMMEX sales are destined to the Mexican, U.S., or another market.  *Id.* at 2-4.  Commerce found that the evidence on the record indicated that, [

], ASF-K did not know where its sales via the IMMEX program were destined.  *Id.* at 2-5.

On May 15, 2023, Commerce issued its final scope decision memorandum in *Freight Rail Couplers from Mexico and the People's Republic of China*.  P.R. 332.  Notably, the scope includes the following language: "Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, *whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar*." *Id.* at Appendix. Commerce also determined that "freight rail couplers are not permanently affixed to freight railcars and that freight rail couplers do not undergo further processing or physical changes when attached to or removed from railcars." *Id.* at 9. In addition, Commerce determined that "freight rail couplers attached to or mounted on railcars are not substantially transformed into a separate class or kind of merchandise from freight rail couplers imported on their own, and, thus, meet the physical description of the merchandise in the scope of these investigations." *Id.* at 10.

Plaintiffs submitted their Case Brief to Commerce on August 15, 2023 and refiled it after removing new factual information on August 18, 2023.  P.R. 378, 382, C.R. 349; P.R. 384, C.R. 350.  Plaintiffs submitted their Rebuttal Brief on August 22, 2023.  P.R. 387, C.R. 351.  CFCP submitted its Case Brief on August 15, 2023.  P.R. 377, C.R. 348.  On August 23, 2023, the CFCP submitted its Rebuttal Brief.  P.R. 389, C.R. 352.

On September 15, 2023, Commerce issued its *Final Affirmative Determination of Sales at Less than Fair Value and Final Negative Determination of Critical Circumstances* and the accompanying Final Issues and Decisions Memorandum. P.R. 400; P.R. 395.

On November 17, 2023, Plaintiffs filed their Complaint in this appeal. ECF 5. On July 15, 2024, Plaintiffs filed their Motion for Judgment on the Agency Record and their Memorandum of Law. ECF 35, 36 and 37.

**B.    Procedural History to the Conflict-of-Interest Claim**

On October 12, 2022, ARC and ASF-K filed a letter on the record of Commerce's investigation requesting that [

], [                                        ], and the [

] due to an alleged conflict of interest.  P.R. 74, C.R. 52/53.

On October 17, 2022, [          ] filed a response letter to the disqualification request with the U.S. Department of Commerce.  P.R. 77, C.R. 55.

On October 18, 2022, Commerce issued its decision not to adjudicate Plaintiffs' conflict-of-interest claims. P.R. 78. Commerce indicated that, although it can disqualify attorneys for "good cause shown" under 19 C.F.R. 351.313, it would decline to decide the conflict-of-interest issue in accordance with that regulation and its preamble.  *Id.* at 2.

Plaintiffs also raised the same conflict-of-interest claims in their Case Brief submitted to Commerce on August 15, 2023 and refiled on August 18, 2023 following the removal of new factual information.  P.R. 384 at 21-46, C.R. 350 at 21-46. CFCP responded in its Rebuttal Case Brief on August 23, 2023.  P.R. 389, C.R. 352.

The procedural history listed above set forth the only submissions related to Plaintiffs' conflict-of-interest claims that are on the administrative record of the Investigation Under Review.

CFCP provided Commerce with context to [

]. P.R. 77, C.R. 55. The [

]. P.R. 77 at 6, C.R. 55 at 6. As a condition of accepting [

]. P.R. 74, Exhibit 2 at 1-2, C.R. 52/53 at Exhibit 2 at 1-2; P.R. 77 at 6, C.R. 55 at 6; P.R. 389 at 44-45, C.R. 352 at 44-45. The petitions in the Predecessor Investigation were filed on September 21, 2021, and ARC withdrew from the Coalition just days later and was replaced by the USW. P.R. 384 at 22-24, C.R. 350 at 22-24. The Commission ultimately reached a negative material injury and a negative threat of material injury determination. Pls.' Br. at 3, ECF 36/37; P.R. 74 at 6; C.R. 52/53 at 6.

Plaintiffs refer to jurisdictionally deficient interlocutory appeals that were brought to this Court during the pendency of the Investigation Under Review at Commerce and the parallel investigation at the Commission. *See Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n*, 600 F. Supp. 3d 1308 (Ct. Int'l Trade 2022), *appeal dismissed*, No. 2023-1355, 2023 WL 4346710 (Fed. Cir. July 5, 2023); Plaintiffs' Notice of Voluntary Dismissal Without Prejudice, *Amsted Rail Company Inc. et al. v. U.S. Dep't Commerce*, CIT Case No. 22-00316 (Ct. Int'l Trade July 18,

2023).  Plaintiffs allege facts and legal arguments that are drawn directly from these interlocutory appeals and that were not part of the administrative record before Commerce.

## IV.    <u>STANDARD OF REVIEW</u>

In this appeal, this Court will determine whether Commerce's challenged decisions were "{U}nsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996).  Substantial evidence is "more than a mere scintilla . . . {it is} such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). An agency's determination is supported by substantial evidence if the agency "articulate{s} {a} rational connection between the facts found and the choice made." *Z.A. Sea Foods Priv. Ltd. v. United States*, 569 F. Supp. 3d 1338, 1347 (Ct. Int'l Trade 2022) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

A plaintiff cannot ask the court to re-weigh the evidence on record. *Usinor v. United States*, 28 CIT 1107, 342 F. Supp. 2d 1267, 1272 (2004). The U.S. Court of International Trade "will affirm the agency's factual determination so long as they are reasonable and supported by the record." *Id.*

This case involves both statutory and regulatory interpretation. In *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2266 (2024), the Supreme Court indicated that courts should "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." The Supreme Court, in *Loper Bright*, maintained a role for agencies in statutory interpretation, indicating that "{I}n an agency case in particular, the court will go about its task with the agency's 'body of experience and informed judgment,' among other information, at its disposal." *Id.* at 2267 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Notably, *Loper Bright* embraces the

utility of *Skidmore* deference, which indicates that an agencies' interpretation of statutes "while not controlling upon the courts . . . do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

An agency's interpretations of its regulations also receive a high level of deference under the "plainly erroneous or inconsistent with the regulation" standard. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The Supreme Court explained *Aurer* deference, in *Kisor v. Wilkie*, 588 U.S. 558, 574-580 (2019), indicating that, when Congress grants agencies rulemaking authority, it intends to give them considerable latitude to interpret ambiguous regulations.

## V.     ARGUMENT

### A.     This Court Should Only Consider Facts and Legal Arguments Contained in the Administrative Record Before Commerce

#### 1.     Factual Allegations Raised in this Appeal Must Have Been Raised in the Case Below

When this Court considers a final determination of Commerce, it does not consider evidence outside of the administrative record before Commerce. *See Nakajima All Co. v. United States*, 2 CIT 25, 26 (1981); *Beker Indus. Corp. v. United States*, 7 CIT 313, 315 (1984) (holding that "{t}he scope of the record for purposes of judicial review is based upon information that was 'before the relevant decision-maker' and was presented and considered 'at the time the decision was rendered.'"); *Ass'n of Am. Sch. Paper Suppliers v. United States*, 34 CIT 31, 33 (2010) ("{e}xcept in very limited circumstances, this court's review of Commerce's determination is

limited to the record before it"). According to 19 U.S.C. § 1516a(b)(2)(A)(i), the administrative record consists of the following:

(i)     a copy of all information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 1677f(a)(3) of this title; and

(ii)    a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register.

As indicated in the definition above, the administrative record contains all information that was presented to, or obtained by, Commerce during the course of its investigation. Consequently, the U.S. Court of International Trade should not consider any factual allegations, evidence or arguments put forward by Plaintiffs that were not part of the administrative record below.

## 2.     Legal Allegations Raised in this Appeal Must Have Been Raised in Commerce's Investigation

Plaintiffs may not raise legal arguments on appeal that were not raised and exhausted before Commerce. Under 28 U.S.C. § 2637(d), "{i}n any civil action not specified in this section, the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  In addition, 19 C.F.R. § 351.309(c)(2) provides the following:

The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results.

Respondents are "procedurally required to raise" all issues and arguments in their case brief to Commerce "at the time Commerce {is} addressing the issue" and can address the requirement by submitting all arguments that are relevant, in the submitters view, to the final results. *Luoyang Bearing Corp. (Grp.) v. United States*, 450 F. Supp. 3d 1402, 1409 (Ct. Int'l Trade 2020), *aff'd*, 844 F. App'x 368 (Fed. Cir. 2021). Exhaustion of administrative remedies requires more than a

9

vague presentation of an argument – a Respondent cannot make a brief and vague assertion in their Case Brief and offer a much more detailed argument on appeal. *Navneet Educ. Ltd. v. United States*, No. 1:22-CV-00132, 2023 WL 9018387, at 11-12 (Ct. Int'l Trade Dec. 29, 2023).

### 3.    New Facts and Legal Arguments Submitted in Plaintiffs' Complaint and Memorandum of Law That Are Not Part of the Administrative Record Should be Rejected

Plaintiffs include new information in their Complaint and Memorandum of Law and such information should be rejected by this Court. Perhaps the clearest example of the new facts presented to this Court but were not part of the administrative record before Commerce is the Plaintiff's submission of a Declaration of a Professor (and two attachments thereto) as Exhibit A to their Complaint. In addition, it is respectfully submitted for the Court's consideration that there are several other portions of Plaintiffs' Complaint that arguably contain factual assertions that were not part of the agency record below.

Plaintiffs' Memorandum of Law also appears to contain legal arguments that it did not exhaust before Commerce. As one example, Amsted includes an argument on appeal that "any prior joint representation does not eliminate the conflict." Pls.' Br. at 15-16, ECF 36/37. Amsted did not make this argument in its case before Commerce despite the fact that Defendant-Intervenor raised the issue in its Response to Amsted's disqualification request (and also addressed the issue in its Rebuttal Brief.) P.R. 77 at 5-6, C.R. 55 at 5-6; P.R. 389 at 46-47, C.R. 352 at 46-47. In addition, in its Final IDM, Commerce, consistent with its prior decision, declined to consider the ethical issues raised by Amsted and, in so deciding, Commerce noted that "Commerce is not an expert in the complex area of conflict-of-interest rules." P.R. 395 at 23. The CFCP addressed this issue in its Rebuttal Brief indicating that "{w}hile Commerce has the authority to regulate the professionals that practice before it, the preamble 19 C.F.R. § 351.313 has carved out professional

ethics questions, specifically citing conflict-of-interest issues as outside Commerce's competence and within the special expertise of local bar authorities."  P.R. 389 at 36, C.R. 352 at 36.  While Amsted discusses issues relating to Commerce's expertise in conflict-of-interest issues in its Memorandum of Law, it did not exhaust those argument in the proceedings below. It is respectfully submitted that arguments that Amsted failed to advance below should be deemed waived for purposes of the current appeal.

**B.**   **Commerce's Decision Not to Treat ASF-K's Sales of FRCs Under the IMMEX Program as Home Market Sales and Commerce's Decision that ASF-K's Home Market was Not Viable was Supported by Substantial Evidence and in Accordance With the Law**

**1.**   **Commerce Acted in Accordance With the Law and Agency Practice When it Decided Not to Change the Comparison Market from Canada to Mexico**

In Commerce's Final Issues and Decision Memorandum (hereinafter "Final IDM"), Commerce indicated that "{c}hanging ASF-K's comparison market from Canada to Mexico for the final determination would be inconsistent with Commerce's practice and not warranted." P.R. 395 at 10. Commerce also determined that "the ensuing finding that, apart from Amsted's IMMEX sales, Amsted's sales in Mexico were not made in sufficient quantity to be used as the basis for determining normal value" and provided a full analysis concluding that Commerce did not err in finding that ASF-K's sales under the IMMEX program were not home market sales. P.R. 395 at 10-16.

Commerce has a practice of not changing the entire comparison market in a final determination. *See* Issues and Decisions Memorandum accompanying *Final Affirmative Determination in the Less than Fair Value Investigation of Certain Oil Country Tubular Goods from Saudi Arabia*, 79 Fed. Reg. 41,986 (Dep't Commerce July 18, 2014) at 7.  P.R. 389 at 3-5, C.R. 352 at 3-5. There is sound reason for this practice. For administrability reasons and

11

compliance with statutory deadlines, "Commerce must determine whether the home market is viable at an early stage in each proceeding to inform exporters which sales to report." *See* Statement of Administrative Action accompanying Uruguay Round Agreements Act (SAA), H.R. Doc. No. 103-316, at 821 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 4662. Commerce's practice is rooted in sound policy. Commerce must determine home market viability and, where a home market is not viable, make an appropriate comparison market determination at an early stage of the proceeding. Respondents are then required to provide the necessary sales data within the applicable deadlines. After conducting an investigation based on this data, Commerce does not typically make an eleventh-hour change to the comparison market due to notions of fairness and notice to the parties. P.R. 395 at 10-11; *see also* Issues and Decisions Memorandum accompanying *Certain Oil Country Tubular Goods from Saudi Arabia: Final Determination of Sales at Less than Fair Value*, 79 Fed. Reg. 41,986 (Dep't Commerce July 18, 2014), at Comment 2, p. 7-8. Simply because Plaintiffs found one example of a remand determination regarding whether third country sales were for consumption does not mean that Commerce did not act in accordance with the law when it indicated that its practice is not revisit comparison market determinations. Pls.' Br. at 42-43, ECF 36/37. While Commerce could do so, as explained more fully below, it was not appropriate to make such a change to the comparison market decision.

> 2. **Commerce's Application of its Knowledge Standard to Determine Whether ASF-K's Foreign Like Product was Sold for Consumption in the Exporting Country was Supported by Substantial Evidence and in Accordance With the Law**

Plaintiffs dispute whether Commerce acted in accordance with the law when it determined that the foreign like product was not sold "*for consumption* in the exporting country," which, in this case, is Mexico. In its final determination, Commerce affirmed its preliminary determination that ASF-K's IMMEX sales were not home market sales. P.R. 395 at 10. Plaintiffs allege that

Commerce applied an incorrect "knowledge test" or an incorrect definition of consumption. Pls.' Br. at 31, 38-41, ECF 36/37. With respect to this knowledge test, Amsted stated on the record in the investigation below that it did not if know if couplers sold into the IMMEX program stayed in Mexico. Pls.' Br. at 38-41, ECF 36/37; P.R. 384 at 15, C.R. 350 at 15.

In the Investigation Under Review, Commerce acted in accordance with the law and in accordance with over two decades of agency practice as affirmed by this Court when it applied the knowledge test to determine if ASF-K's sales to OEMs were sold *for consumption* in the exporting country. This test was recalled by the U.S. Court of International Trade in *Tung Mung Dev. Co. v. United States* and indicates that "{i}n implementing the provisions of 19 U.S.C. § 1677b(a), sales should be included within the home market database if the producer 'knew or should have known that the merchandise was . . . for home consumption based upon the particular facts and circumstances surrounding the sales.'" *Tung Mung Dev. Co. v. United States*, 25 CIT 752, *23 (2001) (citing *INA Walzlager Schaeffler KG,* 21 CIT 110, 123–24, 957 F. Supp. 251, 264 (1997)). The Court, in *Tung Mung Dev. Co. v. United States*, also indicated that, in determining whether the producer knew or should have known that the subject merchandise will be exported, Commerce looks in part to the place where the product is "consumed." *Id.*

An important consideration in Commerce's determination that ASF-K's IMMEX sales were not home market sales was the nature of the IMMEX program itself. P.R. 395 at 14. Commerce described the IMMEX program as a "tax-benefit program that incentivizes foreign (non-Mexican) companies to manufacture goods in Mexico by allowing for non-payment of import duties if the factory (the *maquiladora*) owned by the foreign company produces goods that are exported or sells to another *maquiladora*." P.R. 307 at 10. Commerce preliminarily determined that, "because these sales are part of the IMMEX program, the evidence on the record supports

finding that these freight rail couplers are not sold for consumption in Mexico." *Id.*  In its Final

IDM, Commence indicated that the knowledge inquiry applied was correct, namely "'whether

Amsted knew or should have known that its freight rail couplers sold into the IMMEX program

would be consumed in Mexico is consistent with both judicial precedent regarding the knowledge

test and Commerce's practice with regard to sales into the IMMEX program." P.R. 395 at 12; *See*

*also* P.R. 307 at 11 (in its PDM, Commerce stated that the inquiry was "{g}iven the nature and the

purpose of the IMMEX program, we find that Amsted knew, or should have known, that its freight

rail couplers sold into the IMMEX program ultimately were meant for export, rather than for

domestic consumption." ). ASF-K itself submitted in the proceedings before Commerce and again

before this Court that it did not know if the freight rail couplers that ASF-K sold into the IMMEX

program were for export or for internal consumption. P.R. 384 at 15, C.R. 350 at 15; P.R. 395 at

12; Pls.' Br. at 38-41, ECF 36/37.

   Plaintiffs argue that knowledge of participation in the IMMEX program is not analogous

to knowledge of exporting and that ASF-K had no knowledge, after it delivered its product to

Mexican OEMs, as to whether ASF-K's product was for export or for home market consumption.

Pls.' Br. at 38-41, ECF 36/37; P.R. 384 at 15, C.R. 350 at 15. Plaintiffs attach importance to

Commerce's acknowledgement in the Home Market Viability Analysis that " . . . the IMMEX

program allows the subject merchandise to be sold into the Mexican market and does not require

export . . . ."  P.R. 315 at 5, C.R. 241 at 5.  However, it is important to note that Commerce did

not consider the theoretical possibility of IMMEX sales remaining in the home market to be

determinative, stating the following:

> {O}ur decision is based on the facts at the time of sale, specifically, whether
> Amsted knew or should have known that its freight rail couplers sold into the
> IMMEX program would be consumed in Mexico.  Here, the record is clear that the
> IMMEX sale is taking place under a distinct tax regime established specifically for

the ultimate export of finished goods and that separate steps must be taken afterwards by the buyer for VAT and import duties to be owed as they normally would be for sales within Mexico. *Id.* at 6.

Commerce credited the export-oriented nature of the IMMEX program in assessing ASF-K's knowledge. In their Memorandum of Law, Plaintiffs renew an argument that they made below stating that " . . . there is no evidence that Amsted knew the ultimate disposition of the downstream sale or even a reason to believe that such evidence should exist." Pls.' Br. at 41, ECF 36/37. In response to Plaintiffs' affirmative statements that it did not know where its FRC's were consumed, Commerce pointed out that, in the context of interpreting Section 773(a)(1)(B) of the Act, "{w}here a respondent has no knowledge as to the destination of subject merchandise, except that it is for export, Commerce will classify such sales as export sales and exclude them from the home market sales database" – and that is exactly what Commerce did in this case.[3] P.R. 395 at 11. Commerce stated that ASF-K's claims that its "knowledge ends at the ship-to address of Mexican OEM customers do not establish that ASF-K knew or should have known that freight rail couplers sold to these OEMs were for consumption in Mexico" or should be treated as home market sales. P.R. 395 at 12.[4]

The *Stupp Corp. v. United States*, 359 F. Supp. 3d 1293 (Ct. Int'l Trade 2019), and *INA Walzlager Schaeffler KG v. United States*, 21 CIT 110, 957 F. Supp. 251 (1997), cases that Plaintiffs claim contain a different knowledge standard from what Commerce applied in this case in actuality support the knowledge test applied by Commerce through its citation to *Tung Mung Dev. Co. v. United States*, 25 CIT 752 (2001). *See* P.R. 395 at 12; Pls.' Br. at 38, ECF 36/37. To

---

[3] *See also Final Determinations of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbons Steel Flat Products, Certain Corrosion-Resistant Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Korea*, 58 Fed. Reg. 37,176, 37,182-83 (Dep't Commerce July 9, 1983).
[4] Indeed, the record contained evidence that ASF-K knew that its IMMEX sales were designed for export. P.R. 389 at 25, C.R. 352 at 25.

illustrate this point, the discussions of knowledge test in the case cited by Commerce and in the cases put forward by Plaintiffs are provided below:

- The knowledge test quoted by Commerce was as follows: "{i}n implementing the provisions of 19 U.S.C. § 1677b(a), sales should be included within the home market database if the producer 'knew or should have known that the merchandise was . . . for home consumption based upon the particular facts and circumstances surrounding the sales." *Tung Mung Dev. Co. v. United States*, 25 CIT 752, *23 (2001) (citation omitted).

- The knowledge test in a case cited by Plaintiffs is as follows: "{t}o determine whether a sale is a home market sale, Commerce objectively assesses whether, given the particular facts and circumstances, a producer would have known that the merchandise will be sold domestically or for export." *Stupp Corp. v. United States*, 359 F. Supp. 3d 1293, 1310 (Ct. Int'l Trade 2019), *aff'd in part, vacated in part, remanded*, 5 F.4th 1341 (Fed. Cir. 2021).

- The knowledge test in another case cited by Plaintiffs is as follows: "There is no reference in section 1677b(a) to the destination of goods not sold for home consumption. Therefore, the appropriate burden of proof for determining whether to exclude sales from the home market database in calculating FMV is whether FAG knew or should have known that the merchandise was not for home consumption based upon the particular facts and circumstances surrounding the sales." *INA Walzlager Schaeffler KG v. United States*, 21 CIT 110,  957 F. Supp. 251, 263-64 (1997).

Plaintiffs claim the burden is on the party seeking to exclude the home market sales to show the respondent knew or should have known that the merchandise was not for home market consumption, yet this reading of *INA Walzlager Schaeffler KG v. United States* is incorrect. That case states that the applicable burden of proof is whether respondent (in that case FAG), the party contesting the exclusion of certain sales from home market sales, "knew or should have known that the merchandise was not for home consumption based upon the particular facts and circumstances surrounding the sales" and the issue was whether Commerce had sufficient evidence to conclude that the relevant merchandise was not for home consumption. *INA Walzlager Schaeffler KG*, 21 CIT 110, 123-124, 957 F. Supp. at 263-64. The U.S. Court of International Trade specifically noted in  *INA Walzlager Schaeffler KG v. United States* that the Court would not define a bright-line test, and "{t}he appropriate method for determining the existence of

16

knowledge of the destination of the goods is to examine the particular facts and circumstances of each case." *Id.* at n.2. In the current matter, regardless of where the burden of proof may lie, it is uncontested that ASF-K indicated it did not know the ultimate destination of the couplers it produced in Mexico. Indeed, in the proceeding below, ASF-K could have provided evidence in regard to where it believed its couplers were destined but it failed to do so. Instead, it relied on a claim of ignorance that once its products were delivered under the IMMEX program that it had no knowledge whatsoever as to whether the products were exported or stayed in Mexico.

*Tin Mill Products from Canada* is another example of a case cited by Plaintiffs that supports a conclusion that Commerce's final determination was in accordance with the law. In *Tin Mill Products from Canada*, in order to win on its home market sale argument, the Canadian producer demonstrated it had "no knowledge at the time of sale that its home market sales were destined for exportation by its Canadian customers to third countries" and were classified by Commerce as home market sales with the test applied being whether the respondent knew or should have known where the merchandise was destined. *See* Issues and Decisions Memorandum accompanying *Tin Mill Products from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 89 Fed. Reg. 1,542 (Dep't Commerce Jan. 10, 2024) Comment 1 at 7. The final determination of *Tin Mill Products from Canada* is dated January 2024 and the Investigation Under Review is <u>explicitly distinguished</u> therein by Commerce. Commerce indicated the following:

> {i}n *FRCs from Mexico Final*, the respondent sold merchandise to domestic customers through the IMMEX program . . . . {T}he export-oriented nature of the IMMEX program created a presumption of the respondent's actual or imputed knowledge that its domestic sales through the IMMEX program were destined for exportation. To rebut this presumption and claim that its sales were home market sales, it was respondent's burden to demonstrate its knowledge that its merchandise sold through the IMMEX program were consumed in Mexico. *Id.* at 11.

Contrary to Plaintiffs' claims, Commerce's decision in *Tin Mill Products from Canada* reinforces the correctness of Commerce's final determination in the Investigation Under Review.

Commerce's decision not to treat ASF-K's sales in the context of the IMMEX program as home market sales is supported by substantial evidence and is in accordance with the law, as Commerce has articulated a rational connection between the evidence regarding ASF-K's **lack of** knowledge regarding the ultimate destination of its FRCs and Commerce's application of the correctly stated knowledge standard.

### 3.    Commerce's Definition of Consumption Should be Credited and this Court Should Reject Plaintiffs' Request to Redefine Pursuant to Plaintiffs' Flawed Loper Bright Analysis

Plaintiffs argue that Commerce did not act in accordance with the law when it applied its reasoned and considered analysis of the meaning of consumption under 19 U.S.C. § 1677b(a)(1)(B)(i), which has been applied by Commerce in at least two prior cases involving the IMMEX program. Plaintiffs encourage this Court to adopt a flawed definition of consumption that it found as the third listed entry in an online dictionary and which is contrary to common usage of the term.

Commerce's final determination on the lack of consumption of the foreign like product in the Mexican market was as follows: "{b}ecause Commerce determined that freight rail couplers are not consumed in the production of freight rail cars, regardless of the options for buyers under the IMMEX program, we continue to find that the couplers sold by Amsted to buyers in the IMMEX program are not consumed in Mexico." P.R. 395 at 14. Commerce's application of the term "consumption" in the Investigation Under Review was supported by substantial evidence and in accordance with the law.

    a.    Commerce's Determination That Simple Attachment of an FRC to a Freight Railcar Does Not Turn the FRC into Out of Scope

> Merchandise Is Supported by Substantial Evidence and in
> Accordance with the Law

Commerce's determination that a FRC is not consumed when it is temporarily joined to a freight rail car is supported by substantial evidence and is in accordance with the law. P.R. 395 at 14.

As an initial matter, the scope of this investigation explicitly includes freight rail couplers that are attached to freight railcars. P.R. 332 at 9; P.R. 395 at 13. The fact that the scope specifically includes FRCs joined to rail cars is an important and rationally related piece of evidence in Commerce's analysis of the meaning of consumption in the home market. P.R. 395 at 13-14. Key factual determinations from Commerce's Final Scope Decision Memorandum are listed below:

- FRCs attached to railcars in Mexico and imported into the United States are within the scope of these investigations. P.R. 332 at cmt. 1 at 9.

- Record evidence shows that freight rail couplers are not a permanent component of a railcar and are easily removable, and thus, retain their own identity even after being attached to or mounted on a railcar. P.R. 332 at cmt. 1 at 9-11.

- FRCs do not undergo further processing or physical changes when attached to or removed from railcars. P.R. 332 at cmt. 1 at 9.

The two cases Commerce cited as representative of its practice with regard to goods sold into the IMMEX program were *LWRPT from Mexico* and *Sugar from Mexico*, and these cases state Commerce's position that, when downstream manufacturers turn subject merchandise into non-subject merchandise, a finding of home market consumption is appropriate. P.R. 395 at 13. *See also* Preliminary Decision Memorandum accompanying *Agreement Suspending the Antidumping Duty Investigation on Sugar From Mexico: Preliminary Results of the Administrative Review*, 87 Fed. Reg. 932 (Dep't Commerce Jan. 7, 2022) at 8 (hereinafter *Sugar from Mexico* PDM); Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from*

19

*Mexico: Final Results of Antidumping Duty Administrative Review*, 88 Fed. Reg. 15,665 (Dep't Commerce Mar. 14, 2023) at Comment 4 at 21-23 (hereinafter LWRPT Admin. Rev. IDM).

In *Sugar from Mexico*, like ASF-K, the foreign producer at issue sold goods into the IMMEX program, and Commerce considered whether the foreign producers' sugar sales to IMMEX customers could be considered home market sales and by extension as the basis for normal value. *Sugar from Mexico* PDM at 8. Unlike in this case, sugar was manufactured into non-subject merchandise after its sale to an IMMEX customer. *Id.* The key factor in Commerce's decision was that transformation of the foreign like product into non-subject merchandise. *Id.* The current matter is easily factually distinguished.

Commerce applied its reasoning from *Sugar from Mexico* to whether home market consumption occurred based on a similar set of facts in *Light-Walled Rectangular Pipe and Tube from Mexico*. LWRPT Admin. Rev. IDM at 21-22. In *Light-Walled Rectangular Pipe and Tube from Mexico*, the foreign producer sold merchandise or parts through the IMMEX program that purchasing companies incorporated into automobiles and other industrial products prior to export. *Id.* The merchandise was considered to be consumed in the production of non-subject merchandise and was not exported in its original form. *Id.* The fact that the merchandise did not enter the United States as in scope merchandise was key to Commerce's analysis to treat the Mexican sales as home market sales. *Id.* at 22.

Plaintiffs argue that examination of whether merchandise sold into the IMMEX program by foreign producers is further processed into out of scope merchandise is not a necessary condition to a consumption analysis. Pls.' Br. at 36, ECF 36/37. However, Commerce's prior practice demonstrates that whether the merchandise is transformed into out of scope merchandise prior to export through the IMMEX program is a key element of Commerce's analysis of 'for

consumption in the exporting country' under 19 U.S.C. § 1677b(a)(1)(B)(i). In this case, there is substantial evidence contained in Commerce's Final Scope Determination that freight rail couplers sold by ASF-K into the IMMEX program were explicitly included in the scope language.

Commerce's application of the statutory language 'for consumption in the exporting country' in the context of the IMMEX program is entitled to *Skidmore* deference. Because Commerce's decision is based on the body of Commerce's prior experience and informed judgment of how consumption of the foreign like product should be understood in the context of the IMMEX program, which Commerce thoroughly considered in *Sugar from Mexico* and *Light-Walled Rectangular Pipe and Tube from Mexico,* such decision should be affirmed. *Skidmore v. Swift & Co.*, 323 U.S. at 140.

      b.    <u>Plaintiffs' Proposed Application of its Hand-Picked Definition Should be Rejected</u>

Plaintiffs argue this Court should apply a *Loper Bright* statutory interpretation analysis to Commerce's treatment of the term consumption. Pls.' Br. at 28-30, 32-35, ECF 36/37.

Plaintiffs' proposed construction of the "best" meaning of the term "consumption" is the "use of something" and Plaintiffs found that definition in a third-on-the-list definition provided by the Mirriam-Webster online dictionary. Pls.' Br. at 33, ECF 36/37. This consultation of single dictionary term is not in accordance with standard statutory construction rules. The cases Plaintiffs cite to indicate dictionaries can be used for statutory interpretation actually indicate the word's common usage, the rules of statutory construction, the entirety of the statute, and congressional intent should be considered to resolve ambiguity. Any mention of dictionary definitions in these cases merely affirms the court's understanding of the word's ordinary usage as a starting point for interpretation. *See Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 539 (Fed. Cir. 2019); *Agro Dutch Industries, Ltd. v. United States*, 508 F.3d 1024, 1031-32 (Fed. Cir. 2007)

(consulting multiple dictionary definitions and completing additional steps of statutory construction).

Plaintiffs' proposed definition should not be adopted by this Court to interpret the words "for consumption in the exporting country" in 19 U.S.C. § 1677b(a)(1)(B)(i). Indeed, applying Plaintiff's proposed definition of consumption would lead to the ridiculous result that each time a person "used" a laptop, that laptop would be "consumed." This would be a nonsensical interpretation of that word. An alternative dictionary definition for the term "consumption" is illustrative of the more common use of the term:

> **Black's Law Dictionary, (12th ed. 2024) CONSUMPTION**: "The act of destroying a thing by using it; the use of a thing in a way that exhausts it."

A full statutory interpretation analysis would include an examination of the best dictionary definition, an analysis of the statutory text and structure, and an analysis of legislative history as well as the commercial realities of the industry. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486, 126 S. Ct. 1252, 1257 (2006) (indicating "{t}he definition of words in isolation, however, is not necessarily controlling in statutory construction. A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."); *Comm. Overseeing Action for Lumber Intl. Trade Investigations or Negotiations v. United States*, 483 F. Supp. 3d 1253, 1264-71 (Ct. Int'l. Trade 2020) (applying a statutory interpretation analysis taking into consideration the statutory text, statutory structure, legislative history, and congressional acquiescence)*; Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000), *as amended on denial of reh'g and reh'g en banc* (June 20, 2000).

Plaintiffs do not offer this Court a full statutory interpretation analysis, and a *Skidmore* deference analysis should be applied to uphold Commerce's interpretation of consumption. Contrary to Plaintiffs' definition of consumption, Commerce rightly determined that consumption in the exporting country would have been the further processing of the foreign like product under consideration into out of scope merchandise prior to exportation. P.R. 395 at 12-14, 15-16; P.R. 332 at 8, 10-11.  And here in regard to the question of whether a coupler was "destroy{ed}" or "exhausted" merely by joining it on a freight rail car, Commerce noted that (1) FRCs attached to railcars in Mexico and imported into the United States were explicitly included within the scope definition; (2) record evidence (including admissions by respondents) showed freight rail couplers are not a permanent component of a railcar and are easily removable, and thus, retain their own identity even after being attached to or mounted on a railcar; and (3) FRCs did not undergo further processing or physical changes when attached to or removed from railcars. P.R. 332 cmt. 1 at 9-11. Accordingly, this Court should affirm Commerce's definition of consumption and reject Plaintiffs' incomplete statutory interpretation analysis.

Notably, in *Z.A. Sea Foods Priv. Ltd. v. United States*, 606 F. Supp. 3d 1335, 1343-44 (Ct. Int'l Trade 2022), *aff'd*, No. 2023-1469, 2024 WL 2873428 (Fed. Cir. June 7, 2024), the U.S. Court of International Trade found that a party that sought to contest a finding regarding consumption and third country sales, waived its argument that was anchored in the definition of consumption because an adequate analysis on statutory interpretation had not been made. Defendant-Intervenor submits that Plaintiffs have similarly waived their statutory interpretation argument with regard to the definition of consumption, and also with respect to the application of the knowledge test in this case because they have failed to present adequate argumentation and analysis.

      c.     <u>This Court Should Reject Plaintiffs' Argument that an Alleged Customs and Border Protection Usage in an Unrelated Context Is Relevant</u>

Plaintiffs' second proposed definition of consumption asks this Court to look to a source that would not be considered in a *Loper Bright* analysis. Plaintiffs, while claiming the proposed interpretation of the statutory term consumption is a Customs and Border Protection (hereinafter "CBP") definition of the term, are actually citing to a memorandum to file written in March 2023 by a Commerce official following two video calls with CBP about scope administrability concerns. Pls.' Br. at 34, ECF 36/37; P.R. 222. The language used in the memorandum is not in relation to the meaning of "for consumption in the exporting country" under 19 U.S.C. § 1677b(a)(1)(B)(i). Commerce reasonably rejected Plaintiffs' reliance on supposed Customs and Border Protection language, stating the following:

> With regard to CBP, Commerce consulted CBP to evaluate certain disputed scope language, particularly language related to couplers entering as instruments of international traffic, a term specific to customs law. CBP's clarification of these issues, however, is based on how CBP evaluates entries of subject merchandise into the United States under its controlling laws and regulations. What is pertinent to this question of consumption in home market are the antidumping laws which Commerce administers, and as noted above, Commerce has made a final scope determination that freight rail couplers attached to railcars remain a distinct article of commerce and are within the scope of the investigations." P.R. 395 at 13-14.

In summary, Plaintiffs are asking this Court to apply a definition of consumption that CBP did not use and is not offered with respect to the meaning of 19 U.S.C. § 1677b(a)(1)(B)(i). Commerce made a reasonable, rational decision not to do so, which is supported by substantial evidence and in accordance with the law. In summary, Plaintiffs have submitted to this Court that a different agency's interpretation as to a different issue should be binding on Commerce's interpretation of its governing statute.

**C.      Commerce's Decision Not to Treat ASF-K's Sales of FRCs to OEMs in Mexico as U.S. Sales is Supported by Substantial Evidence and in Accordance with the Law**

In its Final IDM, Commerce determined ASF-K's sales to Mexican OEMs through the IMMEX program were not U.S. sales. P.R. 395 at 17. Before this Court, Plaintiffs advance the same argument they made in their Case Brief before Commerce, claiming it does not seem logical to treat ASF-K's sales to OEMs in Mexico through the IMMEX program as neither home market sales, nor export sales to the United States. Pls.' Br. at 43, ECF 36/37. Plaintiffs appear to be simultaneously arguing that, while they do not know where couplers are actually destined, that, if the freight rail couplers are not consumed in the Mexican home market, they must then be exported to the United States. Pls.' Br. at 38-41, 43-44, ECF 36/37. This is all the odder in light of ASF-K's significant and documented exports to Canada, the actual comparison market used by Commerce.

In this appeal, Plaintiffs have not put forward any arguments as to why Commerce's decision is unsupported by substantial evidence or not in accordance with the law, aside from making some statutory citations without developing an argument with regard to their application. Pls.' Br. at 43-44 (ECF 36/37). Consequently, this Court should affirm Commerce's determination that, consistent with Plaintiffs' concession that they do not know the ultimate country of export of the products, the sales into IMMEX program are not known to be U.S. sales.

**D.      Commerce's Decision to Decline to Consider the Conflict-of-Interest Claims Raised by Plaintiffs was In Accordance with the Law**

As discussed below, Commerce's decision not to make a decision on ARC's meritless conflict-of-interest claim was in accordance with the law.

1.     **Commerce's Decision Not to Adjudicate ARC's Conflict-of-Interest Claim was in Accordance with the Law**

a.     Commerce Does not Adjudicate Issues Pursuant to Bar Rules

On October 18, 2022, Commerce issued a response to Plaintiffs' conflict-of-interests claim, which indicated as follows: "Commerce does not consider it appropriate to address the ethical questions raised by Amsted's filings at this time" and identified 19 C.F.R. § 351.313 and its regulatory preamble as the applicable regulation.  P.R. 78 at 2. *See Regulation Strengthening Accountability of Attorneys and Non-Attorney Representatives Appearing Before the Department*, 78 Fed. Reg. 22,773 (Dep't Commerce Apr. 17, 2013) (providing the preamble and publishing the rule 19 C.F.R. § 351.313). 19 C.F.R. § 351.313 states the following:

> Any attorney or representative practicing before the Department, or desiring so to practice, may for good cause shown be suspended or barred from practicing before the Department, or have imposed on him such lesser sanctions (e.g., public or private reprimand) as the Secretary deems appropriate, but only after he has been accorded an opportunity to present his views in the matter.

Commerce referenced the regulatory preamble, which provides some examples of what would constitute good cause shown[5] and also indicates items that are not covered by the rule, including conflict-of-interest issues under Bar rules.  P.R. 78 at 2; P.R. 395 at 23.

With respect to ethical conflicts, the regulatory preamble of 19 C.F.R § 351.313 explicitly states the rule is not intended to cover ethical conflicts uniquely within the province of local Bar authorities. The regulatory preamble further states the Department will not consider claims that a former law firm lawyer is representing a new client whose interest conflicts with the attorneys'

---

[5] The regulatory preamble to 19 C.F.R. § 351.313 states that "the Department can identify, however, certain conduct by attorneys and non-attorney representatives that directly affects the integrity of the proceedings and that would be considered improper.  Clearly improper conduct includes, but is not limited to, knowingly providing incorrect information to the agency; knowingly making misrepresentations of fact or law; knowingly making false accusations in a proceeding; failing to engage in reasonable diligence including failure to exercise such diligence in the preparation and/or review of submissions; and assisting an attorney or non-attorney representative who had been suspended or disbarred from practicing before Commerce during such disbarment or suspension to work on matters pending before the agencies."  Amsted did not make any allegations of misconduct as provided for in the preamble to the regulation.

former clients. In its Final IDM, Commerce affirmed its decision not to make a decision on ARC's conflict-of-interest claim, indicating that "{c}onsistent with this rule, Commerce has historically declined to intervene in disagreements over conflicts of interest between attorneys and clients." P.R. 395 at 23. Commerce's regulation, 19 C.F.R § 351.313, and its preamble, cited above, are very clear and unambiguous: Commerce does not adjudicate conflict-of-interest issues arising under bar rules.

Commerce's decision not to consider ARC's conflict-of-interest allegations is consistent with the approach that Commerce has taken previously. *See* Issues and Decision Memorandum accompanying *Ripe Olives From Spain: Final Results of Antidumping Duty Administrative Review, 2018-2019*, 86 Fed. Reg. 35,068 (Dep't Commerce July 1, 2021), Comment 3 at 60. In that case, Commerce explicitly stated the conflict of interest was "not a matter for Commerce to resolve because Commerce is not an appropriate tribunal for resolving allegations of professional misconduct by DC Bar members." *Id.* Commerce indicated in its Final IDM that the case Plaintiffs cite in support of their position that a conflict of interest should be found, *Silicon Metal from Kazakhstan*,[6] is not in and of itself enough to establish a practice contrary to *Ripe Olives From Spain.* P.R. 395 at 23; Pls.' Br. at 21, ECF 36/37.

Plaintiffs, in this appeal, challenge Commerce's interpretation of 19 C.F.R. § 351.313 by questioning Commerce's reference to the regulatory preamble. Pls.' Br. 24-25, ECF 36/37. However, the cases Plaintiffs cite actually lend support to Commerce's application of the preamble to 19 C.F.R. § 351.313. First, the regulatory preamble under consideration in *Peabody Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 746 F.3d 1119, 1126-27 (9th Cir. 2014) was deemed

---

[6] *See* Memorandum to the File from Senior Commerce Trade Analyst, *Silicon Metal from the Republic of Kazakhstan: Representation of Tau-Ken Temir LLP by Squire Patton Boggs*, Inv. No. C-834-811 (Oct. 6, 2020). The CFCP notes that Commerce found no conflict of interest because the investigations at issue were not substantially related.

consistent with the regulation, and the Court considered it properly applied to aid in "achieving a general understanding of the statute." (internal citation omitted). In addition, in *Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 998 (10th Cir. 2019), the Court acknowledged a preamble can inform interpretation of a regulation.

Additionally, Plaintiffs' attempt to dilute the relevancy of Commerce's citation to *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) is unavailing. Pls.' Br. at 24, ECF 36/37. *Wyoming Outdoor Council*, 165 F.3d at 53, stands for the proposition that "{a}lthough the preamble does not 'control' the meaning of a regulation, it may serve as a source of evidence concerning contemporaneous agency intent." In *Wyoming Outdoor Council* the preamble was, however, ambiguous and, like the regulation, subject to multiple interpretations. *Id.* at 53-54. In its analysis, the Court credited a plausible interpretation of the preamble's language consistent with the procedures followed by the agency in question. *Id.* at 54. Here, the Preamble to 19 C.F.R § 351.313 is both clear and consistent with Commerce's regulation and there is no regulatory ambiguity. Commerce acted in accordance with the law when it applied the plain meaning of 19 C.F.R § 351.313 and its preamble.

Plaintiffs refer to *Loper Bright* and the overruled *Chevron* doctrine, which relate to statutory interpretation and not to regulatory interpretation. Plaintiffs incorrectly imply that those cases are relevant to this Court's review of Commerce's interpretation of its own unambiguous regulation. Pls.' Br. at 25, ECF 36/37. If 19 C.F.R § 351.313 were considered to be ambiguous, the applicable cases this Court would refer to with regard to agency's interpretation of its regulations are as follows: *Auer v. Robbins*, 519 U.S. 452, 461 (1997)[7] and *Kisor v. Wilkie*, 588 U.S. 558, 574-580 (2019). *Aurer* stands for the proposition that courts should defer to an agency's

---

[7] *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 52 (D.C. Cir. 1999) has a similar holding to the operative Supreme Court decision on deference to agency's interpretations of their own regulations.

interpretation of its regulations unless it is plainly erroneous. *Auer*, 519 U.S. at 461. *Kisor* provided some precisions on the application of *Auer*, stating that it applies in the context of ambiguous regulations. *Kisor*, 588 U.S. at 574. The preamble of 19 C.F.R. § 351.313 could not be clearer as to this matter – Commerce will not adjudicate claims that a "former law firm lawyer is representing a new client whose interest conflicts with the attorney's former clients." Commerce acted consistently with its explicit regulatory preamble and was in accordance with the law.

> b.  Agencies are Not Required to Make Findings Outside of Their Area of Expertise

Commerce further justified its determination that it does not make conflict-of-interest determinations, based on 19 C.F.R. § 351.313 and the application of the regulatory preamble, on the basis it is not "an expert in the complex area of conflict-of-interest rules." P.R. 395 at 23. Commerce continued to state that "{t}he local Bar authority is in the best position to determine whether or not an ethical breach is occurring or has occurred under its ethics rules. Therefore, it is not appropriate for Commerce to entertain motions to disqualify attorneys based on local alleged conflicts of interest." *Id.* Commerce's explanation in its determination that it lacks expertise in conflict-of-interest issues further supports that its decision is in accordance with the law.

As noted above, Commerce's decision was justified in part by its determination that conflict-of-interest rules are outside its area of expertise. P.R. 395 at 23. The CFCP addressed this issue in its Rebuttal Brief indicating that "{w}hile Commerce has the authority to regulate the professionals that practice before it, the preamble 19 C.F.R. § 351.313 has carved out professional ethics questions, specifically citing conflict-of-interest issues as outside Commerce's competence and within the special expertise of local bar authorities." P.R. 389 at 36, C.R. 352 at 36. While *Amsted* discusses issues relating to Commerce's expertise in conflict-of-interest issues in its Memorandum of Law, it did not exhaust those argument in the proceedings below and Plaintiffs

did not advance this argument before the agency, it should be deemed waived for purposes of the current appeal.

Regardless of the issue of failure to exhaust, Plaintiffs incorrectly argue that Commerce makes decisions in areas outside of its core expertise by citing a case in which the U.S. Court of International Trade decided an issue related to a method of adjusting a U.S. price factor based on a Japanese commodity tax. This involved a method of calculation related to antidumping, an issue that squarely falls within Commerce's expertise. *Zenith Elecs. Corp. v. United States*, 14 CIT 831, 851-52, 755 F. Supp. 397, 416-17 (1990), aff'd, 988 F.2d 1573 (Fed. Cir. 1993). Contrary to Plaintiffs' claims, *Zenith Elecs. Corp.* is not evidence that Commerce is required to make decisions outside of its area of expertise. Pls.' Brief at 22, ECF 36/37.

Plaintiffs argue many agencies have adopted attorney ethics rules, however, according to the source cited by Plaintiffs, "which agencies include which rules varies significantly, with no readily apparent pattern." Pls.' Br. at 22, ECF 36/37 (citing George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963, 1979 (April 2016)). Further, Plaintiffs ignore that no agency has adopted the Model Rules of Professional Conduct in full. *Id.* Indeed, "{a} number of other topics covered by the Model Rules appear in the rules of no more than four agencies, including . . . successive conflicts of interest . . . ." *Id.*, *Laws of Agency Lawyering* at 1981 (emphasis added).

Plaintiffs provide examples of agencies that have adopted attorney ethics rules and focus their observations to standards of professional conduct for attorneys appearing and practicing before the SEC in the representation of an issuer. The standards do not concern conflict-of-interest issues, do not cover general attorney ethics issues, and instead primarily address how attorneys should report certain material violations of United States federal or state securities laws by specified individuals, including the officers of the issuer the attorney represents. *See* 17 C.F.R.

§ 205.1-205.7; Pls.' Br. at 22, ECF 36/37. Plaintiffs also cite the rules appearing in the Uniform Rules of Practice and Procedure before the Comptroller of Currency in the Department of Treasury, which do have conflict-of-interest rules but apply only to certain adjudicatory proceedings conducted on the record after the opportunity for a hearing under certain statutory provisions (*see* 12 C.F.R. § 19.1). Pls.' Br. at 22, ECF 36/37. The fact that Plaintiffs can discuss various attorney ethics rules and other rules of attorney conduct applicable in limited contexts before other agencies does not support the conclusion that Commerce must act outside the scope of its expertise (and in direct violation of its own regulations).

In summary, when Commerce declines to act outside its expertise and, as in this case, makes decisions in accordance with its applicable regulation, 19 C.F.R. § 351.313 and the regulatory preamble thereto, Commerce acts in accordance with the law.

### 2. The Context of ARC's Frivolous Ethical Allegation is a Relevant Consideration in This Case

It is respectfully submitted that the frivolous nature of ARC's allegations is a relevant consideration for this Court.[8]

As an initial matter, the U.S. Supreme Court has been clear that it is a matter within the discretion of an agency to take certain enforcement actions and such decisions are presumed to be immune from judicial review. *See Heckler v. Chaney*, 470 U.S. 821 (1985) (holding that under § 701(a)(2) of the APA, judicial review of an administrative agency's decision is not to be had if

---

[8]  To the extent that the Court deems it relevant, it is recalled that the related interlocutory appeals involved an additional allegation by Amsted of a violation of the agency's protective order. Amended Complaint, *Amsted Rail Company Inc. et al. v. U.S. Dep't Commerce*, CIT Case No. 22-00316 (Ct. Int'l Trade November 18, 2022) at ¶¶ 94-100, ¶¶ 94-100; Amended Complaint, *Amsted Rail Company Inc. v. U.S. Int'l Trade Comm'n*, CIT Case No 22-307 (Ct. Int'l Trade Oct. 24, 2022) at ¶¶ 100-108. Despite this serious allegation of ethical misconduct, counsel to Amsted ultimately conceded that they did not actually have any evidence regarding any information that was allegedly compromised. *Amsted Rail Co., Inc. v. United States Int'l Trade Comm'n*, 600 F. Supp. 3d 1308, 1316 (Ct. Int'l Trade 2022), *appeal dismissed*, No. 2023-1355, 2023 WL 4346710 (Fed. Cir. July 5, 2023).

the statute in question is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion). In such a case, the statute can be taken to have "committed" the decision-making to the agency's judgment absolutely. An agency's decision not to take enforcement action is presumed immune from judicial review under § 701(a)(2). Such a decision has traditionally been "committed to agency discretion," and it does not appear that Congress, in enacting the APA, intended to alter that tradition. Accordingly, such a decision is unreviewable unless Congress has indicated an intent to circumscribe agency enforcement. *See also Torrington Co. v. United States*, 15 CIT 456, 460, 772 F. Supp. 1284, 1288 (1991) (indicating Commerce may decline to initiate certain investigations that are "clearly frivolous").

It is respectfully submitted that Amsted's claims are so meritless as to both the facts and the law as to further support an affirmation of Commerce's actions below. A very brief review of the relevant facts is provided below for the Court's consideration. In addition to the fact that the antidumping law is wholly silent to conflict-of-interest issue but consistent with *Chaney,* agencies are not required to investigate every claim brought before them, particularly if those claims lack merit.[9]

First and indisputably, ASF-K was never the Attorney's client. As all parties agree, in regard to the previous representation, and [



                                                                                    ]. P.R. 77 at Exhibit 1, C.R. 55

---

[9] "'{A}n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

at Exhibit 1; P.R. 389 at 30-31, C.R. 352 at 30-31. ASF-K was the identified mandatory respondent in Commerce's Mexico antidumping investigation. No party to this investigation has alleged that ASF-K was a current or former client of the Attorney who is the target of Plaintiffs' disqualification request. Indeed, the engagement letter explicitly stated [

]. P.R. 74 at Exhibit 2, C.R. 52/53 at Exhibit 2.

In order for there to be a conflict with a former client, there must first be a former client. Here, ASF-K, the company covered by the decision on appeal, was never a former client. ARC and ASF-K are two distinct entities, and the previous representation was limited to ARC [

]. P.R. 77 at Exhibit 1; C.R. 55 at Exhibit 1. It is well established that representation of one corporate entity does not create an attorney-client relationship with another corporate entity, even if they are related. P.R. 77 at 3 n. 4 and Exhibit 2, C.R. 55 at 3 n.4 and Exhibit 2 (citing D.C. Bar Rules of Professional Conduct Rule 1.7 Comment 21; ABA Comm'n on Ethics 7 Prof'l Responsibility, Formal Op. 390 (1995)). Specifically, under the Bar rules ". . . the specific entity represented by the lawyer is the 'client.'" *Id.* Ordinarily that client's affiliates (parent and subsidiaries), other stockholders and owners, partners, members, etc. are not considered to be clients of the lawyer. *Id.* As a result, the decision on appeal is in regard to the dumping margin assigned to ASF-K; however, as all parties concede, the company was never a client, and as such there can be no conflict with a former client.

Second, there can be no conflict of interest in that there has been no change in the objective of the representation. As even ARC concedes, the retainer letter explicitly stated:

[

]. *See* P.R. 74 at Exhibit 2, C.R. 52/53 at Exhibit 2; P.R. 384 at 21, C.R. 350 at 21.

The purpose of the representation did not change – in effect, the Coalition was represented for the purpose of obtaining relief for U.S. manufacturers who were being injured as a result of unfairly priced imports. P.R. 389 at 43; C.R. 352 at 43. ASF-K's is now subject to an antidumping order but the fact that this may affect an affiliated entity is not sufficient to create an adverse position under well-established principles of legal ethics. Adverseness must be to the actual former client and be material and direct; material adverseness does not include situations where representation is merely harmful to another entity's economic or financial interests "without some specific tangible direct harm." *Id.*; P.R. 77 at 5 and Exhibit 2 (ABA Formal Op. 95-390); C.R. 55 at 5 at Exhibit 2 (ABA Formal Op. 95-390).[10]  As importantly, there has been no positional change by counsel or the Coalition. The purpose of the representation, as clearly stated in the engagement letter, was to pursue relief for the domestic industry including through antidumping and/or countervailing duty proceedings.  P.R. 74 at Exhibit 2, C.R. 52/53 at Exhibit 2. ARC joined the petitioning Coalition for approximately four (4) days, then dropped out of the Coalition, and then claims a conflict, when the objective of the representation remained the same.  This is not a meritorious argument for disqualification.  P.R. 389 at 43-44, C.R. 352 at 43-44. At most, ARC has created a "thrust upon" conflict as the work performed for the Coalition is still 100% consistent with the purpose of the engagement, in effect to pursue antidumping and countervailing duty claims on behalf of the domestic industry.  *Id.* at 44.  *See, e.g.*, *Kempner v. Oppenheimer & Co.*,

---

[10] Amsted incorrectly likens Commerce's investigation to a litigation as if the Petitioner and ASF-K are on either side of the "v", but the reality is that the Petitioner and ASF-K are parties to a government investigation and there is no "v" as in a litigation before a Court.

*Inc.*, 662 F. Supp. 1271, 1277-1278 (S.D.N.Y 1987) (indicating that, when co-clients in an action have interests that become adverse during the course of the action, there is no basis for disqualification when it is the client and not the attorney who has changed position); *Allegaert v. Perot*, 565 F.2d 246, 249-251 (2nd Cir. 1977); *Bd. of Regents of Univ. of Nebraska v. BASF Corp.*, No. 4:04CV3356, 2006 WL 2385363, at \*1-\*6, \*10-\*12 (D. Neb. Aug. 17, 2006). For ARC to now allege a conflict when there has been no change in the objective of the representation is beyond nonsensical.

Third, the Predecessor Investigation and the Current Investigation are not substantially related and for that reason there also cannot be a conflict-of-interest under the D.C. Bar Rules of Professional Conduct. The only case law on the question of whether two antidumping matters are "substantially related" for purposes of a conflict analysis further undercuts Plaintiffs' arguments. *GEO Specialty Chemical, Inc. v. Husisian*, 951 F. Supp. 2d 32, 42-43 (D.D.C. 2013), specifically addresses the issue of whether two antidumping proceedings are substantially related. The U.S. District Court for the District of Columbia found that the two antidumping related proceedings, involving the same product from the same country and arising from the same investigation, were not substantially related:

> {E}ach Commerce Department review or proceeding . . . is its own 'administrative proceeding, . . . claim, {or} investigation' and therefore qualifies as its own 'matter.' . . . It would be contrary to this definition, not to mention common sense, for this Court to lump together every glycine review that has occurred in the past eighteen years and that occurs indefinitely into the future simply because they deal with the same general matter under the same administrative I.D. number. *Id.* at 43.

The Court in *GEO Specialty Chemical* found that the two matters that were connected to the very <u>same</u> antidumping investigation were not "substantially related." Here, and as previously indicated, the Predecessor Investigation and the Current Investigation are different cases, with

different records, different countries, different scopes, and different parties; in other words, they are considerably <u>less</u> related than in the facts from *GEO*.[11]

Fourth, the engagement agreement between ARC and counsel contained an explicit advance waiver of conflict of interest on the part of ARC (the actual former client), including an agreement to waive all current or future conflicts with respect to antidumping, countervailing duty, and other trade remedy investigations <u>and an agreement not to seek disqualification</u> in that respect.[12]  P.R. 74 at Exhibit 2, C.R. 52/53 at Exhibit 2.  D.C. Bar Ethics Opinion 317 indicates that, if a client's waiver of his lawyer's conflict of interest has been relied upon by another client or the lawyer, the client's subsequent change of heart as to the waiver will not restore those involved to the *status quo ante*. P.R. 77 at 8 and Exhibit 5 (D.C. Bar Ethics Opinion 317 at 1-2), C.R. 55 at 8 and Exhibit 5 (D.C. Bar Ethics Opinion 317 at 1-2). Accordingly, there was a waiver of conflicts, an agreement not to seek disqualification, and a reliance by both counsel and the Petitioner in this matter as to those waivers.

The rationale behind the reliance provision is logical: it would be inequitable to allow a company such as ARC that signed a written waiver of conflicts, which was relied upon in good faith by the Coalition and counsel (as seen in the filing of the petition), to then retract its consent after such good faith reliance.[13] Of course, this is exactly what ARC is attempting to do in the

---

[11] Plaintiffs relied on a case involving an antidumping and a 337 investigation, *Makita Corp. v. United States*, 17 CIT 240, 819 F. Supp. 1099 (1993).  *See* Pls. Brief at 16-17; P.R. 384 at 35, 38-40, C.R. 350 at 35, 38-40.  In contrast to the allegations in the Makita case, Plaintiffs failed to provide evidence that would justify departing from the GEO standard.  Indeed, the CIT has already examined Plaintiffs' reliance on this case, declining to adopt Plaintiffs' "overly broad" reading of that case, noting that the facts in Makita were "vastly different from the facts here," and that "{m}ost notably, the Makita plaintiffs had furnished affidavits and live testimony that detailed the precise nature of the information that the potentially conflicted attorney had acquired."  *See Amsted Rail Co., Inc. v. United States Int'l Trade Comm'n*, 600 F. Supp. 3d 1308, 1326-1327 (Ct. Int'l Trade 2022), appeal dismissed, No. 2023-1355, 2023 WL 4346710 (Fed. Cir. July 5, 2023).  In comparison, the Court noted that Amsted's allegations were "too threadbare." *Id.* at 1327.
[12] It should be noted that, consistent with ABA Formal Opinion Op 21-497, ". . . even if the current and prior matters are 'substantially related'" and there is materially adverseness, a written waiver is enforceable.  *See* P.R. 77 at Exhibit 4, p. 5 ; C.R. 55 at Exhibit 4, p. 5.
[13] Reliance can include investment of substantial time, money and effort in the representation of another affected

present matter, which is impermissible consistent with ethics guidance from the D.C. Bar. *See* P.R. 77 at Exhibit 5; C.R. 55 at Exhibit 5.[14]

Fifth, in the Predecessor Investigation, ARC was a member of the petitioning Coalition. Because ARC and McConway & Torley LLC accepted participation in a joint representation, confidentiality was waived as between these co-clients and, consequently, no conflict can arise as a result of the use by one co-client of information shared in the representation. *See generally* P.R. 77 at 5, C.R. 55 at 5; P.R. 389 at 46-47, C.R. 352 at 46-47; *See also Hall CA-NV, LLC v. Ladera Dev., LLC*, No. 318CV00124RCJWGC, 2020 WL 1033560, at *2 (D. Nev. Mar. 2, 2020) (indicating that the Restatement (Third) of the Law Governing Lawyers § 75 in comment c-d states that "{i}n a subsequent proceeding in which former co-clients are adverse, one of them may not invoke the attorney-client privilege against the other with respect to communications involving either of them during the co-client relationship. That rule applies whether or not the co-client's communication had been disclosed to the other during the co-client representation, unless they had otherwise agreed."). Indeed, the D.C. Bar has recognized that *the prevailing rule is that, as between commonly represented clients, the privilege does not attach. Hence, it must be assumed that if litigation eventuates between clients, the privilege will not protect such communications*. P.R. 77 at 5, C.R. 55 at 5. Accordingly, the information shared in a joint representation cannot serve as a basis for a conflict claim.

Sixth, Plaintiffs allege they have been harmed by the Coalition's use of its BPI obtained prior to the filing of the Petition in the Predecessor Investigation. Pls.' Br. at 16-17, ECF 36/37.

---

client, the disclosure of confidential information to the lawyer by the other client, and the development of a relationship of trust between the lawyer and the other client.
[14] Plaintiffs allege that the conflict-of-interest waiver was limited [                    ]. Pls.' Br. at 9, ECF 36/37.  Plaintiffs' position is without merit because conflict-of-interest waivers may travel with an attorney when he or she changes law firms. *See In re Shared Memory Graphics LLC*, 659 F.3d 1336, 1339, 1341-1342 (Fed. Cir. 2011).

Plaintiffs' allegations are anchored in the scope definition and other information that is clearly in the public domain. Pls.' Br. at 8, ECF 36/37. The scope from the Predecessor Investigation was already in the public domain at the time of the filing of the current case. In addition, ARC has not identified <u>any</u> specific confidential information or even what category of confidential information it shared prior to the Predecessor Investigation that was used in Commerce's investigation. Not only are Plaintiffs advancing arguments that are directly contradicted by relevant legal authority, but they continue to make unfounded allegations that are not substantiated by evidence. And even if ARC had identified any such information (which it did not), its engagement agreement specifically provided that [

]. P.R. 74 at Exhibit 2; C.R. 52/53 at Exhibit 2. [15]

Lastly, Plaintiffs' request for relief further supports that its arguments are meritless. Rather than request a remand for reconsideration by the agency, Plaintiffs have requested this Court overturn Commerce's decision and require the agency to conduct the investigation again. Pls.' Br. at 26-27, ECF 36/37. In Plaintiff's Prayer for Relief, it indicates that its request is rather for the Court to "dismiss the petition and terminate the investigation" (even though the investigation at issue is obviously already concluded). Clearly established Federal Circuit case law indicates the

---

[15] It should be noted that the underlying investigation at Commerce was not an adversarial proceeding and full procedural due process rights do not attach in antidumping investigations. In cases in which this has been analyzed, the process that is due is set forth in the antidumping statute or the agency regulations implementing the statute. *Gulf States Tube Div. of Quanex Corp. v. United States*, 21 CIT 1013, 1039, 981 F. Supp. 630, 652 (1997). In addition, contrary to Plaintiffs' insinuations, Commerce does not hold itself out as quasi-judicial. The case that Plaintiffs cite to support their assertion that Commerce acts in a quasi-judicial capacity does not explicitly so state; Commerce's procedures as described in *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1381 (Fed. Cir. 2001) are some of same procedures that have been explicitly identified as investigatory by this Court. *See e.g. NEC Corp. v. U.S. Dep't of Com.*, 21 CIT 933, 948, 978 F. Supp. 314, 329 (Ct. Int'l Trade 1997), aff'd sub nom. *NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998) (stating that antidumping proceedings are not adjudicatory but are investigatory, thereafter describing some aspects of Commerce's procedures (including that there is an opportunity for judicial review of Commerce's final determination), and citing legislative history indicating that administrative proceedings under Title VII of the Tariff Act of 1930 are investigatory); *see also* S. Rep. No. 96–249 at 100 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381.

U.S. Court of International Trade can remand agency decisions for redetermination but should not require or direct agencies to reach any specific conclusion. *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1231,1238 (Fed. Cir. 2022); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 515 F.3d 1372, 1383-85 (Fed. Cir. 2008); *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381-82 (Fed. Cir. 2003). Plaintiffs are thus asking for relief both unwarranted by the facts and also contrary to judicial review standards.

It has been well established for quite some time that disqualification motions have become increasingly popular tools of the litigation process and which can be weaponized for strategic purposes.  See e.g.  *Laker Airways Ltd. v. Pan Am. World Airways*, 103 F.R.D. 22, 41 (D.D.C. 1984).  It is respectfully submitted that Plaintiff's arguments as to this matter are frivolous as seen in their lack of both factual and legal support, and accordingly should not serve as a basis for remand.

## VI.    <u>CONCLUSION</u>

For the reasons discussed above, Defendant-Intervenor respectfully requests this Court hold that Commerce's *Final Determination* is supported by substantial evidence and in accordance with the law.

Respectfully submitted,

By: */s/ Daniel B. Pickard*
Daniel B. Pickard, Esq.
Amanda L. Wetzel, Esq.
Claire M. Webster, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
*Counsel to Coalition of Freight Coupler Producers*